UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

Thomson-Shore, Inc

Debtor.

_____ /

Case No. 19-44343-tjt
Chapter 11
Hon. Thomas J. Tucker

## COVER SHEET FOR FIRST DAY MOTION TO USE CASH COLLATERAL OR TO OBTAIN CREDIT

The debtor has filed a motion to use cash collateral or to obtain postpetition financing, which is attached to this Cover Sheet. In accordance with LBR 4001-2(b) (E.D.M.), the debtor has identified below, by page and paragraph number, the location in the proposed order accompanying the motion of each of the following provisions:

| Provision | Containd in Proposed Order | Location in Proposed Order |
|---|---|---|
| (1) Provisions that grant liens on the estate's claims and causes of action arising under Chapter 5 of the Code. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |

| | | |
|---|---|---|
| (2) Provisions that grant cross-collateralization protection to the prepetition secured creditor (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the secured party's lien prepetition) other than liens granted solely as adequate protection against diminution in value of a prepetition creditor's collateral. | _____ Yes<br><br>__X___ No | Page ____, ¶ ____ |
| (3) Provisions that establish a procedure or conditions for relief from the automatic stay. | X____ Yes<br><br>_____ No | Page 11, ¶12 |
| (4) Provisions regarding the validity or perfection of a secured creditor's prepetition liens or that release claims against a secured creditor. | _____ Yes<br><br>__X___ No | Page ____, ¶ ____ |
| (5) Provisions that prime any lien without that lienholder's consent. | _____ Yes<br>__X___ No | Page ____, ¶ ____ |
| (6) Provisions that relate to a sale of substantially all of the debtor's assets. | _____ Yes<br>__X___ No | Page ____, ¶ ____ |
| (7) Provisions for the payment of professional fees of the debtor or any committees, including any carve-outs for such payments. | __X___ Yes<br><br>_____ No | Page 7, ¶ 7<br>Page 9, ¶8b<br>Page 9, ¶9 |
| (8) Provisions for the payment of prepetition debt. | _____ Yes<br>__X___ No | Page ____, ¶ ____ |

| | | |
|---|---|---|
| (9) Provisions that waive the debtor's exclusive right to file or solicit acceptances of a plan during the time periods specified in 11 U.S.C. § 1121. | _____ Yes<br>__X__ No | Page ____, ¶ ____ |
| (10) Provisions that require the debtor's plan to be on terms acceptable to the secured creditor. | _____ Yes<br>__X__ No | Page ____, ¶ ____ |
| (11) Provisions that require or prohibit specific terms in the debtor's plan. | _____ Yes<br>__X__ No | Page ____, ¶ ____ |

| | | |
|---|---|---|
| (12) Provisions establishing that proposing a plan inconsistent with the order constitutes a default. | _____ Yes<br>___X___ No | Page _____, ¶ _____ |
| (13) Provisions that waive surcharge under 11 U.S.C. § 506(c). | __x___ Yes<br>_____ No | Page 10, ¶ 10 |
| (14) Provisions that address the rights and obligations of guarantors or co-obligors. | _____ Yes<br>___X___ No | Page _____, ¶ _____ |
| (15) Provisions that prohibit the debtor from seeking approval to use cash collateral without the secured creditor's consent. | _____ Yes<br>___X___ No | Page _____, ¶ _____ |
| (16) Provisions that purport to bind a subsequent trustee. | _____ Yes<br>___X___ No | Page _____, ¶ _____ |
| (17) Provisions that obligate the debtor to pay any of a secured creditor's professional fees. | _____ Yes<br>___X___ No | Page _____, ¶ _____ |

GOLDSTEIN, BERSHAD,& FRIED, P.C.

By: /s/ Scott M. Kwiatkowski
Scott M. Kwiatkowski (P67871)
Attorneys for Debtors
4000 Town Center, Suite 1200
Southfield, Michigan 48075
(248) 355-5300
scott@bk-lawyer.net

Dated: March 25, 2019

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISON

In Re: Thomson-Shore, Inc.

Case No. 19-44343-tjt

Chapter 11

Debtor.

Hon: Thomas J. Tucker

_____/

## FIRST DAY MOTION FOR ENTRY OF ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, AND(II) SCHEDULING A FINAL HEARING

Thomson-Shore, Inc. ("Debtor"), needs the financing requested in this Motion to stave off an imminent liquidation.   The proposed lender is the only potential source of financing the Debtor has located after an extensive search. The Debtor has entered into a financing agreement with Crestmark Bank to continue financing receivables; however, that funding alone is not sufficient to bridge the gap to the sale of the Debtor's assets.

The financing is expected to provide the Debtor a bridge to a sale to the DIP Lender or a third party that submits the highest and best bid.   Simply put, without immediate approval of this financing the Debtor will cease operation and the value of a going concern will be lost.

Debtor moves, therefore, under 11 U.S.C. §§ 105, 362, 363 and 364, Fed. R. Bankr. P. 2002, 4001 and 9014 and E.D. Mich. LBR 4001-2, 4001-3 and 9013 for the entry of an order, in the form attached as Exhibit A ("Interim

superpriority financing from CJK Group Inc. ("DIP Lender") on an interim and final basis, all as described in the DIP Loan Agreement attached as <u>Exhibit B hereto</u> ("DIP Loan Agreement") and in the proposed Interim Order.

In support of this Motion, (a) the Debtor incorporates (i) the Declaration of Peter Shima in Support of Chapter 11 Filings ("Shima Declaration"), which is being filed simultaneously with the filing of this Motion; (b) the Debtor respectfully states:

## JURISIDCATION AND VENUE

1.  The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.  This is a core proceeding under 28 U.S.C. § 157(b).

3.  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.  The Debtor commenced a voluntary case under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") on March 25, 2019 ("Petition Date").

5.  The Debtor is continuing possession of its property and is operating and managing its business as a debtor-in-possession under 11 U.S.C. §§ 1107(a) and 1108.

6.  No trustee, examiner or official committee of unsecured creditors has been appointed in this Chapter 11 case.

7. The principal legal basis for the relief requested in this Motion are §§ 105, 362, 363 and 364 of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, E.D. Mich. LBR 4001-2 and 9014 and applicable case law.

**A. Description of Debtor's Business**

8. The Debtor was founded in 1972 and is located in Dexter, Michigan USA, The Debtor is a 100 percent employee-owned full service book manufacturing, printing, publishing, production and distribution company. The Debtor specializes in fulfilling the needs of book publishers, from an author's initial Word document to the end reader. The business solutions span the entire publishing supply chain. Publishers of all types and sizes (authors, self publishers, independent publishers, trade, religious and university) benefit from the following services: short to medium run digital and offset book printing, case and perfect binding, layout and design, editorial review, ISBN acquisition, E-book conversion, marketing and full service trade distribution and fulfillment.

9. The Debtor currently has approximately 180 employees and grosses approximately $2 million per month.

10. Prior to 2008, the Debtor had been in excellent financial condition, and made the decision to retool the business at a cost of roughly $10 million, resulting in taking on more debt than usual. Profitability declined as increased scale in operations was not fully utilized through higher sales, buying power for paper materials suffered due to lower volume purchases from the Debtor's vendors, and finally, several key events occurred which impacted

the Debtor's financial stability and ultimately forced the need for a bankruptcy filing.

11. The Debtor made substantial efforts over the last five years to diversify products and services, introducing color text printing, digital printing, printing on light weight paper, specialty hand binding, distribution and publishing services; however, none of these services could offset the economic forces affecting the industry, along with unanticipated negative events the Debtor has been unable to overcome.

12. In November 2017, the Debtor was the victim of a cyber ransome-ware attack which completely shut down the information system. All aspects of the Debtor were severely impacted and production significantly declined, resulting in six figure losses.

13. In June 2018, a major competitor was forced into liquidation due to the unfavorable industry trends. The Debtor was unable to capitalize on this event and gain greater profitability.

14. The Debtor sought continued support for increased liquidity from its current banking relationship and alternative funding sources, but was unable to raise enough capital to offset the liquidity crisis. The Debtor hired an outside financial consultant in the fourth quarter of 2018 to develop an emergency turnaround plan and review strategic options for the Debtor. Further, the Debtor initiated solicitations of interest in purchasing it and over 20 printing companies were approached for a potential sale or investment.

15. In November 2018, in a move to reduce costs, management pay was reduced and the Debtor reduced staffing levels. In December 2018 the CEO was replaced and the new CEO implemented a turnaround plan.

16. As a result of the historical difficulties, and current financial projections, the Debtor will propose a sale of substantially all of its assets at an auction sale. A potential purchaser has made an offer to purchase substantially all of the Debtor's assets for a purchase price of $8,250,000.00.

17. For the reasons stated, as well as other reasons, to maintain and sustain its business operations and preserve the going concern value of its assets and enterprise value of its business the Debtor determined it would be in its best interest and the best interest of its creditors and estate to initiate this Chapter 11 case.

### B. Description of Debtor's Pre-Petition Liens

18. The financing statements of record according to a UCC search conducted in the Debtor's state of organization ("UCC Search") are the following filings: (1) US Bank Equipment Finance; (2) Old National Bank; (3) VAR Resource, Inc.; (4) Crestmark Bank; (5) Bindtech LLC; (6) Industrial Leasing; (7) Plymouth Packaging; (8) Peoples United Bank/NFS Leasing; (9) Xerox Financial Services; (10) Eastman Kodak Company; and (11) CJK Group Inc.

19. Old National Bank is the first secured creditor on the real property and on all assets with the exception of receivables and inventory. Crestmark Bank has an all asset lien and is the first secured creditor as to receivables and

inventory and Old National Bank is a junior lienholder as to receivables and inventory.

20. CJK Group provided a bridge loan to allow the Debtor to continue operating. CJK Group has a junior lien on all assets of the Debtor.

21. Bindtech LLC has an all asset lien senior only CJK Group.

22. The remaining lien holders are specific as to pieces of equipment as either purchase money security interests or leases.

## C. The Need for § 364 Credit and the Insufficiency of Cash Usage Alone

23. The Debtor's use of its remaining cash would be insufficient to enable the Debtor to operate beyond this week. At the Debtor's request, a 13-week, weekly cash forecast was prepared that begins with this week and ends the week ending June 21, 2019 ("Budget"). The Budget is attached as Exhibit C. The Budget assumes no new debt (other than of trade debt in the ordinary course, Crestmark receivable financing, and the DIP Loan), equity financing, capital, or other liquidity infusion, and that the Debtor has unrestricted access to its existing cash and future cash collections during the period covered by the Budget. The Budget demonstrates that without additional borrowing or capital infusion, the Debtor will have insufficient cash collections and, therefore, insufficient cash to operate its business beyond this week, the week ending March 29, 2019, and as a result could not conduct a sale process and otherwise maximize going concern value under § 363.

24. The Debtor would not be able to sustain its business operations solely with the use of cash and requires additional liquidity to finance its current

operations in the form of the § 364 financing requested in this Motion.

### D. Efforts to Obtain § 364 Credit on More Favorable Terms

25. While the Debtor has spoken to other potential lenders for debtor-in-possession financing, including its secured lenders, the DIP Lender is the only party that is willing to make debtor-in-possession financing available on terms that the Debtor reasonably believes can be satisfied.

26. The Debtor has sought potential purchasers and investors for over 12 months and the terms and conditions of the DIP Lender and Stalking Horse Bidder are the most favorable to the Debtor and its creditors.

27. Generally, the DIP Lender proposes financing the Debtor's projected cash needs of up to a maximum amount of $500,000.00 per the Budget ("DIP Loan Agreement") through an anticipated § 363 sale hearing date to occur no later than May 3, 2019. This financing would occur under §§ 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code.

28. It would be time consuming, expensive and ultimately futile for the Debtor to attempt to obtain approval for financing with a lender other than the DIP Lender. The Debtor is unable to obtain the required funds in the form of unsecured credit or unsecured debt allowable under § 503(b)(1) of the Bankruptcy Code, as an administrative expense under §§ 364(a) or 364(b) of the Bankruptcy Code on terms otherwise more favorable than those terms offered by the DIP Lender. Consequently, the DIP Lender's proposed financing is on the best terms under the circumstances.

### RELIEF REQUESTED

29. The Debtor requests the entry of the Interim Order and Final Order authorizing it to borrow money and obtain credit from the DIP Lender, to

execute the documents to be executed in connection with the DIP Loan Agreement, and to obtain the DIP Orders. The following are the salient terms of the proposed DIP Loan Agreement and the proposed Interim Order granting this Motion on an interim basis:

A) During the Revolving Commitment Period, subject to the terms of the DIP Loan Agreement, make Revolving Loans to Borrower in amounts not to exceed in the aggregate (after giving effect to all Revolving Loans repaid) the Revolving Commitment.

B) Procedure for Borrowing. Borrower may borrow Revolving Loans in accordance with Section 2 of the DIP Loan Agreement, provided that Borrower gives Lender irrevocable notice one business day prior to the requested borrowing date (or by such later time as Lender otherwise accepts in its sole discretion), specifying (a) the amount of the Revolving Loan to be borrowed, and (b) the requested borrowing date (a "Notice of Borrowing"). Upon receipt of any Notice of Borrowing, Lender will make the amount of each borrowing available on the borrowing date requested by Borrower in funds immediately available to Borrower.

C. Number of Advances. Notwithstanding any provision to the contrary in the Loan Documents, Borrower may request no more than two Revolving Loans per week.

D. Amount of Revolving Loans. Notwithstanding any provision to the contrary in the Loan Documents, the amount of any Revolving Loan during any week may not exceed the amount shown as necessary for that week in the applicable Budget and Projections.

E. Revolving Nature of Advances. Amounts borrowed in accordance with Section 2 of the DIP Loan Agreement may be paid and re-borrowed during the Revolving Commitment Period.

F. Maturity. Borrower shall pay all outstanding Revolving Loans on the Termination Date as defined in the DIP Loan Agreement

G. <u>Interim Order</u>. The Court must have entered the Interim Order in the Chapter 11 Case in form and substance satisfactory to Lender in its reasonable discretion, and the Interim Order must be in full force and has not been vacated, stayed, or modified in any manner without the prior written consent of Lender.

H. <u>Intercreditor Arrangements</u>. The Interim Order must include intercreditor provisions setting forth the relative claim and lien priorities in respect of the Obligations and the Prepetition Obligations, in each case satisfactory to Lender in its reasonable discretion.

I. <u>Petition Date</u>. The Petition Date must have occurred, and the First Day Orders sought by Borrower must have been entered by the Court in form and substance satisfactory to Lender in its sole discretion.

J. <u>Chapter 11 Sale Milestones</u>.

> a. <u>Bidding Procedures Motion</u>. On the Petition Date, Borrower shall have filed a motion in the Chapter 11 Case with the Bankruptcy Court, in form and substance reasonably acceptable to Lender (the "Bidding Procedures Motion") requesting a Chapter 11 Order approving bidding procedures and approval of a sale of all or substantially all of the assets of Borrower under sections 105, 363 and 365 of the Bankruptcy Code, which motion and bidding procedures (including the bidding protections set forth in the DIP Loan Agreement) shall be on terms reasonably acceptable to Lender.

> b. <u>Bidding Procedures Order</u>. On or before March 29, 2019, the Court shall have entered a Chapter 11 Order (the "Bidding Procedures Order") approving the bidding procedures set forth in the Bidding Procedures Motion, which Bidding Procedures Order shall be in form and substance reasonably acceptable to Lender.

> c. <u>Competing Bids</u>. On or before April 25, 2019, binding bids with respect to a competing transaction, if any, shall be due and delivered to Borrower in accordance with the Bidding

Procedures Order, with copies of such bids being provided to Lender.

d. <u>Auction</u>. On or before April 29, 2019, an auction with respect to a competing transaction, if any, shall have been completed in accordance with the Bidding Procedures Order.

e. <u>Winning Bid</u>. The Bankruptcy Court shall have entered a Chapter 11 Order approving the sale of substantially all of Borrower's assets in a sale under sections 105, 363 and 365 of the Bankruptcy Code on or before May 3, 2019, and such sale shall have closed on or before May 6, 2019.

f. <u>Payment</u>. The irrevocable payment in full of all Obligations and the Prepetition Obligations must occur on or before May 6, 2019.

g. <u>Information Regarding Sale Process</u>. Borrower shall provide Lender with a status report and such other updated information relating to the sale process as may be reasonably requested by Lender, in form and substance reasonably acceptable to Lender.

K. <u>Superpriority Claims</u>. Subject to the Carve-Out as defined in the DIP Loan Agreement, the DIP Order, and the superpriority claim of Crestmark, a division of MetaBank, as successor to Crestmark Bank, against Borrower under section 364(c)(1) of the Bankruptcy Code, the Obligations are entitled, in accordance with section 364(c)(1) of the Bankruptcy Code (without the need to file a proof of claim), to a superpriority claim against Borrower, Borrower's estate and Borrower's property and assets, excluding the proceeds of Avoidance Actions, with priority over any and all other obligations, liabilities, and indebtedness of Borrower, now existing or hereafter arising, of any kind whatsoever, and including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final Order), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code, whether now in existence of hereafter incurred by Borrower, and shall at all times be senior to the rights of Borrower, Borrower's estate, and any successor trustee, estate representative, or any creditor, in the Chapter 11 Case or any subsequent cases or proceedings under the Bankruptcy Code (the "Lender Superpriority Claim"), and the Lender Superpriority Claim shall have recourse to and be payable from all prepetition and postpetition assets of Borrower, including, but not limited to, the Collateral.

L. <u>Senior Lien on Unencumbered Assets</u>. The Obligations are subject to the Carve-Out and the DIP Order, in accordance with section

364(c)(2) of the Bankruptcy Code, secured by a perfected lien on all Collateral, whether arising prior to, on or after the Petition Date, that was not subject to any valid, perfected and non-avoidable liens as of the Petition Date.

M. Junior Lien on Certain Encumbered Assets. The Obligations are, subject to the Carve-Out and the DIP Order, in accordance with section 364(c)(3) of the Bankruptcy Code, secured by a perfected lien on all Collateral described in the Prepetition Security Documents, whether arising prior to, on or after the Petition Date, which perfected lien securing the Obligations is subject to valid, perfected and non-avoidable liens as of the Petition Date that were permitted under the terms of the Prepetition Loan Agreement and which were senior in priority to the liens granted under the Prepetition Security Documents.

N. Claims and Liens Effective. All of the claims and liens described in paragraphs K, L and M above will be effective and perfected as of the date that the Court enters the Interim Order, without the necessity of the signing or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents. Borrower shall sign and deliver to Lender (for recording or filing, as appropriate) such mortgages and pledges (and other Security Documents), and Lender will be authorized in accordance with the DIP Order to file such financing statements and other instruments and documents, as advisable (as reasonably determined by Lender) to evidence and secure the Obligations. Borrower shall set forth the cost of such recording and filing in the Budget.

O. Events of Default. Each of the following shall constitute an Event of Default under this agreement:

a. Payment Defaults. Failure of Borrower to make any payment of (a) any principal of the Revolving Loans when due or (b) any interest on the Revolving Loans, or any other amount payable under the Loan Documents, within three days after such interest or other amount becomes due in accordance with the terms thereof.

b. Other Defaults. Failure of Borrower to materially comply with or to perform when due any other term contained in the Loan Documents, or failure of Borrower to materially comply with or to materially perform any other term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or between Lender.

c. False Statements. Any warranty, representation, or statement made or furnished to Lender by or on behalf of

Borrower under the Loan Documents is false or misleading in any material respect, either now or at the time made or furnished.

d. <u>Defective Collateralization</u>. Any of the Loan Documents, other than as expressly permitted under this agreement or the other Loan Documents, ceases to be in full force (including failure of the Security Documents to create a valid and perfected lien and security interest in any Collateral) at any time and for any reason.

e. <u>Final Order</u>. The Court has not entered the Final Order on or before May 3, 2019, or the Final Order is not in full force or has been vacated, reversed, or modified in any respect adverse to Lender without its prior written consent.

f. <u>Dismissal of Chapter 11 Case</u>. Any dismissal of the Chapter 11 Case (or the Court makes a ruling requiring the dismissal of the Chapter 11 Case), suspension of the Chapter 11 Case, or conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or Borrower files any pleading requesting such relief; or Borrower files a motion for the approval of, or there arises (a) except as otherwise provided in this agreement, any other claim having priority senior to or pari passu with the claims of Lender under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code (other than the claims of Lender with respect to the Prepetition Obligations and the Carve-Out) or (b) any lien on the Collateral having a priority senior to or pari passu with the liens and security interests granted in this agreement, except as expressly provided in this agreement and in the DIP Order.

30. All of terms are set forth in the attached DIP Loan Agreement and the Debtor seeks approval of all terms in the DIP Loan Agreement and the Interim Order attached as Exhibit A.

## BASIS FOR RELIEF

### A. Debtor-in-Possession Financing

31. Section 364(c) of the Bankruptcy Code provides that if a debtor-in-possession is unable to obtain unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code as an administrative expense, the court, after notice and a hearing, may authorize the debtor-in-possession to obtain credit or incur debt (1) with priority over any or all administrative expenses of the kind specified in §§ 503(b) or 507(b); (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

32. The Debtor satisfies the requirements of § 364(c) of the Bankruptcy Code because (a) the Debtor is unable to obtain unsecured credit or unsecured debt allowable under § 503(b)(1) of the Bankruptcy Code, as an administrative expense under §§ 364(a) or 364(b) of the Bankruptcy Code, or on terms otherwise more favorable than those terms offered by the DIP Lender, and is in the best interest of the bankruptcy estate.

33. In the Debtor's business judgment, the DIP Lender represents the best financing option to effectuate the purposes and advance the Debtor's reorganization efforts in implementing and consummating a § 363 sale in order to maximize value to the estate.

34. Likewise, the interest rate and fees required under the DIP Loan Agreement are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize lender incentives that extend well beyond the specific liens and rights specified in § 364 of the Bankruptcy Code and those proposed to be granted to the DIP Lender in the Interim Order.

35. Having determined that financing is available only under § 364(c) of the Bankruptcy Code, the Debtor negotiated with the DIP Lender at arms-length and pursuant to its business judgment, which is to be accorded great weight so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code. *See, e.g., S. Bank Tr.Nat'/Ass'n v. Am. Airlines, Inc. (In re AMR Corp.)* 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013) ("In determining whether to approve a Debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the Debtor's business judgment.").

36. The Debtor's efforts described elsewhere in this Motion and in the Shima Declaration more than satisfy the standard that has been established in the case law.

37. The DIP Loan Agreement is clearly for the benefit of the Debtor's bankruptcy estate and creditors. The DIP Loan Agreement allows the Debtor to maintain operations and, thus, preserve and enhance the Debtor's going concern value. As evidenced by the Budget, use of cash alone is insufficient to pay even the normal operating expenses of the Debtor. With the additional liquidity provided by the DIP Loan Agreement, the Debtor will be able to maintain ongoing operations, thereby permitting it to generate revenues, pay its employees and operate its business for the benefit of all parties-in-interest while pursuing an orderly § 363 sale process.

38. The terms and conditions of the DIP Loan Agreement are fair and reasonable and were negotiated by the parties in good faith and at arms-length.

Accordingly, the DIP Lender should be accorded the benefits of § 364(e) of the Bankruptcy Code.

## B. The Interim Approval Should be Granted

39. Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to § 364 may not be commenced earlier than 14 days after service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize obtaining credit to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate.

40. On an interim basis, the Debtor requests that this Court authorize the Debtor to borrow and use up to $500,000.00 during the next 30 days. This amount anticipates a final hearing on the Motion on or before the end of the 30 day period and that the Court approves the financing on the terms requested in the Interim Order. The Debtor must have the interim relief requested in the Interim Order to maintain and operate its business. Absent such relief, the Debtor will be unable to meet its payroll obligations or to preserve and protect its assets and the value of those assets, and operations will cease. The Debtor has inadequate cash to operate and pay necessary expenses and to move forward with a sale process, absent the proposed DIP Loan Agreement being approved on an expedited interim basis.

41. As a result, the Debtor needs the DIP Loan Agreement and the amount requested on an interim basis to avoid immediate and irreparable harm to the Debtor's bankruptcy estate until a final hearing can be held. Absent access to the DIP Loan Agreement, the Debtor's business will simply

shut down and its employees will have to be terminated and its customers not provided services.

42. The Debtor requests, pursuant to Bankruptcy Rule 4001(c), that the Court authorize the Debtor, from and after the entry of the Interim Order, until an order is entered following the Final Hearing on the Motion, to obtain credit under the DIP Loan Agreement. This will enable the Debtor to maintain ongoing operations and the means by which it may avoid immediate and irreparable harm and prejudice to its bankruptcy estate, all parties-in-interest and the Debtor's customers, pending the final hearing.

**NOTICE**

### A. Notice with Respect to Interim Hearing on the Motion

43. Notice of this Motion, the interim hearing and the relief proposed to be granted in the Interim Order has been provided (by hand, fax, overnight mail, electronic mail, or courier) to the United States Trustee, the Debtor's top 20 largest unsecured creditors, counsel to the DIP Lender, all creditors believed to have an interest in the DIP Collateral, all parties who filed requests for notice pursuant to Bankruptcy Rule 2002, and all parties appearing of record in the UCC Search. The Debtor submits that, under the circumstances, no further notice of the hearing on the interim financing is necessary and requests that any further notice be dispensed with and waived.

### B. Notice with Respect to Final Hearing on the Motion

44. The Debtor respectfully requests that the Court set a final hearing date on the Motion for a date within 21 days after entry of the Interim Order, and

authorize the Debtor to serve a copy of this Motion and the Interim Order which

fixes the time and date for filing objections to this Motion, by first class mail, fax, or electronic mail upon (a) counsel to the unsecured creditors' committee, if any; (b) the creditors included on the list filed under Rule 1007(d); (c) the Office of the United States Trustee; (d) counsel to the DIP Lender; (e) all parties appearing on record in the UCC Search or otherwise known to the Debtor to have or asset liens on or security interests in any of the Debtor's assets; and (f) all parties who have timely filed requests for notice under Bankruptcy Rule 2002. The Debtor requests that the Court deem such notice of the final hearing to be sufficient notice under Bankruptcy Rule 4001.

## REQUEST FOR RELIEF

WHEREFORE, the Debtor respectfully requests that the Court (a) enter the Interim Order, in the form attached as Exhibit 1, which, among other relief, (i) authorizes the Debtor to enter into the DIP Loan Agreement; (ii) authorizes, on an interim basis, the Debtor to borrow up to $_____, and on a final basis, the Debtor to borrow up to $500,000.00, under the DIP Loan Agreement from the DIP Lender on a secured, superpriority administrative expense claim basis, including the grant of liens under §§ 364(c)(2) and 364(c)(3) and a superpriority administrative expense claim under § 364(c)(1); and (iii) establish notice procedures and schedule the Final Hearing on this Motion for approval of the DIP Loan Agreement; and (b) grant such other and further relief as this Court deems just and equitable

GOLDSTEIN, BERSHAD & FRIED, P.C.

/s/ Scott M. Kwiatkowski

Scott M. Kwiatkowski (P67871)

Attorneys for Debtor

4000 Town Center, Suite 1200

Southfield, MI 48075

(248) 355-5300

scott@bk-lawyer.net

# EXHIBIT A

In Re:  Thomson-Shore, Inc.

              Debtor.

Case No. 19-44343-tjt

Chapter 11

Hon:  Thomas J. Tucker

_____/

# ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, AND (II) SCHEDULING A FINAL HEARING

Upon the emergency motion (the "Motion") of Thomson-Shore Inc. ("Debtor"), seeking pursuant to section 105, 362, 363(c)(2), 364(c)(1), 364(c)(2) and 364(c)(3) of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rule 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure, and Rules 4001-2 and 9013-1 of the Local Bankruptcy Rules, the entry of an interim and final order: (I) authorizing the Debtor to obtain postpetition financing pursuant to a debtor-in-possession credit facility (as amended, supplemented or otherwise modified from time to time the "DIP Loan Agreement") between the Debtor and CJK Group, Inc. ("DIP Lender") pursuant to which the Debtor is seeking authorization to borrow up to, in the aggregate, the principal amount of $500,000.00, which, together with all interest, fees and expenses due and payable under the DIP Loan Agreement (the "Obligations"), to be (A) secured by first priority senior secured liens on all property of the Debtor that is not otherwise subject to a lien pursuant to Section 364(c)(2), subject only to the Carve-Out (as defined below) (B)

secured by best available junior liens pursuant to Section 364(c)(3) on all assets of the Debtor that are subject to (i) valid and perfected prepetition liens, (ii) Permitted Liens (as defined below), and (iii) the Carve-Out, and (C) granting the DIP Lender superpriority administrative claims in the Case pursuant to Section 364(c)(1) of the Bankruptcy Code, senior in right of payment over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(a) of the Bankruptcy Code or otherwise, subject only to Permitted Liens and the Carve-out, (II) scheduling a final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") approving the relief requested in the Motion on a final basis, and (III) approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion and exhibits attached thereto; submitted in support hereof; a hearing having been held and concluded on March _____, 2019 before this Court (the "Interim Hearing"); and upon the entire record made at the Interim Hearing; and after due deliberation and sufficient cause appearing therefore;

IT IS HEREBY FOUND AND CONCLUDED that:

(A) On March 25, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief with this Court under Chapter 11 of the Bankruptcy Code, thereby commencing the Case. The Debtor is continuing in possession of their property, and operating and managing its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

(B) This Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of this Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

(C) Telephone, email, facsimile, or overnight mail notice of the Interim Hearing and the entry of this Order has been provided to (i) the Office of the United States Trustee (the "U.S. Trustee"); (ii) the creditors holding the 20 largest unsecured claims against the Debtor (iii) counsel to the DIP Lender; (iv) known holders of prepetition liens against the Debtor's property; (v) any person has filed a request for notice in the above captioned case pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The requisite notice of the Motion and the relief requested thereby and this Order has been provided in accordance with Bankruptcy Rule 4001, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitations, sections 102(1) and 364 of the Bankruptcy Code, and no other notice need be provided for entry of this order.

(D) The relief requested by the Motion is necessary to avoid immediate and substantial harm to the Debtor's estate, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of this Order.

(E) The Debtor does not have sufficient available resources of working capital and financing to carry on the operation of its business without the funding available under the DIP Loan Agreement. The Debtor has an

immediate need to obtain financing form the DIP Lender in order to permit, among other things, the Debtor to pay employees and to continue its business operation in an orderly manner, maintain business relationships with vendors, supplies, and customer and satisfy other working capital and operational needs.

(F) The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or pursuant to Sections 364(a) and 364(b) of the Bankruptcy Code. Financing on a post-petition basis is not available to the Debtor unless the Debtor grants: (i) the DIP Loan Lien (as defined below) under the DIP Loan Agreement, pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, to secure the Obligations, and (ii) pursuant to Section 364(c)(1) of the Bankruptcy Code, the Superpriority claims in respect of the Obligations. The DIP Lender has indicated a willingness to make such loans and advances and provide such other financial accommodations pursuant to the terms and conditions set forth in the DIP Loan Agreement. The Debtor is otherwise unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Loan Agreement and in the absence of the DIP Loan Agreement will be forced to promptly terminate operations and their employees and liquidate.

(G) The DIP Loan Agreement has been negotiated in good faith and at arms-length by the Debtor, and the DIP Lender, and any credit extended and loans made to the Debtor pursuant to the DIP Loan Agreement used by the Debtor for the benefit of the Debtor shall be deemed to have been extended,

issued, made, or used as the case may be, in good faith as required, and within the meaning of, Section 364(e) of the Bankruptcy Code.

(H) The terms of the DIP Loan Agreement and this Order are fair and reasonable, and reflect the Debtor's exercise of prudent business judgment consistent with the fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

(I) Entry of this Order is in the best interests of the Debtor's estate and creditors because its implementation, among other things, will allow for the Debtor to remain in business by providing for interim working capital which is necessary to sustain the operations of the Debtor's existing business and provide the appropriate care and safety to its customers, including their immediate payroll and other critical interim working capital needs. Absent the entry of this Order, the Debtor's estate would be immediately and irreparably harmed.

(J) Each of the foregoing findings by the Court will be deemed a finding of fact if and to the full extend that it makes and contains factual finding, and will be deemed a concluding of law if an to the full extend that it makes and contains legal conclusions.

Based upon the foregoing findings and conclusions, and upon the record made by the Debtor before this Court at the hearing on the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1. The Motion is granted subject to the terms and conditions set forth in

this Order.

2. All objections, if any, to the Motion are resolved hereby or, to the extent not resolved, are overruled.

3. The DIP Loan Agreement is approved in all respects and is incorporated into this Order by reference.

4. The Debtor is authorized and obligated to comply with and perform, and is bound by, all of the terms, conditions and waivers contained in the DIP Loan Agreement and this Order, and the Debtor is authorized, directed, and obligated to repay amounts borrowed, with interest, fees, and expenses, and any other allowed charges and amounts, to the DIP Lender in accordance with and subject to the terms and conditions set forth in the DIP Loan Agreement and this Order. None of any documents related to the DIP Loan Agreement, any provision thereof, any right arising under any thereof, shall be voidable or avoidable under section 548 of the Bankruptcy Code, under any applicable state Uniform Voidable Transaction Act or similar statue or common law, or otherwise. The Debtor is further authorized, obligated, and directed to fund each of the Debtor's professional's weekly allocated amount under the Budget in advance, which each professional will hold in trust for application to the professional's invoices when allowed by the Court. The Debtor is expressly authorized and empowered to execute and deliver any other document of any kind required to be executed and delivered in connection with the DIP Facility.

5. The Debtors are expressly authorized to immediately borrow from the DIP Lender, on the terms and subject to the conditions set forth in the DIP Loan Agreement and this Order, up to $500,000.00 in the aggregate, with $500,000.00 on an interim basis. All such loans shall be advanced via wire

transfer to the designated bank account of the Debtor pursuant to the wire transfer instructions to be provided by the Debtor to the DIP Lender.

6. The Debtor is authorized to use the proceeds of the DIP Loan Agreement for working capital needs and to pay operating costs and expenses of the Debtor for the period ending on the Termination Date of the DIP Facility in accordance with the DIP Loan Agreement and the budget attached to the DIP Loan Agreement.

7. Pursuant to Section 364(c)(1) of the Bankruptcy Code, all of the Obligations shall constitute allowed claims (the "Superpriority Claims") against the Debtor with priority over any and all administrative expenses and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in section 503(b) and 507(b) of the Bankruptcy Code, which allowed claims shall be payable from and have recourse to all pre and post-petition property of the Debtor and all proceeds thereof, excluding Avoidance Actions (defined below) and all proceeds and recoveries from Avoidance Actions, subject in all cases only to the Permitted Liens, the Carve-Out to the extent specifically provided for herein and in the DIP Loan Agreement, and any similar superpriority claim under Section 364(c)(1) granted to Crestmark, a division of MetaBank, as successor to Crestmark Bank.

8. As security for the Obligations, the DIP Lender shall have and is hereby granted (effective upon the date of this Order and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge

agreements, financing statements or otherwise), valid and perfected security interests in, and liens (the "Liens"), on all currently owned or hereafter acquired property and assets of the Debtor of any kind and nature, whether real of personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all, proceeds, products, rents and profits thereof, including, without limitation, all cash, accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, investment property, letters of credit rights, vehicles, goods, accounts receivable, inventory, cash-in-advance deposits, real estate, machinery, intellectual property (including trademarks and trade names), licenses, cause of actions, right to payment including tax refund claims, insurance proceeds and tort claims and the proceeds, products, rents and profits of all of the foregoing ("DIP Loan Collateral"), including, without limitation, all cash or checks on hand, all cash or securities deposited into any account maintained by the Debtor and the proceeds of all causes of action (other than causes of action arising on or after the Petition Date under Sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code ("Avoidance Actions")) and the proceeds and recoveries therefrom) with the following priorities.

(a) Pursuant to Section 364(c)(2) of the Bankruptcy Code, a first priority, perfected Lien upon all of the Debtor's right, title and interest in, to, and under the DIP Loan Collateral that is not otherwise encumbered by a valid, perfected and non-avoidable security interest or lien on the Petition Date;

(b) Pursuant to Section 364(c)(3) of the Bankruptcy Code, a best available junior, perfected Lien upon all of the Debtor's right, title, and interest in, to and

under all DIP Loan Collateral subject only to a permitted lien. The foregoing

Liens are referred to herein as the "DIP Loan Liens" Except to the extent expressly set forth in this Order, including the Carve-Out, the DIP Loan Liens granted pursuant to this Order and the DIP Loan Agreement to the DIP Lender to secure the Obligations shall not be subordinated. "Permitted Liens" means (a) liens for unpaid taxes that are not yet due and payable and that arise and are senior to the DIP Facility Liens by operation of law, (b) purchase money security interests and liens of lessors under capital leases, (c) easements, rights of way, covenants, conditions, zoning variances, and similar encumbrances that do not materially interfere with the use or value of the property subject thereto, (d) mechanic's materialmen's warehousemen's, or similar liens that arise and are senior to the DIP Loan Liens and prepetition liens by operation of law, and (e) liens and encumbrances that are valid, binding, enforceable, perfected and non-avoidable liens existing on the Petition Date. Notwithstanding anything to the contrary in this Order, nothing in this Order shall prevent any party for challenging the amount, validity, priority, enforceability, or extent of any prepetition liens or claims.

9. The DIP Loan Liens shall be subject to a carve-out (the "Carve-Out") for the payment of (1) Court allowed and unpaid professional fees, expenses, and disbursements in amounts not to exceed the line items allocated to each professional under the Budget (in the aggregate, the "Professional Expense Cap"), and (2) the payment of fees pursuant to 28 U.S.C. § 1930, ("UST Fees"); provided, that so long as the Termination Date has not occurred, (i) the Debtor may borrow under the DIP Facility to fund each professional's weekly allocated amount under the Budget in advance, which each professional will hold in trust

the Debtor will be permitted to pay allowed UST Fees as the same are due and payable in an amount not to exceed those set forth in the Budget; and (ii) payments of professional fees and UST Fees shall not reduce the amount of the Carve-Out. During the continuance of an Event of Default under the DIP Loan Agreement or a default under the Interim Order or the Final Order, as the case may be, any payments actually made to such professionals during such continuance shall reduce the Professional Expense Cap on a dollar-for-dollar basis.

10. Upon entry of, and to the extent provided in the Final Order, neither the Debtor nor its estate may assert a claim under Section 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection, or enhancement of, or realization by the DIP Lender upon the DIP Loan Collateral. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any DIP Loan Collateral.

11. All DIP Loan Liens shall be valid, binding and perfected automatically upon the entry of this Order. The DIP Lender shall not be required to file, or serve financing statements, mortgages, notice of lien, or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect the DIP Loan Liens. If, however, the DIP Lender in its reasonable discretion, shall determine to file any such financing statements, mortgages, agreements, notice of lien, or similar instruments, or to otherwise confirm perfection of the DIP Loan Liens, the Debtor, at the Debtor's expense to the extend provided for in the Budget, is hereby authorized, directed, and obligated to so cooperate with

and assist in such process to the extent provided in the DIP Loan Agreement or this Order, and all such documents shall be deemed to have been perfected at the time of and on the date of this Order, with the priorities set forth herein, and shall be and hereby are deemed and adjudicated senior to any other post-petition filing by any other person or entity with respect to the same collateral. A certified copy of this Order may, at the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of liens or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

12. Upon the occurrence of and during the continuance of an Event of Default under the DIP Loan Agreement, the DIP Lender is entitled to exercise rights and remedies and take all or any of the following actions without further relief from the automatic stay pursuant to Section 362(a) of the Bankruptcy Code or any other applicable stay or injunction or further order of or application to this Court: (a) terminate its obligation to make advances under the DIP Loan Agreement; (b) declare the principal of and accrued interest, fees, and other liabilities constituting the Obligations to be immediately due and payable; and/or (c) take any other action or exercise any other right or remedy permitted to the DIP Lender under the DIP Loan Agreement, this Order, or by operation of law; provided, however, that the DIP Lender may not exercise its rights under clause (c) without providing to counsel for the Debtor, counsel for any committee, and the US Trustee not less than five business days written notice of an expedited motion for relief from the automatic stay and the Debtor waives any right to assert any defense to such expedited motion for relief from the

automatic stay other than the defense that no Event of Default under the DIP Loan Agreement has occurred or is continuing.

13. So long as the Debtor remains in control of the DIP Loan Collateral, (i) the DIP Lender shall not, in any way or manner, be liable or responsible for (A) the safekeeping of the DIP Loan Collateral, (B) any loss or damage thereto occurring or arising in any manner or fashion from any cause (C) any diminution in the value thereof, or (D) any act or default of any carrier, services, bailee, custodian, forwarding agency, or other person, and (ii) all risk of loss, damage, or destruction of the DIP Loan Collateral shall be borne by the Debtor.

14. The Debtor is authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Loan Agreement as the DIP Lender may reasonably require as evidence of and for the protection of the Obligations, or which otherwise may be deemed reasonably necessary by the DIP Lender to effectuate the terms and conditions of the DIP Loan Agreement or this Order. The Debtor and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Loan Agreement, any amendments, waivers or modifications that are not materially adverse to the Debtor without further order of this Court; provided, however, that counsel to the Debtor's secured creditors, the U.S. Trustee and counsel to any committee shall receive reasonable advance notice of any such modification or amendments. Any other amendments or modifications require the prior approval of this Court upon notice and hearing.

15. The Debtor is hereby required to afford representatives, agents, and/or employees of the DIP Lender access to the Debtor's premises, books, records and personnel (including officers and directors) in accordance with the DIP Loan Agreement, and shall cooperate, consult with, and provide to such persons all such information.

16. Having been found to be extending credit to the Debtor in good faith, based on the record before this Court, the DIP Lender shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code with respect to the Obligations and the DIP Loan Liens created, adjudicated, or authorized by this Order in the event that his Order or any finding, adjudication, or authorization contained herein is stayed, vacated, reversed or modified on appeal. Any stay, modification, reversal, or vacation of this Order shall not affect the validity of any Obligations of the Debtor to the DIP Lender incurred by the Debtor pursuant hereto prior to the DIP Lender's actual receipt of written notice of the effective date of any such stay, modification reversal or vacation. Notwithstanding any such stay, modfication, reversal, or vacation, all financing extended to the Debtor pursuant to this Order and all Obligations incurred by the Debtor pursuant hereto prior to the DIP Lender's actual receipt of written notice of the effective date of any such stay, modification, reversal, or vacation shall be governed in all respects by the original provisions hereof, and the DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the liens, security interest, and priorities granted herein with respect to all such Obligations.

17. The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order confirming any plan of reorganization in

the Case, (b) converting the Case to a Chapter 7 Case; or (c) dismissing the Case, and, to the greatest extent permitted by applicable law, the terms and provisions of this Order, as well as the Superpriority Claims and DIP Loan Liens granted pursuant to this Order, the DIP Loan Agreement, and related documents (as applicable) shall continue in full force and effect notwithstanding the entry of any such order, and such Superpriority Claims and DIP Loan Liens shall maintain their priority as provided by this Order until all of the Obligations are indefeasibly paid in full in cash.

18. The DIP Lender is hereby relieved of the requirement to file proofs of claim or requests for payment of administrative expenses in the Case with respect to any Obligations.

19. Nothing in the Order, the DIP Loan Agreement, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtor in the operation of its business, or in connection with its restructuring or sale efforts. The DIP Lender shall not be deemed to be in control of the operations of the Debtor or to be acting as "responsible persons" or "owners or operators" and shall have no fiduciary duty with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute.

20. The stay of this Order set forth in Bankruptcy Rule 6004 is hereby waived and this Order shall be effective immediately upon its entry.

21. To the fullest extent permitted by law, the provisions of this Order and the DIP Loan Agreement shall be binding upon and inure to the benefit of the parties thereto, and their respective successors and assigns.

22. This Order, the Motion, and the DIP Loan Agreement shall be construed together when possible. To the extent any provision of this Order directly conflicts with any provision of the Motion or any provision of the DIP Loan Agreement, the provision of this Order shall control.

23. The Final Hearing to consider the relief requested in the Motion is scheduled for April _____, 2019 at _____ (prevailing Eastern Time) before this Court. Within 2 business days after entry of this order, the Debtor shall serve, by United States Mail, first-class postage prepaid, fax, or email notice of the entry of this Order and of the final Hearing (the "Final Hearing Notice"), together with copies of this Order, the proposed Final Order and the Motion on: (a) the Notice Parties; (b) any additional party which has filed prior to such a date a request for notices with this Court and (c) counsel for any committee. The Final Hearing Notice shall state that any party in interest objecting to the relief sought at the Final Hearing shall file written objections with the Clerk of the United States Bankruptcy Court for the Eastern District of Michigan, no later than April _____, 2019 at 4:00 p.m. (prevailing Eastern Time), which objections shall be served upon so as to be received on or before such date and time by: (A) Scott M. Kwiatkowski, Goldstein, Bershad & Fried, P.C., 4000 Town Center, Suite 1200, Southfield, MI 48075; (B) DIP Lender Attorney,

Aaron J. Crandall, Gray Plant Mooty, 1010 W. St. Germain, Suite 500, Saint Cloud, MN 56301, (C) Office of the United States Trustee; and (D) counsel for any committee appointed.

24. The Court shall retain jurisdiction to enforce this Order, and over any matters or disputes arising from or relating to the implementation of this Order.

# EXHIBIT B

<u>**DEBTOR-IN-POSSESSION LOAN AGREEMENT**</u>

This Debtor-In-Possession Loan Agreement is dated March 25, 2019, and is by and between THOMSON-SHORE, INC., a Michigan corporation ("Borrower") and CJK GROUP, INC., a Minnesota corporation ("Lender").

On March 25, 2019 (the "Petition Date"), Borrower commenced a voluntary case under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"), and Borrower has continued to operate its business and manage its properties as a debtor-in-possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.

Borrower has requested, and Lender has agreed to provide, a secured debtor-in-possession loan facility to Borrower, in an aggregate original principal amount not to exceed the Revolving Commitment (defined below), plus capitalized fees and interest, the proceeds of which will be used in accordance with the Budget (defined below) and the terms of this agreement. The parties therefore agree as follows:

        **1.**    <u>**Definitions**</u>. The following words have the following meanings when used in this agreement. Capitalized terms used but not defined in this agreement have the meanings attributed to such terms in the Uniform Commercial Code. All references to dollar amounts mean amounts in lawful money of the United States of America.

      1.1    <u>Avoidance Actions</u>. The term "Avoidance Actions" means claims and causes of actions under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code.

      1.2    <u>Bankruptcy Code</u>. The term "Bankruptcy Code" means Title 11 of the U.S. Code, as applicable to the Chapter 11 Case, now and hereafter in effect, or any applicable successor statute.

      1.3    <u>Bankruptcy Court</u>. The term "Bankruptcy Court" is defined in the recitals, but "Bankruptcy Court" will also mean any other court having competent jurisdiction over the Chapter 11 Case.

      1.4    <u>Bidding Procedures Motion</u>. The term "Bidding Procedures Motion" is defined in Subsection 5.7(a).

      1.5    <u>Bidding Procedures Order</u>. The term "Bidding Procedures Order" is defined in Subsection 5.7(b).

      1.6    <u>Borrower</u>. The word "Borrower" is defined in the recitals.

      1.7    <u>Budget</u>. The word "Budget" means each weekly budget of Borrower, setting forth in reasonable detail the receipts and disbursements of Borrower on a

weekly basis from the Petition Date through and including the Termination Date, including dollar amounts and the parties to whom the amounts will be paid, as such budget may be amended or modified from time to time by Borrower, so long as Lender has provided prior written consent to any such amendment or modification.

1.8     Carve-Out. The word "Carve-Out" is defined in Section 6.1.

1.9     Chapter 11 Case. The term "Chapter 11 Case" is defined in the recitals.

1.10    Chapter 11 Order. The term "Chapter 11 Order" means any order entered in the Chapter 11 Case.

1.11    Collateral. The word "Collateral" means and includes all property and assets granted as collateral security by Borrower to Lender under the Prepetition Security Documents or the Loan Documents. For the avoidance of doubt, the Collateral does not include any Avoidance Actions or proceeds thereof.

1.12    DIP Order. The term "DIP Order" means, as the context may require, the Interim Order and the Final Order collectively, or the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be.

1.13    Effective Date. The term "Effective Date" means the date on which each of the conditions precedent set forth below in Sections 3.1 through 3.7 is satisfied.

1.14    Exit Fee. The term "Exit Fee" means a fee in the amount of $30,000.

1.15    Event of Default. The term "Event of Default" means and includes any of the Events of Default set forth in Section 7.

1.16    Final Order. The term "Final Order" means a final Chapter 11 Order (as the same may be amended, restated, or otherwise modified from time to time after entry thereof with the consent of Lender in its sole discretion) authorizing the Revolving Loans in substantially the form of the Interim Order, with only such modifications in form and substance that are satisfactory to Lender in its sole discretion.

1.17    First Day Orders. The term "First Day Orders" means all Chapter 11 Orders entered or approved on the Petition Date or within five days after the Petition Date or based on motions filed on or around the Petition Date, which must each be in form and substance reasonably satisfactory to Lender.

1.18    Interest Rate. The term "Interest Rate" means 15.00% per annum.

1.19    Interim Order. The term "Interim Order" means an interim Chapter 11 Order (as the same may be amended, restated, or otherwise modified from time to time after entry thereof with the consent of Lender in its sole discretion), with changes to such form as are satisfactory to Lender, in its sole discretion, approving the Loan Documents, which Interim Order shall, among other things: (a) have been entered on such prior notice to such parties as may be satisfactory to Lender in its sole discretion; (b) authorize the extensions of credit in respect of the Revolving Commitment in the amounts and the terms set forth in this agreement; (c) grant the Lender Superpriority Claim status and other Collateral and liens referred to in the Loan Documents; and (d) approve the payment by Borrower of the fees provided for in this agreement.

1.20    Lender. The word "Lender" is defined in the recitals.

1.21    Lender Superpriority Claim. The term "Lender Superpriority Claim" is defined in Section 6.1.

1.22    Loan Documents. The term "Loan Documents" means this agreement, the Security Documents, the DIP Order, and any promissory note issued with respect to the Revolving Loans.

1.23    Material Adverse Effect. The term "Material Adverse Effect" means any event or circumstance that (a) has a material adverse effect on the business, assets, operations, condition (financial or otherwise), liabilities, properties, or prospects of Borrower, (b) materially and adversely affects the ability of Borrower to pay the Obligations, or (c) materially and adversely affects the rights of Lender under the Loan Documents, including the validity, enforceability, or priority of the liens purported to be created by the Security Documents.

1.24    Notice of Borrowing. The term "Notice of Borrowing" is defined in Section 2.1.

1.25    Obligations. The word "Obligations" means all amounts owing to Lender under the Loan Documents.

1.26    Origination Fee. The term "Origination Fee" means an origination fee for the Revolving Commitment in the amount of $30,000.

1.27    Petition Date. The term "Petition Date" is defined in the recitals.

1.28    Plan of Reorganization. The term "Plan of Reorganization" means a plan of reorganization or plan of liquidation in the Chapter 11 Case.

1.29    Prepetition Loan Agreement. The term "Prepetition Loan Agreement" means the Loan Agreement dated March 1, 2019, between Borrower and Lender, as amended, restated, or otherwise modified from time to time.

1.30    Prepetition Security Documents. The term "Prepetition Security Documents" means (a) the Security Agreement dated March 1, 2019, by Borrower to and for the benefit of Lender, and (b) the Mortgage dated March 1, 2019, by Borrower to and in favor of Lender, and recorded in the official real estate records of Washtenaw County, Michigan, on March 11, 2019, as Document No. 6461958.

1.31    Prepetition Obligations. The term "Prepetition Obligations" means the "Indebtedness" as defined in the Prepetition Loan Agreement.

1.32    Professional Expense Cap. The term "Professional Expense Cap" is defined in Section 6.1.

1.33    Projections. The word "Projections" means the financial projections and any forward-looking statements of Borrower furnished to Lender prior to the Effective Date.

1.34    Revolving Commitment. The term "Revolving Commitment" means the commitment of Lender to make or otherwise fund any Revolving Loan. The initial amount of the Revolving Commitment is $500,000.00.

1.35    Revolving Commitment Period. The term "Revolving Commitment Period" means the period from and including the Effective Date to but excluding the Termination Date.

1.36    Revolving Loan. The term "Revolving Loan" means each loan made by Lender to Borrower in accordance with Section 2.

1.37    Security Documents. The term "Security Documents" means each of the security agreements and other instruments and documents signed and delivered in accordance with Sections 3 and 7.16. The Security Documents supplement, and do not limit, the security interests granted in accordance with the DIP Order.

1.38    Termination Date. The term "Termination Date" means the earliest to occur of: (a) 60 days following the date of this agreement; (b) the acceleration of the Revolving Loans and the termination of the Revolving Commitment in accordance with the terms of this agreement; (c) the date of dismissal or conversion of the Chapter 11 Case; (d) the date a party other than Lender or an affiliate of Lender is approved by the Bankruptcy Court as the purchaser of substantially all of the assets of Borrower in a sale under sections 105, 363 and 365 of the Bankruptcy Code in accordance with the Bidding Procedures Order; or (e) the date Borrower and Lender  or an affiliate of Lender close a sale of substantially all of Borrower's assets to Lender under sections 105, 363 and 365 of the Bankruptcy Code in accordance with the Bidding Procedures Order.

1.39      UST Fees. The term "UST Fees" is defined in Section 6.1.

**2.      Revolving Loans**. During the Revolving Commitment Period, subject to the terms and in reliance on the representations and warranties of Borrower in this agreement, Lender agrees to make Revolving Loans to Borrower in amounts not to exceed in the aggregate (after giving effect to all Revolving Loans repaid) the Revolving Commitment.

2.1      Procedure for Borrowing. Borrower may borrow Revolving Loans in accordance with Section 2, provided that Borrower gives Lender irrevocable notice one business day prior to the requested borrowing date (or by such later time as Lender otherwise accepts in its sole discretion), specifying (a) the amount of the Revolving Loan to be borrowed, and (b) the requested borrowing date (a "Notice of Borrowing"). Upon receipt of any Notice of Borrowing, Lender will make the amount of each borrowing available on the borrowing date requested by Borrower in funds immediately available to Borrower.

2.2      Number of Advances. Notwithstanding any provision to the contrary in the Loan Documents, Borrower may request no more than two Revolving Loans per week.

2.3      Amount of Revolving Loans. Notwithstanding any provision to the contrary in the Loan Documents, the amount of any Revolving Loan during any week may not exceed the amount shown as necessary for that week in the applicable Budget and Projections.

2.4      Revolving Nature of Advances. Amounts borrowed in accordance with this Section 2 may be paid and re-borrowed during the Revolving Commitment Period.

2.5      Maturity. Borrower shall pay all outstanding Revolving Loans on the Termination Date.

2.6      Fees.

a.      Origination Fee. Borrower agrees to pay to Lender the Origination Fee, as fee compensation for the Revolving Commitment. The Origination Fee will be in all respects fully earned on the date of this agreement and non-refundable and non-creditable after that date. The Origination Fee will be due and payable on the Termination Date.

b.      Exit Fee. Borrower agrees to pay to Lender on the Termination Date the Exit Fee. The Exit Fee will be in all respects fully earned on the Termination Date and due and payable on the Termination Date and non-refundable and non-creditable after that date.

2.7      Repayment. On the Termination Date, Borrower promises to pay and shall pay to Lender the aggregate outstanding principal amount of the Revolving Loans, together with all then accrued and unpaid interest thereon, the Origination Fee, the Exit Fee, and all other amounts due Lender under the Loan Documents.

2.8      Prepayments. Borrower may prepay any Revolving Loan, in whole or in part, at the option of Borrower, without prepayment penalty or fee.

2.9      Interest Rate. Each Revolving Loan will bear interest for each day at a rate equal to the Interest Rate.

2.10    Late Charge. If Borrower does not make any payment of principal or interest due under this agreement within 15 days of the due date of the payment, Borrower shall pay to Lender a late charge equal to 5% of the amount of such payment.

2.11    Computation of Interest and Fees. Interest and fees payable under this agreement will be calculated assuming a year having 360 days, but charged based upon the actual number of days elapsed.

2.12    Application of Payments. Lender will apply, at its option, all payments and prepayments first to the Origination Fee and the Exit Fee, second to any costs of collection, third to any late charges, fourth to accrued interest, and the remainder to principal.

2.13    Costs of Collection. Borrower promises to pay all costs of collection under this agreement, including, but not limited to, attorneys' fees paid or incurred by Lender on account of such collection, whether or not suit is filed with respect thereto and whether or not such costs are paid or incurred, or to be paid or incurred, prior to or after the entry of judgment.

**3.**    **Conditions to Credit Extensions.** The obligation of Lender to make Revolving Loans will not become effective until the date on which each of the following conditions is satisfied:

3.1      Budget and Projections. Lender has received the Budget and the Projections, each of which will be in form and substance satisfactory to Lender.

3.2      Fees and Expenses. Lender has received all fees and other amounts due and payable on or prior to the Effective Date, including reimbursement or payment of all out-of-pocket expenses (including legal fees and expenses of any professionals or professional firms retained by Borrower) required to be reimbursed or paid by Borrower under the Loan Documents.

3.3        <u>Collateral Requirements</u>. Lender has received evidence satisfactory to it that it has, or concurrently with the Effective Date will have, a perfected lien on, and security interest in, the Collateral as set forth below in Section 6.

3.4        <u>Litigation</u>. Except for the Chapter 11 Case, there will not exist any pending or threatened litigation, proceeding, or investigation that (a) would prohibit, enjoin, or contest the transactions contemplated by the Loan Documents, or (b) could have a Material Adverse Effect.

3.5        <u>Interim Order</u>. The Bankruptcy Court has entered the Interim Order in the Chapter 11 Case in form and substance satisfactory to Lender in its reasonable discretion, and the Interim Order is in full force and has not been vacated, stayed, or modified in any manner without the prior written consent of Lender.

3.6        <u>Intercreditor Arrangements</u>. The Interim Order shall include intercreditor provisions setting forth the relative claim and lien priorities in respect of the Obligations and the Prepetition Obligations, in each case satisfactory to Lender in its reasonable discretion.

3.7        <u>Petition Date</u>. The Petition Date has occurred, and the First Day Orders sought by Borrower have been entered by the Bankruptcy Court in form and substance satisfactory to Lender in its sole discretion.

3.8        <u>Additional Conditions to Each Revolving Loan</u>. The obligation of Lender to make any future Revolving Loan (other than the initial Revolving Loan) will be subject to the following conditions precedent:

       a.      <u>No Breach of Warranties</u>. The representations and warranties contained in this agreement are correct on and as of the date of such advance as though made on and as of such date.

       b.      <u>No Defaults</u>. No event has occurred and is continuing, or would result from such Revolving Loan, that constitutes an Event of Default or would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

       c.      <u>Maximum Loan Borrowing</u>. The aggregate unpaid principal amount outstanding under the Revolving Loan, together with the requested advance, will not exceed the Revolving Commitment.

       d.      <u>Principal Reduction Payments</u>. Borrower shall make principal reduction payments to Lender as necessary, so that the aggregate outstanding principal balance of the Revolving Loans at no time exceeds the Revolving Commitment.

e. <u>Additional Information</u>. Borrower shall provide information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request, in form and substance satisfactory to Lender, in its sole discretion.

**4.** **<u>Representations and Warranties</u>**. Borrower represents and warrants to Lender as of the date of this agreement:

4.1 <u>Organization</u>. Borrower is a corporation which is duly organized, validly existing, and in good standing under the laws of the State of Michigan. Borrower has the full power and authority to own its properties and to transact the businesses in which it is presently engaged. Borrower is in good standing in all states in which the failure to so qualify would have a Material Adverse Effect.

4.2 <u>Financial Information</u>. (a) The financial statements supplied to Lender truly and completely disclose the financial condition of Borrower as of the date of the statements. (b) The Projections and any forward-looking statements, estimates, and proforma financial information furnished to Lender (including, without limitation, the Budget) are based upon good faith estimates and assumptions believed by Borrower to be reasonable at the time made.

4.3 <u>Power; Authorization; Enforceability of Agreement</u>. Subject to the entry by the Bankruptcy Court of the DIP Order, Borrower has the power to make, deliver, and perform each of the Loan Documents to which it is a party. Borrower has taken all necessary organizational action to authorize the execution, delivery, and performance of the Loan Documents to which it is a party. Subject to the entry by the Bankruptcy Court of the DIP Order, no consent or authorization of, filing with, notice to, or other act by any governmental authority or any other person is required in connection with the extensions of credit under this agreement or with the execution, delivery, performance, validity, or enforceability of the Loan Documents, except consents, authorizations, filings, and notices that have already been obtained and are in full force. The Loan Documents given by Borrower, when delivered, constitute legal, valid, and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms.

4.4 <u>Orders</u>. The Interim Order is (and the Final Order when entered will be) effective to create, in favor of Lender, for the benefit of Lender, a legal, valid, binding, and enforceable perfected security interest in the Collateral and the proceeds and products of the Collateral without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents.

4.5    Hazardous Substances. The terms "hazardous substance," "disposal," "release," and "threatened release," as used in this agreement shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. section 9601, et seq. (CERCLA), the Superfund Amendments and Reauthorization Act of 1986, as amended, Pub. L. No. 99-499 (SARA), the Hazardous Materials Transportation Act, as amended, 49 U.S.C. section 1801, et seq., the Resource Conservation and Recovery Act, as amended, 49 U.S.C. section 6901, et seq., or other applicable state of federal laws, rules or regulations adopted pursuant to any of the foregoing. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (a) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under or about any of the properties; (b) Borrower has no knowledge of, or reason to believe that there has been (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any Hazardous Substance by any prior owners or occupants of any of the properties, or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters; (c) Neither Borrower nor any tenants, contractor, agents or other authorized user of any of the properties shall use, generate, manufacture, store, treat, dispose of, or release any Hazardous Substance on, under, or about any of the properties; and any such activity shall be conducted in compliance with all applicable federal, state and local laws, regulations and ordinances, including without limitation those laws, regulations and ordinances described above. Borrower authorizes Lender and its agents to enter upon the properties to make such inspections and tests as Lender may deem appropriate to determine compliance of the properties with this Section of this agreement. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the properties for Hazardous Substances. Borrower hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this Section of this agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Borrower's ownership or interest in the properties, whether or not the same was or should have been known to Borrower. The provisions of this Section of this agreement, including the obligation to indemnify, shall survive the payment of the Obligations and the termination or expiration of this agreement and shall not be affected by Lender's acquisition of any interest in any of the properties, whether by foreclosure or otherwise.

4.6          **Information**. All information heretofore or contemporaneously herewith furnished by Borrower to Lender for the purposes of or in connection with this agreement or any transaction contemplated hereby is, and all information hereafter furnished by or on behalf of Borrower to Lender will be, true and accurate in every material respect on the date as of which such information is dated or certified; and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading.

4.7          **Survival of Representations and Warranties**. Borrower understands and agrees that Lender is relying upon the above representations and warranties in extending credit to Borrower. Borrower further agrees that the foregoing representations and warranties will be continuing in nature and will remain in full force and effect until all of the Revolving Loans are paid in full, or until this agreement is terminated in the manner provided above, whichever is the last to occur.

**5.**      **Affirmative Covenants**. Borrower covenants and agrees with Lender that, while this agreement is in effect, Borrower will:

5.1          **Financial Records**. Maintain its books and records in accordance with generally accepted accounting principles, applied on a consistent basis, and permit Lender to examine and audit, at Lender's expense, Borrower's books and records at all reasonable times.

5.2          **Financial Statements**. As soon as available, but in any event not later than fifteen days after the end of each calendar month, deliver to Lender an unaudited balance sheet and an unaudited statement of income for such month, in each case setting forth a variance report comparing such balance sheet and statement of income against the projected balance sheet and related statements of income provided to Lender in the Budget, in each case, certified by an officer of Borrower as being fairly stated in all material respects (subject to normal year-end audit adjustments and the absence of footnotes). All financial statements delivered as required under this Section 5.2 must be complete and correct in all material respects (subject to normal year-end audit adjustments and quarterly adjustments and the absence of footnotes) and must be prepared in reasonable detail and in accordance with generally accepted accounting principles, applied on a consistent basis.

5.3          **Budgets**. As soon as available, but in any event not later than two business days after the end of each calendar week, deliver to Lender a Budget, in each case, certified by an officer of Borrower as being fairly stated in all material respects. All Budgets delivered as required under this Section 5.3 must be complete and correct in all material respects and must be prepared in reasonable detail and in

accordance with generally accepted accounting principles, applied on a consistent basis.

5.4     <u>Additional Information</u>. Promptly furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request from time to time.

5.5     <u>Pleadings</u>. Deliver to Lender all pleadings, motions, applications, judicial, or financial information, and other documents when filed by or on behalf of Borrower with the Bankruptcy Court, if any such pleadings are (a) requests for relief under sections 363 or 365 of the Bankruptcy Code, or (b) directly related to the Loan Documents, bidding procedures, or any plan of reorganization or plan of liquidation, and any disclosure statement related thereto shall be delivered in advance of the filing thereof to the extent reasonably practical. Borrower will not be required, however, to deliver any such pleading, motion, application, judicial, or financial information to the extent it is accessible to Lender on the electronic docket maintained for the Chapter 11 Case. Moreover, this Section 5.5 will not require delivery of any sealed documents or unredacted versions of documents for which Borrower is seeking sealed treatment.

5.5     <u>First Day Orders</u>. Cause all First Day Orders and all other Chapter 11 Orders establishing procedures for administration of the Chapter 11 Case or approving significant transactions entered by the Bankruptcy Court to be in accordance with and permitted by the terms of this agreement and reasonably acceptable to Lender in all respects.

5.7     <u>Chapter 11 Sale Milestones</u>.

     a.    <u>Bidding Procedures Motion</u>. On the Petition Date, Borrower shall have filed a motion in the Chapter 11 Case with the Bankruptcy Court, in form and substance reasonably acceptable to Lender (the "Bidding Procedures Motion") requesting a Chapter 11 Order approving bidding procedures and approval of a sale of all or substantially all of the assets of Borrower under sections 105, 363 and 365 of the Bankruptcy Code, which motion and bidding procedures (including the bidding protections set forth in this agreement) shall be on terms reasonably acceptable to Lender.

     b.    <u>Bidding Procedures Order</u>. On or before March 29, 2019, the Bankruptcy Court shall have entered a Chapter 11 Order (the "Bidding Procedures Order") approving the bidding procedures set forth in the Bidding Procedures Motion, which Bidding Procedures Order shall be in form and substance reasonably acceptable to Lender.

c. <u>Competing Bids</u>. On or before April 25, 2019, binding bids with respect to a competing transaction, if any, shall be due and delivered to Borrower in accordance with the Bidding Procedures Order, with copies of such bids being provided to Lender.

d. <u>Auction</u>. On or before April 29, 2019, an auction with respect to a competing transaction, if any, shall have been completed in accordance with the Bidding Procedures Order.

e. <u>Sale</u>. The Bankruptcy Court shall have entered a Chapter 11 Order approving the sale of substantially all of Borrower's assets in a sale under sections 105, 363 and 365 of the Bankruptcy Code on or before May 3, 2019, and such sale shall have closed on or before May 6, 2019.

f. <u>Payment</u>. The irrevocable payment in full of all Obligations and the Prepetition Obligations has occurred on or before May 6, 2019.

g. <u>Information Regarding Sale Process</u>. Borrower shall provide Lender with a status report and such other updated information relating to the sale process as may be reasonably requested by Lender, in form and substance reasonably acceptable to Lender.

5.8 <u>Chapter 11 Case Milestones</u>. The Bankruptcy Court shall have entered (a) the Interim Order not later than March 29, 2019, and (b) the Final Order not later than May 3, 2019.

5.9 <u>Insurance</u>. Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages, and with insurance companies reasonably acceptable to Lender. Borrower, upon request of Lender, will deliver from time to time the policies or certificates of insurance in form satisfactory to Lender.

5.10 <u>Performance</u>. Perform and comply with all terms, conditions, and provisions set forth in this agreement and in all other instruments and agreements between Borrower and Lender in a timely manner.

5.11 <u>Operations</u>. Conduct its business affairs in a reasonable and prudent manner and in compliance with all applicable federal, state, and municipal laws, ordinances, rules, and regulations respecting its properties, charters, businesses, and operations.

5.12 <u>Inspection</u>. Permit employees or agents of Lender at any reasonable time to inspect all Collateral and to examine or audit Borrower's books, accounts, and records and make copies and memoranda of Borrower's books, accounts, and

records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

5.13    Proceeds of Revolving Loans. Use the proceeds from the Revolving Loans only to: (a) pay reasonable costs, fees, and expenses of Lender, associated with the transactions contemplated by the Loan Documents; (b) pay for fees, costs, and expenses incurred by persons or firms retained by Borrower in accordance with sections 327, 328, or 363 of the Bankruptcy Code; and (c) provide ongoing working capital requirements of Borrower and to pay for fees, costs, and expenses related to the Chapter 11 Case; each in accordance with the Budget.

5.14    Additional Assurances. Make, sign and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Revolving Loans and to perfect Lender's security interest in the Collateral.

5.15    Notification. Immediately upon any officer of Borrower becoming aware of any Event of Default or event which, through passage of time, may become an Event of Default, provide to Lender notice of the nature thereof and the action, if any, Borrower proposes to take with respect thereto.

6.    **Priority and Liens**.

6.1    Carve-Out. The "Carve-Out" consists of all amounts needed for the payment of (a) Bankruptcy Court allowed and unpaid fees, expenses, and disbursements of professionals in amounts not to exceed the line items allocated to each professional under the Budget (in the aggregate, the "Professional Expense Cap"), and (b) the payment of fees pursuant to 28 U.S.C. § 1930 ("UST Fees"); provided, that so long as the Termination Date has not occurred, (i) Borrower may borrow under the Revolving Loan to fund each professional's weekly allocated amount under the Budget in advance, which each professional will hold in trust for application to the professional's invoices when allowed by the Bankruptcy Court, and Borrower will be permitted to pay allowed UST Fees as the same are due and payable in an amount not to exceed those set forth in the Budget; and (ii) payments of professional fees and UST Fees shall not reduce the amount of the Carve-Out. During the continuance of an Event of Default or a default under the Interim Order or the Final Order, as the case may be, any payments actually made to such professionals during such continuance shall reduce the Professional Expense Cap on a dollar-for-dollar basis.

6.2     Superpriority Claims. Subject to the Carve-Out, the DIP Order, and the superpriority claim of Crestmark, a division of MetaBank, as successor to Crestmark Bank, against Borrower under section 364(c)(1) of the Bankruptcy Code, the Obligations are entitled, in accordance with section 364(c)(1) of the Bankruptcy Code (without the need to file a proof of claim), to a superpriority claim against Borrower, Borrower's estate and Borrower's property and assets, excluding all Avoidance Actions and the proceeds thereof, with priority over any and all other obligations, liabilities, and indebtedness of Borrower, now existing or hereafter arising, of any kind whatsoever, and including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final Order), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code, whether now in existence of hereafter incurred by Borrower, and shall at all times be senior to the rights of Borrower, Borrower's estate, and any successor trustee, estate representative, or any creditor, in the Chapter 11 Case or any subsequent cases or proceedings under the Bankruptcy Code (the "Lender Superpriority Claim"), and the Lender Superpriority Claim shall have recourse to and be payable from all prepetition and postpetition assets of Borrower, including, but not limited to, the Collateral.

6.3     Senior Lien on Unencumbered Assets. The Obligations are, subject to the Carve-Out and the DIP Order, in accordance with section 364(c)(2) of the Bankruptcy Code, secured by a perfected lien on all Collateral, whether arising prior to, on or after the Petition Date, that was not subject to any valid, perfected and non-avoidable liens as of the Petition Date.

6.4     Junior Lien on Certain Encumbered Assets. The Obligations are, subject to the Carve-Out and the DIP Order, in accordance with section 364(c)(3) of the Bankruptcy Code, secured by a perfected lien on all Collateral, whether arising prior to, on or after the Petition Date, which perfected lien securing the Obligations is subject to valid, perfected and non-avoidable liens as of the Petition Date that were permitted under the terms of the Prepetition Loan Agreement and that were senior in priority to the liens granted under the Prepetition Security Documents.

6.5     Claims and Liens Effective. All of the claims and liens described in Sections 6.2, 6.3 and 6.4 will be effective and perfected as of the date that the Bankruptcy Court enters the Interim Order, without the necessity of the signing or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents. Borrower shall sign and deliver to Lender (for recording or filing, as appropriate) such mortgages and pledges (and other Security Documents), and Lender will be authorized in accordance with the DIP Order to file such financing statements and other instruments and documents, as advisable (as reasonably determined by Lender) to evidence and secure the

Obligations. Borrower shall set forth the cost of such recording and filing in the Budget.

**7.** **Events of Default**. Each of the following shall constitute an Event of Default under this agreement:

7.1    Payment Defaults. Failure of Borrower to make any payment of (a) any principal of the Revolving Loans when due or (b) any interest on the Revolving Loans, or any other amount payable under the Loan Documents, within three days after such interest or other amount becomes due in accordance with the terms thereof.

7.2    Other Defaults. Failure of Borrower to materially comply with or to perform when due any other term contained in the Loan Documents, or failure of Borrower to materially comply with or to materially perform any other term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or between Lender.

7.3    False Statements. Any warranty, representation, or statement made or furnished to Lender by or on behalf of Borrower under the Loan Documents is false or misleading in any material respect, either now or at the time made or furnished.

7.4    Defective Collateralization. Any of the Loan Documents, other than as expressly permitted under this agreement or the other Loan Documents, ceases to be in full force (including failure of the Security Documents to create a valid and perfected lien and security interest in any Collateral) at any time and for any reason.

7.5    Final Order. The Bankruptcy Court has not entered the Final Order on or before May 3, 2019, or the Final Order is not in full force or has been vacated, reversed, or modified in any respect adverse to Lender without its prior written consent.

7.6    Dismissal of Chapter 11 Case. Any dismissal of the Chapter 11 Case (or the Bankruptcy Court makes a ruling requiring the dismissal of the Chapter 11 Case), suspension of the Chapter 11 Case, or conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or Borrower files any pleading requesting such relief; or Borrower files a motion for the approval of, or there arises (a) except as otherwise provided in this agreement, any other claim having priority senior to or pari passu with the claims of Lender under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code (other than the claims of Lender with respect to the Prepetition Obligations and the Carve-Out) or (b) any lien on the Collateral having a priority senior to or pari passu with the liens and security

interests granted in this agreement, except as expressly provided in this agreement and in the DIP Order.

7.7     Adverse Orders. Borrower files a motion seeking, or a Chapter 11 Order is entered: (a) approving payment of any pre-petition claim other than (i) as provided in a First Day Order or (ii) as otherwise consented to by Lender in writing; (b) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $100,000 in the aggregate or to permit other actions that would have a Material Adverse Effect; or (c) approving any settlement or other stipulation not approved by Lender and not included in the Budget with any secured creditor of Borrower providing for payments as adequate protection or otherwise to such secured creditor.

7.8     DIP Order. The DIP Order (a) ceases to be in full force, or (b) is amended, stayed, reversed, vacated, or otherwise modified in any respect adverse to Lender without the prior written consent of Lender.

7.9     Failure to Comply with Order. Borrower fails to comply with the terms of any Chapter 11 Order in any material respect.

7.10    Trustee. A Chapter 11 Order is entered appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3), (4) of the Bankruptcy Code in the Chapter 11 Case (or Borrower files or otherwise supports any pleading seeking such relief).

7.11    Confirmation of Amount. Borrower supports (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest signed by or on behalf of Borrower) any other person's opposition to any motion made in the Bankruptcy Court by Lender seeking confirmation of the amount of Lender's claim or the validity and enforceability of the liens in favor of Lender.

7.12    Loan Documents. Borrower seeks to, or supports (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest signed by or on behalf of Borrower) any other person's motion to, disallow in whole or in part Lender's claim in respect of the Obligations or to challenge the validity and enforceability of the liens in favor of Lender or contest any material provision of any Loan Document; or such liens or superpriority claims otherwise cease to be valid, perfected, and enforceable in all respects.

7.13    Adverse Motions. Borrower files any pleading or proceeding that could reasonably be expected to result in a Material Adverse Effect, or a Chapter 11

Order is entered with respect to any pleading or proceeding brought by any other person that results in a Material Adverse Effect.

7.14    Further Assurances. Borrower fails to sign and deliver to Lender any agreement, financing statement, mortgages, notice of lien, or similar instrument or document that is necessary, or that Lender may reasonably request from time to time, to more fully evidence, confirm, validate, perfect, preserve, and enforce the liens created in favor of Lender under the DIP Order.

7.15    Milestones. Borrower fails to meet any of the milestones set forth in Sections 5.7 and 5.8 unless satisfaction of such milestone is waived by Lender in writing.

**8.    Rights and Remedies of Lender upon Default.** Upon the occurrence of an Event of Default, Lender may, in its sole discretion:

8.1    Acceleration. Lender may, by notice to Borrower, declare the Revolving Commitment to be terminated forthwith, whereupon the Revolving Commitment will immediately terminate, and (b) Lender may, by notice to Borrower, declare the Revolving Loans (with accrued interest thereon) and all other amounts owing under the Loan Documents to be due and payable forthwith, whereupon the same will immediately become due any payable. Except as expressly provided in this Section 8.1, Borrower expressly waives presentment, demand, protest, nonpayment, dishonor, and all other notices of any kind.

8.2    Automatic Stay. Lender may file an expedited motion for relief from the automatic stay provided in section 362 of the Bankruptcy Code upon five business days' notice to enforce its rights and remedies under the Loan Documents. Borrower's sole defense to such motion shall be that no Event of Default has occurred or is continuing.

8.3    Other Remedies. In addition to the remedies set forth above, Lender may exercise any other remedies provided for by this agreement and the Security Documents in accordance with their terms.

8.4    Remedies Cumulative. Each and every power or remedy herein specifically given will be in addition to every other power or remedy, existing or implied, given now or hereafter existing at law or in equity, and each and every power and remedy herein specifically given or otherwise so existing may be exercised from time to time and as often and in such order as may be deemed expedient by Lender, and the exercise or the beginning of the exercise of one power or remedy shall not be deemed a waiver of the right to exercise at the same time or thereafter any other power or remedy. No delay or omission of Lender in the exercise of any right or power accruing hereunder shall impair any such right or power or be construed to be a waiver of any default or acquiescence therein.

**9.** **Miscellaneous Provisions**. The following miscellaneous provisions are a part of this agreement:

9.1    Amendments. This agreement may not be amended or modified except in a writing signed by all parties hereto.

9.2    Counterparts. This agreement may be signed in several counterparts, each of which will, for all purposes, be deemed an original, and all of such counterparts, taken together, will constitute the same agreement.

9.3    Choice of Law/Venue, Severability. This agreement is made in the State of Minnesota and shall be construed in accordance with the laws thereof. Any action or proceeding arising out of this agreement shall be venued in the Bankruptcy Court. If any provision hereof is in conflict with any statute or rule of law of the State of Minnesota of is otherwise unenforceable, such provisions shall be deemed null and void only to the extent of such conflict or unenforceability, and shall be deemed separate from and shall not invalidate any other provision of this agreement. If any of the provisions of this agreement are determined to be unenforceable by reason of extent, duration, scope or otherwise, the parties contemplate that the Court making such determination shall modify such extent, duration, scope or other provisions and enforce them for the purposes set forth in this agreement.

9.4    Time is of the Essence. Time is of the essence in the performance of this agreement.

9.5    Notices. All notices required to be given under this agreement shall be given in writing and shall be effective when actually delivered or when deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown below:

|  |  |
|---|---|
| Borrower: | THOMSON-SHORE, INC. |
|  | Attn. Peter Shima |
|  | 7300 W Joy Rd |
|  | Dexter, MI 48130 |
| Lender: | CJK GROUP, INC. |
|  | Attn. Brianna Blazek |
|  | General Counsel |
|  | 3323 Oak Street |
|  | Brainerd, MN 56401 |

Any party may change its address for notices under this agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.

9.6     Entire Agreement. This agreement, together with the other Loan Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this agreement.

9.7     Costs and Expenses. Borrower agrees to pay upon demand all of Lender's out-of-pocket expenses, including reasonable attorneys' fees, incurred in connection with this agreement or in connection with the Revolving Loans made under this agreement. Lender may pay someone else to help collect the Revolving Loans and to enforce this agreement, and Borrower will pay that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and legal expenses, whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also will pay any court costs, in addition to all other sums provided by law.

9.8     Successors and Assigns. The provisions of this agreement will be binding upon and inure to the benefit of the parties and their successors and assigns. Borrower, however, may not assign or otherwise transfer any of its rights or obligations under this agreement without the prior written consent of Lender. Lender may assign or otherwise transfer any of its rights or obligations under this agreement, without the consent of the Bankruptcy Court, to an affiliate of Lender, which affiliate will be entitled to all of the rights and protections provided to Lender in the Loan Documents, including the DIP Order.

9.9     Survival. All warranties, representations, and covenants made by Borrower in this agreement or in any certificate or other instrument delivered by Borrower to Lender under this agreement shall be considered to have been relied upon by Lender and will survive the making of the Revolving Loans and delivery to Lender of the Loan Documents, regardless of any investigation made by Lender or on Lender's behalf.

9.10    Waiver. Lender shall not be deemed to have waived any rights under this agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.

*[SIGNATURE PAGE FOLLOWS]*

*[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION LOAN AGREEMENT]*

The parties are signing this agreement on the date stated in the introductory clause.

**BORROWER:**

THOMSON-SHORE, INC.,
a Michigan corporation

By: _____
      Peter Shima, President

**LENDER:**

CJK GROUP, INC.,
a Minnesota corporation

By: _____
      Chris Kurtzman, Chief Executive Officer

# EXHIBIT C

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Number | | | | | | | | | | | | | | |
| Week Ending | 3/29/2019 | 4/5/2019 | 4/12/2019 | 4/19/2019 | 4/26/2019 | 5/3/2019 | 5/10/2019 | 5/17/2019 | 5/24/2019 | 5/31/2019 | 6/7/2019 | 6/14/2019 | 6/21/2019 | |
| Net Cash Received | $ 380,000 | $ 380,000 | $ 427,500 | $ 475,000 | $ 475,000 | $ 475,000 | $ 475,000 | $ 475,000 | $ 475,000 | $ 475,000 | $ 475,000 | $ 475,000 | $ 475,000 | $ 5,962,500 |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | |
| Materials | $ 213,000 | $ 175,000 | $ 197,000 | $ 219,000 | $ 219,000 | $ 219,000 | $ 219,000 | $ 219,000 | $ 219,000 | $ 219,000 | $ 219,000 | $ 219,000 | $ 219,000 | $ 2,775,000 |
| Payroll and Payroll Tax/Withholdings | $ 16,000 | $ 310,000 | $ 16,000 | $ 310,000 | $ 16,000 | $ 310,000 | $ 16,000 | $ 310,000 | $ 16,000 | $ 310,000 | $ 16,000 | $ 310,000 | $ 16,000 | $ 1,972,000 |
| Health Insurance (BC/BS) | $ 118,000 | $ - | $ - | $ - | $ 118,000 | $ - | $ - | $ - | $ 118,000 | $ - | $ - | $ - | $ 118,000 | $ 472,000 |
| R & M Machinery | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 | $ 17,000 | |
| Utilities | $ 75,000 | $ - | $ 32,000 | $ 32,000 | $ 32,000 | $ 32,000 | $ 32,000 | $ 32,000 | $ 32,000 | $ 32,000 | $ 32,000 | $ 32,000 | $ 32,000 | $ 171,000 |
| Supplies | $ 22,000 | $ 22,000 | $ 22,000 | $ 22,000 | $ 22,000 | $ 22,000 | $ 22,000 | $ 22,000 | $ 22,000 | $ 22,000 | $ 22,000 | $ 22,000 | $ 22,000 | $ 286,000 |
| Insurance - General | $ 3,300 | $ 3,300 | $ 3,300 | $ 3,300 | $ 3,300 | $ 3,300 | $ 3,300 | $ 3,300 | $ 3,300 | $ 3,300 | $ 3,300 | $ 3,300 | $ 3,300 | |
| Other Manufacturing Expense | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | |
| Information Systems | $ 4,700 | $ 4,700 | $ 4,700 | $ 4,700 | $ 4,700 | $ 4,700 | $ 4,700 | $ 4,700 | $ 4,700 | $ 4,700 | $ 4,700 | $ 4,700 | $ 4,700 | |
| Bank and Credit Card Fees | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | |
| Other Administrative Expense | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | |
| Total Cash Disbursements For Operations | $ 474,700 | $ 537,700 | $ 265,700 | $ 583,700 | $ 437,700 | $ 583,700 | $ 287,700 | $ 581,700 | $ 437,700 | $ 583,700 | $ 287,700 | $ 581,700 | $ 437,700 | $ 6,131,100 |
| Net Cash Flow From Operations | $ (94,700) | $ (157,700) | $ 161,800 | $ (106,700) | $ 37,300 | $ (106,700) | $ 187,300 | $ (106,700) | $ 37,300 | $ (106,700) | $ 187,300 | $ (106,700) | $ 37,300 | |
| Legal and Professional Fees | $ 13,500 | $ 13,500 | $ 13,500 | $ 13,500 | $ 13,500 | $ 13,500 | $ 13,500 | $ 13,500 | $ 13,500 | $ 13,500 | $ 13,500 | $ 13,500 | $ 13,500 | |
| Adequate Protection Payments 'ONG' | | $ 29,333 | | | | $ 29,333 | | | | | $ 29,333 | | | |
| Leases | | | $ 4,670 | | | | $ 4,670 | | | | | $ 4,670 | | |
| DIP Interest | | | | | $ 2,000 | | | | | $ 2,500 | | | $ 3,000 | |
| Contingency | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | |
| Total other | $ 17,500 | $ 46,833 | $ 22,170 | $ 17,500 | $ 19,500 | $ 46,833 | $ 22,170 | $ 17,500 | $ 19,800 | $ 20,000 | $ 46,833 | $ 22,170 | $ 20,500 | $ 337,010 |
| Net Cash Flow | $ (112,200) | $ (204,533) | $ 139,630 | $ (124,200) | $ 17,800 | $ (153,533) | $ 165,130 | $ (124,200) | $ 19,800 | $ (126,700) | $ 140,467 | $ (128,870) | $ 16,800 | |
| Cumulative | $ (112,200) | $ (316,733) | $ (177,103) | $ (301,303) | $ (283,503) | $ (437,037) | $ (271,907) | $ (396,107) | $ (376,307) | $ (503,007) | $ (362,540) | $ (491,410) | $ (474,610) | |
| DIP Loan Required | | | | | | | | | | | | | | |

$ 500,000

Comments:

First few weeks of shipments may be lower due to supplier disruptions

Utilities - we have been advised some utilities may require escrow accounts, $ is for current month

Leases - lease payments not included in operating expenses

Legal and Professional Fees:

Goldstein ("r-5 bk attny): $7,500 per week

Eby ("r-5 bk attny): $2,500 per week

Unsecured creditors committee: $3,500/wk

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re: Thomson-Shore, Inc.

Debtor.

_____/

Case No. 19-
Chapter 11
Hon:

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2019 I electronically filed the following papers with the Clerk of the Court using the ECF system which will send notification of such filing to the following ECF Participants:

| Documents Filed: | First Day Motion for Entry of Order (I) Authorizing Debtor to Obtain Postpetition Financing on a Senior Secured, Superpriority Basis, And(II) Scheduling a Final Hearing and Proposed Order |
|---|---|
| ECF Participants: | All parties listed by the Court for service via electronic mailing |

And I hereby certify that on March 25, 2019 I served the documents as indicated on the attached page:

/s/ Jennifer L. Gamalski
Jennifer L. Gamalski
4000 Town Center, Suite 1200
Southfield, MI 48075
Phone: (248) 355-5300
Fax: (248) 355-4644
Scott M. Kwiatkowski P-67871
email scott@bk-lawyer.net

Dated: March 25, 2019

| Secured Creditors | Contact | Served at: |
|---|---|---|
| Bindtech, LLC | Chad Dillon | cdillon@bindtechinc.com |
| CJK Group | Aaron Crandall | Aaron.Crandall@gpmlaw.com |
| Crestmark Bank | Paul Hage | phage@jaffelaw.com |
| Eastman Kodak Co. | Mustapha (Steve)Dakroub<br><br>Jodi Westacott | Mustapha.dakroub@kodak.com<br><br>Jodi.Westacott@Kodak.com |
| Old National Bank | Julie Teicher | jteicher@maddinhauser.com |
| Plymouth Packaging | Carlos Evangelista | Carlos.Evangelista@westrock.com |
| Ryder Exchange | David Phillips | david_r_phillips@ryder.com |
| Webster Township Treas | Bill Sinkule | bsinkule@twp.webster.mi.us |
| Xerox Financial Services | Heather Thomas | heather.thomas@mos-xerox.com |
| | | |
| USTrustee | Paul Randel | paul.randel@usdoj.gov |

| | | |
|---|---|---|
| **Top 20 Unsecured** | | |
| AXA / MONY Life Ins. | Litigation | litigationservicedocs@axa-equitable.com |
| BC Adhesives | Melissa Shibilski | mshibilski@bcadhesives.com |
| Berryville Graphics | Mitchel W. | Mitchelw.@coralgraphics.com |
| Circle, Inc. | Ben Alba | balba@circleincorporated.com |
| DTE | Ms. Anderson | andersonaj@dteenergy.com |
| Ecological Fibers | Chris White<br>V. Losey | cwhite@ecofibers.com<br>vlosey@ecofibers.com |
| FujiFilm Graphic | Sandy Stachurski | sstachurski@fujifilm.com |
| Hamernik LLC | Customer Service | contactus@hamernik.com |
| Holland Litho Printing | Customer Service | sales@hollandlitho.com |
| KBA / Koenig & Bauer | Joni Key | joni.key@koenig-bauer.com |
| LBS, Inc. | Robert Mauritz | RobM@lbsbind.com |
| Lindenmyr Munroe | Jim Devries and<br>Steven Savino | jdevries@lindenmeyr.com<br>ssavino@cng-inc.com |
| Millcraft Paper | Doug Spencer | spencerd@millcraft.com |
| Muller Martini Corporation | Mary Boitano | mary.boitano@mullermartini.com |
| Rowman & Littlefield | K. Flowers | kflowers@nbnbooks.com |
| Transcendia, Inc. | Lucy Molina | Lucy.Molina@transcendia.com |
| UPS | | Corporate Headquarters<br>55 Glenlake Parkway NE<br>Atlanta, GA 30328 |
| US Bank | Claims | poc@ourcardhelp.com |
| Vertiv | Mike Davis or<br>Dean Wall | michael.davis@veritivcorp.com<br>dean.wall@veritiv.com |
| Woodland Paper, Inc. | Andy McLaughlin | amclaughlin@woodlandpaper.com |

| Counsel for DIP Lenders | Paul Hage, Esq. | phage@jaffelaw.com |
|---|---|---|
| | Aaron Crandall, Esq. | Aaron.Crandall@gpmlaw.com |
| | | |