# EXHIBIT B

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

THOMSON-SHORE, INC.,
a Michigan corporation

AND

SHERIDAN DEXTER, INC.,
a Minnesota corporation

March 25, 2019

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| AGREEMENT | | 1 |
| | | |
| ARTICLE 1 DEFINITIONS | | 2 |
| Section 1.1 | Definitions | 2 |
| Section 1.2 | Cross References | 9 |
| Section 1.3 | Interpretive Provisions | 10 |
| | | |
| ARTICLE 2 PURCHASE AND SALE | | 11 |
| Section 2.1 | Purchase and Sale | 11 |
| Section 2.2 | Excluded Assets | 13 |
| Section 2.3 | Assumed Liabilities | 14 |
| Section 2.4 | Excluded Liabilities | 15 |
| Section 2.5 | Purchase Option | 16 |
| Section 2.6 | Assumption/Assignment of Contracts and Rights | 17 |
| Section 2.7 | Purchase Price; Adjustments; Allocation of Purchase Price | 17 |
| Section 2.8 | Closing Costs and Payments | 19 |
| Section 2.9 | Prorations | 19 |
| Section 2.10 | Deposit | 20 |
| Section 2.11 | Closing | 20 |
| Section 2.12 | Deliveries by Seller | 20 |
| Section 2.13 | Deliveries by Purchaser | 22 |
| Section 2.14 | Title Insurance | 22 |
| | | |
| ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLER | | 23 |
| Section 3.1 | Organization | 23 |
| Section 3.2 | Corporate Authorization | 23 |
| Section 3.3 | Governmental Authorization | 24 |
| Section 3.4 | Noncontravention | 24 |
| Section 3.5 | Required Consents | 24 |
| Section 3.6 | Litigation | 24 |
| Section 3.7 | Permits | 24 |
| Section 3.8 | Intellectual Property Rights | 24 |
| Section 3.9 | Compliance with Laws and Court Orders | 25 |
| Section 3.10 | Real Property | 25 |
| Section 3.11 | Business Employees; Employee Benefit Plans | 25 |
| Section 3.12 | Title to the Purchased Assets | 26 |
| Section 3.13 | Certain Fees | 27 |
| Section 3.14 | Taxes | 27 |
| Section 3.15 | Labor Matters | 27 |
| Section 3.16 | Environmental Matters | 27 |
| Section 3.17 | Contracts | 28 |
| Section 3.18 | Inventory | 29 |
| Section 3.19 | Accounts Receivable | 29 |

i

|  |  | Page |
|---|---|---|
| Section 3.20 | Insurance | 29 |
| Section 3.21 | Patriot Act; OFAC Certification | 29 |
| **ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER** |  | **30** |
| Section 4.1 | Organization | 30 |
| Section 4.2 | Corporate Authorization | 30 |
| Section 4.3 | Governmental Authorization | 30 |
| Section 4.4 | Noncontravention | 30 |
| Section 4.5 | Financial Wherewithal | 31 |
| Section 4.6 | Litigation | 31 |
| Section 4.7 | Certain Fees | 31 |
| Section 4.8 | "AS IS" TRANSACTION | 31 |
| Section 4.9 | Inspections | 32 |
| **ARTICLE 5 COVENANTS OF SELLER** |  | **32** |
| Section 5.1 | Conduct of the Business | 32 |
| Section 5.2 | Access to Information | 33 |
| Section 5.3 | Notices of Certain Events | 34 |
| Section 5.4 | WARN Act | 34 |
| **ARTICLE 6 COVENANTS OF PURCHASER** |  | **34** |
| Section 6.1 | Confidentiality | 34 |
| Section 6.2 | Post-Closing Access | 34 |
| Section 6.3 | Notices of Certain Events | 35 |
| Section 6.4 | Casualty | 35 |
| **ARTICLE 7 COVENANTS OF PURCHASER AND SELLER** |  | **35** |
| Section 7.1 | Efforts; Further Assurances | 35 |
| Section 7.2 | Certain Filings | 35 |
| Section 7.3 | Public Announcements | 35 |
| Section 7.4 | Bankruptcy Court Matters | 36 |
| Section 7.5 | Notices | 38 |
| Section 7.6 | Receivables and Post-Closing Receipts | 38 |
| Section 7.7 | Name Change | 38 |
| Section 7.8 | No Successor Liability | 39 |
| **ARTICLE 8 TAX MATTERS** |  | **39** |
| Section 8.1 | Tax Cooperation | 39 |
| Section 8.2 | Transfer Taxes | 39 |
| **ARTICLE 9 EMPLOYEE MATTERS** |  | **39** |
| Section 9.1 | Business Employees and Offers of Employment | 39 |

ii

CR4812-0732-7017 v13

Section 9.2     Employee Plans ..................................................................................... 40

**ARTICLE 10 CLOSING CONDITIONS** ......................................................................... 41
Section 10.1    Conditions to Obligations of Purchaser and Seller ............................... 41
Section 10.2    Conditions to Obligations of Purchaser .................................................. 41
Section 10.3    Conditions to Obligations of Seller ........................................................ 42

**ARTICLE 11 SURVIVAL** ............................................................................................... 42
Section 11.1    Survival ..................................................................................................... 42

**ARTICLE 12 TERMINATION** ....................................................................................... 42
Section 12.1    Grounds for Termination ......................................................................... 42
Section 12.2    Effect of Termination ............................................................................... 44

**ARTICLE 13 MISCELLANEOUS** .................................................................................. 45
Section 13.1    Notices ....................................................................................................... 45
Section 13.2    Waivers ...................................................................................................... 46
Section 13.3    Binding Effect; Assignment .................................................................... 46
Section 13.4    Governing Law .......................................................................................... 46
Section 13.5    Jurisdiction ................................................................................................ 47
Section 13.6    Waiver of Jury Trial .................................................................................. 47
Section 13.7    No Third Party Beneficiaries ................................................................... 47
Section 13.8    Entire Agreement; Amendments; Counterparts ...................................... 47
Section 13.9    Headings .................................................................................................... 47
Section 13.10   Joint Drafting ............................................................................................ 48
Section 13.11   Expenses .................................................................................................... 48
Section 13.12   Injunctive Relief ....................................................................................... 48
Section 13.13   Disclosure Schedules ................................................................................ 48

**EXHIBIT A** ....................................................................................................................... 1

**EXHIBIT B** ....................................................................................................................... 2

**EXHIBIT C** ....................................................................................................................... 3

**EXHIBIT D** ....................................................................................................................... 4

0784812-0733-3017-v13

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT dated as of March 25, 2019, (this "Agreement") is entered into by and among Sheridan Dexter, Inc., a Minnesota corporation ("Purchaser"), on the one hand and Thomson-Shore, Inc., a Michigan corporation ("Seller"), on the other hand. Purchaser and Seller are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

WHEREAS, Seller operates a commercial printing business that provides print services and solutions, binding services and solutions, and publishing and distribution services and solutions, along with related services and technologies (including, without limitation, prepress, print, mailing and digital solutions) to the commercial and retail print markets, including catalogs and publications inclusive of books and magazines, retail (direct mail and inserts), educational text and workbooks and digital printing and solutions (the "Business");

WHEREAS, Seller is indebted to CJK Group, Inc., the parent company to Purchaser ("Parent") pursuant to certain Pre-Petition Loans (as defined below);

WHEREAS, Seller desires to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase such Purchased Assets and to assume such Assumed Liabilities, upon the terms and subject to the conditions set forth herein;

WHEREAS, the board of directors (or similar governing body) of Seller has determined that it is advisable and in the best interests of Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Approval Order (as defined below), and the board of directors of Seller has approved the same.

WHEREAS, Seller intends to file a voluntary petition for reorganization relief (the "Bankruptcy Case", and the date of such filing, the "Petition Date"), pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and in connection with such filing, seek the entry of an order by the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") approving this Agreement and authorizing Seller to consummate the transactions contemplated hereby and by the Ancillary Agreements (as defined below);

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to an Approval Order (as defined below) to be entered in the Bankruptcy Case under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and in order to prescribe the

terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

# ARTICLE 1

## DEFINITIONS

Section 1.1  Definitions.  The following terms, as used herein, have the following meanings:

(a)  "Accounts Receivable" means all accounts, accounts receivable, rents, receivables, note receivables, promissory notes executed in favor of Seller, and any other evidence of indebtedness of or rights to receive payment for goods or services provided by the Seller in connection with the Business prior to the Closing, billed and unbilled, recorded or unrecorded, with collection agencies or otherwise, including any such items that have been charged off as bad debt, together with all financial and billing records related to the Accounts Receivable.

(b)  "Affiliate" means, with respect to any Person: (i) any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person; (ii) any other Person that, directly or indirectly, owns or controls, whether beneficially, or as trustee, guardian or other fiduciary, twenty percent (20%) or more of the equity interests having ordinary voting power in the election of directors of such Person, or (iii) any other Person who is a director, officer, joint venturer, shareholder, member, or partner: (a) of such Person, (b) of any subsidiary of such Person, or (c) of any Person described in clause (i) above. For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities, by contract or otherwise. When used in this Agreement as relating to Seller, the term "Affiliate" has the meaning ascribed to such term in Section 101(2) of the Bankruptcy Code.

(c)  "Agreement" means this Asset Purchase Agreement (including all Schedules and Exhibits to this Asset Purchase Agreement), as originally executed by the Parties and as this Asset Purchase Agreement may be subsequently amended, restated, modified or supplemented from time to time in accordance with its terms.

(d)  "Agreed Principles" means with respect to calculations of the Specified Matters Amount, and the preparation of the Closing Statement delivered in connection therewith: (i) Accounts Receivable shall be calculated net of any reserves for doubtful accounts and shall be mutually determined by Purchaser and Seller in good faith in accordance with GAAP; (ii) Inventory shall be determined in accordance with GAAP, net of any reserves for defective, obsolete or damaged Inventory and calculated based on a physical count of the Inventory to be conducted jointly and in good faith by Purchaser and Seller; provided, however, that with respect to the amounts set forth in subsections (i) and (ii) hereof, together with any other amounts to be calculated in connection with determining the Specified Matters Amount, in each case, such amounts shall be calculated in good faith by Seller in consultation with Purchaser and in accordance with GAAP.

2

(e) "Ancillary Agreement(s)" means any agreement, document or instrument (other than this Agreement) that Seller or Purchaser, as applicable, enters into or delivers in connection with the consummation of the Transactions contemplated hereby.

(f) "Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in Michigan are authorized or required by Law to close.

(g) "Claim" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code. When used in this Agreement, the term "Claim" will be given the broadest possible meaning permitted by applicable Law and will include all manner and type of claim, whenever and wherever such claim may arise. As used in this Agreement, the term "Claim" also includes a Claim against any Affiliate, the holder of which holds or believes it holds a Claim against a Seller arising from or related to the same or similar facts and circumstances surrounding the claim against the Affiliate.

(h) "Closing Date" means the date of the Closing.

(i) "Code" means the Internal Revenue Code of 1986, as amended.

(j) "Confidentiality Agreement" means the Confidentiality Agreement, dated January 18, 2019, between Seller and Parent.

(k) "Contract" means any written agreement, arrangement, Lease, mortgage, contract, note, power of attorney, purchase order, sales order, bond, loan, Lease, insurance policy, covenant, understanding, commitment or instrument relating to the Business, the Purchased Assets or the operation thereof to which Seller is a party or by which any of the Purchased Assets are bound.

(l) "Cure Costs" means the amounts determined by a Final Order of the Bankruptcy Court to be necessary to cure all defaults and to pay all actual or pecuniary losses that have resulted from any such defaults on the part of the Seller under any of the Assumed Contracts as required by Section 365(b)(1) of the Bankruptcy Code.

(m) "Customer Obligations" means the amounts set forth on Schedule 1.1(m) for advanced billings, customer deposits, prepaid customer postage, volume rebates, customer sales discounts and payment discrepancies as of January 31, 2019, as such Schedule shall be updated to reflect estimated balances of the foregoing as of the close of business on the day immediately prior to the Closing Date, as required pursuant to Section 2.7(b).

(n) "Employee Benefit Plan" means every plan, fund, contract, program and arrangement (whether written or not) that is maintained or contributed to by the Seller (or any member of its "controlled group" as that term is used in Section 414(b) or (c) of the Code) for the benefit of current or former employees of the Seller, including those intended to provide: (i) medical, surgical, health care, hospitalization, dental, vision, workers' compensation, life insurance, death, disability, legal services, severance, sickness or accident benefits (whether or not defined in Section 3(1) of ERISA); (ii) pension, profit sharing, stock bonus, retirement, supplemental retirement or deferred compensation benefits (whether or not tax qualified and whether or not defined in Section 3(2) of ERISA); (iii) bonus, incentive compensation, member

3

interest option, member interest appreciation right, phantom member interest or member interest purchase benefits; or (iv) salary continuation, unemployment, supplemental unemployment, termination pay, vacation, holiday benefits or material fringe benefits (whether or not defined in Section 3(3) of ERISA).

(o) "Employee Payments" means the amounts set forth on Schedule 1.1(o) for unpaid salary, wages, accrued vacation, benefit reimbursements (including with respect to accrued medical, vision and life insurance), flexible spending obligations, and applicable payroll taxes of Seller as of January 31, 2019, as such Schedule shall be updated to reflect estimated balances of the foregoing as of the close of business on the day immediately prior to the Closing Date, as required pursuant to Section 2.7(b). For the avoidance of doubt, Employee Payments shall not include any salary reductions or salary deferrals made in 2018 that are intended to be paid in 2019.

(p) "Environmental Law" means any and all Laws relating to: (i) the effect of the environment or Hazardous Materials on human health or emissions, (ii) discharges or releases of Hazardous Materials into the environment, including ambient air, surface water, groundwater or land, or (iii) the handling of Hazardous Materials, or the clean-up or other remediation thereof.

(q) "Environmental Liabilities and Obligations" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in connection with ownership or operation of the Business prior to Closing, including but not limited, the Owned Real Property and the Leased Real Property, and Claims related to: (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Materials or waste, (ii) the release of Hazardous Materials or waste; and (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments.

(r) "ERISA" means the Employee Retirement Income Security Act of 1974, and all Laws issued thereunder.

(s) "ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with Seller for purposes of Section 414(b), (c), (m) or (o) of the Code.

(t) "Escrow Agent" means Absolute Title, Inc.

(u) "ESOP" means the Thomson-Shore, Inc. Employees' Stock Ownership Plan as amended and restated on January 1, 2016, and "ESOP Trustee" means Capital Trustees, LLC.

(v) "Final Order" means an order, judgment, ruling, or other decree (or any revision, modification, or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court that has jurisdiction over any proceeding in connection with the Bankruptcy Case for the purpose of such proceeding, which order, judgment, ruling, or other decree has not been reversed, vacated, stayed, modified, supplemented, or amended and as to which: (i) no appeal, petition for review, reargument, rehearing, reconsideration, or certiorari has been taken and is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration, or certiorari has expired, or (ii) such appeal or petition

4

has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending.

(w)    "GAAP" means U.S. generally accepted accounting principles as in effect from time to time, consistently applied.

(x)    "Governance Documents" means, with respect to any entity, all documents: (i) pursuant to which the legal existence of the entity is established, (ii) that were adopted or approved by the owners, board of directors, partners, members, managers or other similar management authority of the entity and set forth provisions for the regulation and management of the entity's internal affairs, and (iii) that are binding upon any owners of the entity and establish the governance, economic and/or other rights of such owners in their capacity as such.

(y)    "Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority, or arbitral body.

(z)    "Hazardous Materials" means all substances defined as hazardous substances, hazardous wastes, hazardous materials, pollutants, toxic wastes, toxic substances or contaminants or otherwise regulated under Environmental Laws or with respect to which liability or standards of conduct are imposed under Environmental Laws.

(aa)    "Improvements" has the meaning set forth in Section 2.1(a) of this Agreement.

(bb)    "Intellectual Property" means, interchangeably and collectively as the context requires: (i) patents and invention disclosures, including continuations, divisionals, continuations-in-part, renewals and reissues; (ii) trademarks, service marks, trade names, trade dress, designs, logos, emblems, signs or insignia, slogans, domain names and other similar designations of source or origin, together with all goodwill symbolized by the foregoing (iii) copyrights and copyrightable material; (iv) trade secrets and other confidential information, know-how, customer lists, prospect lists, business plans, inventions, proprietary processes, formulae, algorithms, models and methodologies; (v) rights of publicity and privacy relating to the use of the names, likenesses, voices, signatures and biographical information of natural Persons; (vi) all rights with respect to hardware, software, computer programs, computer program code (including source code and executable code), the algorithms underlying any computer program, documentation associated with any software, data and databases, to the extent not otherwise embodied in the foregoing clauses (i)-(v); (vii) all moral rights and/or rights of attribution and/or integrity in any of the foregoing; (viii) registrations and applications for any of the foregoing; (ix) the right to sue for past infringement or unauthorized use of any of the foregoing; and (x) all other intellectual property.

(cc)    "Intellectual Property Rights" means all of Seller's Intellectual Property rights (but, in each case, only to the extent such Intellectual Property rights are transferrable without the consent of any third party), other than Off-the-Shelf Software.

GP:4812-0732-3617 v13

(dd) "Inventory" means all supplies, goods, finished goods, materials, raw materials, work in process, parts, subassemblies, finished goods, packaging materials and other accessories related thereto owned by Seller and used or usable in the Business, whether or not prepaid, and wherever located, held or owned.

(ee) "Knowledge" means, with respect to Seller, actual knowledge of Peter Shima, Benjamin Mattison, Carl Trisdale, Amy Daybird, Lori Minnick and Robert Durgy, together with the knowledge that would have been obtained by such individuals after reasonable inquiry.

(ff) "Law" means any law, statute, ordinance, code, regulation, rule, principle of common law, Order, license or other requirement of any Governmental Authority.

(gg) "Lease" or "Leases" means all leases, subleases and other occupancy agreements (written and oral), including all amendments, extensions and other modifications thereto.

(hh) "Leased Real Property" means any land, Improvements, or other interest in real property, subject to a Lease or sub-Lease pursuant to which Seller is a party.

(ii) "Liabilities" means any and all debts, losses, liabilities, claims (including Claims), damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations of any nature, whether known or unknown, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses in connection therewith (including reasonable legal or other professional fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder).

(jj) "Liens" means, with respect to any of the Purchased Assets, including but not limited to the Owned Real Property and Leased Real Property, all mortgages (including all Mortgages), claims (including all Claims), leases (including all Leases), options, hypothecations or similar restrictions, liens, pledges, security interests, and charging orders and any other encumbrance, right or interest of any kind or character, whether vested or contingent, that evidences or secures a debt or payment obligation or adverse ownership interest in the Purchased Asset in question, whether imposed by agreement, understanding, law, equity or otherwise, or liens, interests or encumbrances both now existing or hereafter arising which would encumber such Purchased Asset arising under any agreement binding on the Seller or the Purchased Assets or arising from any act or omission of the Seller or arising pursuant to any right, title or interest, or any lien or encumbrance which could hereafter be asserted as a result of the transfer of the Purchased Assets by the Seller, whether voluntary or involuntary and whether arising by law, contract, or otherwise, and shall include "liens" as such term is defined in Section 101(37) of the Bankruptcy Code.

(kk) "Local Rules" means the Local Rules of the United States Bankruptcy Court for the Eastern District of Michigan, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Case.

(ll) "Material Adverse Effect" means any change, event, circumstance or development that is or would reasonably be expected to be, materially adverse to the business,

6

results of operations or condition (financial or otherwise) of the Business and the Purchased Assets, taken as a whole; provided, however, that "Material Adverse Effect" will not include, and the determination of the existence of a Material Adverse Effect shall not take into account, any of the following: (i) changes or conditions affecting the industries generally in which the Business operates; (ii) changes in national or international business, economic, political or social conditions (including any act of war, terrorism or armed conflict); (iii) changes in financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (iv) changes in Law or GAAP or interpretations thereof; (v) the public announcement, pendency or completion of the Transactions; (vi) any action taken by Seller as required by this Agreement; (vii) changes resulting from the filing, commencement and continuation of the Bankruptcy Case (or any litigation resulting therefrom); or (x) actions taken by Seller pursuant to (or as contemplated by) Orders entered by the Bankruptcy Court in the Bankruptcy Case.

(mm) "Mortgage" means that certain Mortgage, dated August 20, 2013, executed and delivered by Seller to Old National Bank, successor by merger to United Bank & Trust, and recorded with the Washtenaw County Recorder on September 10, 2013, as Document Number 6165863.

(nn) "Multiemployer Plan" means any "multiemployer plan" (as defined in Section 3(37) of ERISA).

(oo) "OFAC" means the Office of Foreign Assets Control.

(pp) "Off-the-Shelf Software" means off-the-shelf computer software as such term is commonly understood, that is commercially available for less than $5,000.00, under non-discriminatory pricing terms.

(qq) "Order" means any order, decision, judgment, writ, injunction, decree, award or other determination of any Governmental Authority.

(rr) "Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business consistent with past practice.

(ss) "Owned Real Property" has the meaning set forth in Section 2.1(a) of this Agreement.

(tt) "Permits" means all notifications, licenses, permits, approvals, franchises, certificates, authorizations, operating permits, registrations, plans and other similar documents and authorizations issued by any Governmental Authority to Seller and primarily used, or held for use, in connection with the operation of the Business or the Purchased Assets, in each case to the extent transferable without the consent of any Governmental Authority;

(uu) "Permitted Liens" means (i) Liens granted by Purchaser (excluding any Liens of Parent under the Pre-Petition Loans); (ii) Liens that arise under zoning, building codes, land use and other similar Laws; (iii) Liens for real estate Taxes, tangible personal property Taxes, assessments and other governmental charges for the calendar year in which the Closing occurs and subsequent years not yet due and payable; (iv) matters of title with respect to the Owned

7

QB\4812-0732-3017 v13

Real Property as set forth in the Title Commitment (excluding any Liens recorded or filed in favor of Old National Bank, including the Mortgage and not otherwise objected to by Purchaser pursuant to Section 2.14); and (v) with respect to leased or expressly licensed property (including the Leased Real Property), the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed Contract.

(vv) "Person" means an individual, corporation, partnership, limited liability company, association, joint venture, trust or other entity or organization, including a Governmental Authority or any other entity or institution of any type whatsoever, including any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

(ww) "Pre-Closing Tax Period" means: (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

(xx) "Pre-Petition Loans" means the indebtedness of Seller to Parent as evidenced by that certain Promissory Note dated March 1, 2019, executed and delivered by Seller, prior to the Petition Date and assigned to Purchaser by Parent, in the original principal amount of $760,000.00, governed by that certain Loan Agreement dated March 1, 2019, and secured by: (i) that certain Security Agreement dated March 1, 2019, executed and delivered by Seller to Parent, and (ii) that certain Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated March 1, 2019, executed and delivered by Seller to Parent, recorded on March 11, 2019 with the Washtenaw County Recorder as Document No. 646198.

(yy) "Property Taxes" means all real property Taxes, personal property Taxes, rent Taxes and similar ad valorem obligations levied with respect to the Purchased Assets, including but not limited to, the Leased Real Property and the Owned Real Property, for any Taxable period.

(zz) "Purchase Money Equipment" means the equipment listed on Schedule 1.1(zz) attached to this Agreement.

(aaa) "Purchase Money Equipment Option Period" has the meaning set forth in Section 2.5 of this Agreement.

(bbb) "Specified Matters Amount" means, an amount equal to the aggregate amount of Accounts Receivable, plus the aggregate amount of Inventory, plus the aggregate amount of pre-paids which relate to the Purchased Assets minus the aggregate amount of Employee Payments, and minus the aggregate amount of Customer Obligations, in each case, as of the close of business on the day immediately prior to the Closing Date and determined in accordance with the Agreed Principles and limited to the categories used to prepare the Statement of Specified Matters attached as Exhibit A.

(ccc) "Target Specified Matters Amount" means $3,903,709.00.

(ddd) "Tax" or "Taxes" means all taxes, assessments, charges, duties, fees, levies or other governmental charges (including interest, penalties or additions associated therewith), including income, franchise, capital stock, real property, personal property, tangible, estimated

8

withholding employment, payroll, social security, unemployment compensation, disability, transfer, sales, use, franchise, excise, gross receipts, value-added and all other taxes of any kind imposed by any Government Authority, whether disputed or not, whether inchoate, accrued, invoiced, levied, or otherwise, and any charges, interest or penalties imposed or that may be imposed thereon by any Government Authority.

(eee) "Tax Return(s)" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes of any kind or nature filed or required to be filed, including any schedule or attachment thereto, and including any amendment thereof.

(fff) "Title Commitment" means that certain written commitment from Absolute Title, Inc., to issue an owner's policy of title insurance delivered by Seller to Purchaser pursuant to Section 2.14.

Section 1.2   Cross References.   Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Agreement | Preamble |
| Allocation Schedule | 2.7(c) |
| Approval Hearing | 7.4(b)(ii) |
| Approval Order | 7.4(c) |
| Assignment and Assumption Agreement | 2.12(e) |
| Assumed Contracts | 2.1(b) |
| Assumed Liabilities | 2.3 |
| Auction | 7.4(b)(ii) |
| Avoidance Actions | 2.1(j) |
| Backup Bid | 7.4(b)(iv) |
| Backup Bidder | 7.4(b)(iv) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid Deadline | 7.4(b)(i) |
| Bidding Procedures | 7.4(a) |
| Bidding Procedures Order | 7.4(a) |
| Bill of Sale | 2.12(d) |
| Breakup Fee | 7.4(b)(iii) |
| Business | Recitals |
| Business Employees | 9.1(a) |
| Cash Purchase Price | 2.7(a) |
| Casualty | 6.4 |
| Closing | 2.11 |
| Closing Statement | 2.7(b) |
| Credit Bid | 2.7(a) |
| DIP Financing | 5.1(c) |
| Deeds | 2.12(b) |
| Deposit | 2.10(a) |

9

| Term | Section |
|------|---------|
| Deposit Escrow Account | 2.10(a) |
| Deposit Escrow Agreement | 2.10(a) |
| Downward Adjustment Amount | 2.7(b)(iii) |
| ESOP Approval | 10.2(e) |
| Excluded Assets | 2.2 |
| Excluded Contract | 2.6(b) |
| Excluded Liabilities | 2.4 |
| Incremental Bid Amount | 7.4(b)(ii) |
| Intellectual Property Assignment | 2.12(f) |
| Initial Overbid | 7.4(b)(i) |
| Initial Overbid Amount | 7.4(b)(i)(1) |
| Nonassignable Contract | 2.6(c) |
| Outside Date | 12.1(b) |
| Parties | Preamble |
| Parent | Recitals |
| Party | Preamble |
| Patriot Act | 3.21 |
| Petition Date | Recitals |
| Prevailing Bid | 7.4(b)(ii) |
| Prohibited Person | 3.21 |
| Purchase Price | 2.7(a) |
| Purchase Money Equipment Option Period | 2.5 |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| Qualified Bidder | 7.4(b)(ii) |
| Sale and Bidding Procedures Motion | 7.4(a) |
| Seller | Preamble |
| Seller's Prior Year Taxes | 2.9(a) |
| Senior Lender | 10.3(e) |
| Threshold | 2.7(b)(3) |
| Transactions | Recitals |
| Transfer Taxes | 8.2 |
| Transferred Employees | 9.1(a) |
| WARN Act | 5.4(a) |

Section 1.3   Interpretive Provisions. Unless the context expressly requires otherwise:

(a)   the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(b)   words defined in the singular shall have a comparable meaning when used in the plural, and vice versa;

(c)   the words "Dollars" and "$" mean U.S. dollars;

(d)    references herein to a specific Article, Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Articles, Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement;

(e)    wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation;"

(f)    references herein to any gender shall include each other gender;

(g)    references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement;

(h)    with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding;"

(i)    the word "or" shall be disjunctive but not exclusive;

(j)    references herein to any Law shall be deemed to refer to such Law as amended, reenacted, supplemented or superseded in whole or in part and in effect from time to time and also to all rules and regulations promulgated thereunder; and

(k)    references herein to any contract mean such contract as amended, supplemented or modified (including any waiver thereto) in accordance with the terms thereof.

## ARTICLE 2

## PURCHASE AND SALE

Section 2.1    Purchase and Sale. Subject to the terms and conditions set forth in this Agreement and subject to approval by the Bankruptcy Court, at the Closing, Seller agrees to sell, assign, transfer and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Seller, all right, title and interest of Seller as of the Closing Date in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363 of the Bankruptcy Code. "Purchased Assets" shall mean all of the direct and indirect right, title and interest of Seller in and to all tangible and intangible assets, properties, rights, Claims and Contracts used, useful or held for use in, or related to, the Business (but excluding the Excluded Assets) as of the Closing, including, without limitation, the following:

(a)    the parcels of land legally described on Schedule 2.1(a) attached to this Agreement (the "Owned Real Property") together with all buildings, improvements, and fixtures erected on the Owned Real Property (collectively, the "Improvements") and all easements and other rights appurtenant thereto;

11

(b)   all rights of Seller under any executory contracts and unexpired leases (including all Leases for any Leased Real Property) of Seller that are set forth on Schedule 2.1(b), as such Schedule may be updated prior to the Bid Deadline (collectively, the "Assumed Contracts");

(c)   all cash deposits of clients or customers held by Seller as security for receivables or obligations;

(d)   all deposits of Seller as security for rent, electricity, telephone, bonds or other sureties or otherwise (except for retainers held by any professional in the Bankruptcy Case), and prepaid charges and expenses, including all prepaid rent and all prepaid charges, expenses and rent under any Lease;

(e)   all Accounts Receivable and all Claims against third parties related to the collectability thereof;

(f)   all Inventory, along with any transferable warranty and service rights of the applicable Seller related thereto;

(g)   all tangible personal property, including all machinery, equipment, tools, tooling, vehicles, forklifts, computers, mobile phones, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, office supplies, production supplies, other miscellaneous supplies, and other tangible personal property of any kind owned by Seller, wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Seller or any other space where any of Seller's properties or any other assets may be situated;

(h)   to the extent transferable, all rights and obligations under or arising out of all insurance policies relating to the Business or any of the Purchased Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to Seller, with respect to cancelled policies);

(i)   to the extent transferable, all Permits, authorizations, approvals, decisions, zoning orders, registrations, licenses, filings, certificates, variances or similar rights issued to Seller and used by or in connection with the Business;

(j)   to the extent transferrable, all avoidance claims or causes of action under Chapter 5 of the Bankruptcy Code or applicable Law (including any preference or fraudulent conveyance claims or causes of action) (collectively, the "Avoidance Actions");

(k)   all causes of action, choses in action, rights of recovery, rights of setoff and rights of recoupment and all other rights or Claims against third parties relating to the Business, the Purchased Assets or the Assumed Liabilities, including actions relating to vendors and service providers used in the Business that are counterparties to Assumed Contracts;

(l)   all information regarding Seller's past, current and prospective customers and suppliers (including any and all lists thereof (including contact information), purchase and sale history, correspondence, complaints, and any and all other data, reports, and information of any

12

kind kept or maintained by or on behalf of Seller), pricing and cost information, and business and marketing plans and proposals;

    (m)    all telephone and facsimile numbers and telephone directory listings;

    (n)    all Intellectual Property Rights;

    (o)    all goodwill and other intangible assets associated with or relating to, the Purchased Assets, including customer and supplier lists and the name "Thomson-Shore" and any variant thereof;

    (p)    all books, records, files and papers of Seller relating to the Business or the Purchased Assets, including equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence, financial and accounting records, Tax records and other similar documents and records (all in the state in which such records and information currently exist);

    (q)    all rights of Seller under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of Seller or with third parties (other than with Purchaser or any of its Affiliates under this Agreement, the Confidentiality Agreement or any Ancillary Agreement), including non-disclosure or confidentiality, non-compete or non-solicitation agreements entered into in connection with the Auction; and

    (r)    all rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold or services provided, to Seller or to the extent affecting any Purchased Assets other than any warranties, representations and guarantees pertaining to any Excluded Asset.

    Section 2.2    Excluded Assets. Notwithstanding any other provision of this Agreement to the contrary, the Purchased Assets shall not include, and Seller shall retain all right, title and interest in and to the following (the "Excluded Assets"):

    (a)    all of Seller's cash and cash equivalents on hand (including all undeposited checks) and in banks and other financial institutions;

    (b)    subject to Section 2.5, all Purchase Money Equipment;

    (c)    all retainer fees, deposits, advances and similar fees previously paid to third party advisors (including for legal, accounting, financial advisory, investment banking and consulting services concerning the Bankruptcy Case);

    (d)    Seller's corporate seals, Governance Documents, stock record books, minute books, and organizational documents;

    (e)    any unexpired Lease or executory Contract not identified in this Agreement as an Assumed Contract;

13

GP:4812-0732-3017 v13

19-44343-tjt   Doc 15-2   Filed 03/25/19   Entered 03/25/19 14:41:31   Page 18 of 76

(f) all rights of Seller in or under the Employee Benefit Plans, including all pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith;

(g) all rights of Seller under or arising out of: (i) all insurance policies relating to the operation of the Business prior to the Closing; (ii) all insurance policies relating to the Excluded Assets and Excluded Liabilities; and (iii) all directors' and officers' indemnification policies, in each case, including, with respect to (i), (ii) and (iii) above, all Claims arising thereunder whether known or unknown;

(h) personnel records for Business Employees who are not Transferred Employees;

(i) all rights of Seller arising under this Agreement or in connection with the Transactions;

(j) any Tax refund or reimbursement due to Seller or their Affiliates;

(k) any shares of stock or other equity interests in Seller; and

(l) all bank accounts, deposit accounts, securities accounts, brokerage accounts and other accounts holding any cash, cash equivalents or securities belonging to Seller.

Section 2.3 Assumed Liabilities. Subject to the terms, conditions, and other provisions of this Agreement, at and effective as of the Closing Date, the Purchaser shall assume the future payment and performance of (or, if otherwise stated in this Agreement), pay at the Closing the following liabilities (collectively, the "Assumed Liabilities"):

(a) all Liabilities related to or arising under the Assumed Contracts, Permits (which are transferable to Purchaser) and Intellectual Property Rights (which are transferable to Purchaser);

(b) all Cure Costs;

(c) any and all costs and expenses in connection with providing "adequate assurance of future performance" with respect to the Assumed Contracts (as contemplated by Section 365 of the Bankruptcy Code);

(d) all costs, expenses and liabilities pro-rated to Purchaser as set forth in Section 2.9;

(e) the Customer Obligations, not to exceed the amounts set forth in Schedule 1.1(m), as such Schedule shall be updated by mutual agreement of the Parties prior to the Closing Date; and

(f) the Employee Payments, only to the extent such Employee Payments relate to Transferred Employees, and in any case, not to exceed the amounts set forth in Schedule 1.1(o), as such Schedule shall be updated by mutual agreement of the Parties prior to the Closing Date.

14

Section 2.4    Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement, Purchaser is assuming only the Assumed Liabilities and is not assuming any other Liability of Seller, whether known or unknown presently in existence or arising hereafter. All other Liabilities will be retained by and remain Liabilities of Seller (all such Liabilities other than the Assumed Liabilities are collectively referred to as the "Excluded Liabilities"). Without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims all of the Excluded Liabilities, including all of the following Liabilities of Seller:

(a)    all Liabilities arising out of any of the Excluded Assets, including the Excluded Contracts;

(b)    all Liabilities arising out of, relating to or otherwise in respect of the Purchased Assets and/or Business arising prior to the Closing, other than the Assumed Liabilities;

(c)    all Environmental Liabilities and Obligations;

(d)    all Liabilities of Seller for indebtedness, including all guarantees of third party obligations and reimbursement obligations to guarantors of Seller's obligations or under letters of credit;

(e)    all Liabilities (i) related to Taxes or Property Taxes arising out of, relating to or in respect of the Business, the Owned Real Property or the Purchased Assets for any Pre-Closing Tax Period and; (ii) of Seller for any Taxes (including, without limitation, Taxes payable by reason of contract, assumption, transferee or successor Liability, operation of Law, pursuant to Treasury Regulation Section 1502-6 (or any similar provision of any state or local law) or otherwise and any Taxes owed by Seller and arising in connection with the consummation of the Transactions contemplated by this Agreement) arising or related to any period(s) on or prior to the Closing Date; (iii) any Transfer Taxes required to be paid by Seller in consummating this Agreement, as set forth in Section 2.8(b); and (iv) Taxes arising from or in connection with an Excluded Asset;

(f)    all Liabilities under the WARN Act arising as a result of the Transactions (including any Liabilities resulting from the failure to provide adequate notice under the WARN Act);

(g)    all Liabilities with respect to any third party advisory fees and expenses (including legal, accounting, financial advisory, valuation, investment banking and consulting fees and expenses) incurred by or on behalf of Seller;

(h)    all Liabilities arising out of or in connection with Claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions by Seller and their respective Affiliates that occurred, or arise from events that occurred, prior to the Closing Date;

(i)    all Liabilities of Seller or its predecessors arising out of any contract, agreement, Permit, franchise or claim that is not transferred to Purchaser as part of the Purchased Assets or, is not transferred to Purchaser because of any failure to obtain any third-party or governmental consent required for such transfer;

15

(j)    drafts or checks outstanding at the Closing (except to the extent an Assumed Liability);

(k)    all Liabilities of Seller to its equity holders respecting dividends, distributions in liquidations, redemptions of interests, option payments or otherwise, and any Liability of Seller pursuant to any agreement with an Affiliate;

(l)    except for the Assumed Liabilities set forth in Section 2.3(f), all Liabilities in respect of Seller's past, present and future employees under applicable Laws (including any severance, separation pay, change-of-control bonuses, stay bonuses or other payments or benefits to any employee of Seller on account of any termination of such employee's employment on or before the Closing Date);

(m)    except for the Assumed Liabilities set forth in Section 2.3(f), any Liability arising under any Employee Benefit Plan or any other employee benefit plan, policy, program, agreement or arrangement at any time maintained, sponsored or contributed to by Seller or any ERISA Affiliate, or with respect to which Seller or any ERISA Affiliate has any Liability including with respect to any underfunded pension Liability;

(n)    any Liability arising under the ESOP, or any stock ownership plan, policy, program, agreement or arrangement at any time maintained, sponsored or contributed to by Seller or any Affiliate associated with the ESOP, or with respect to which Seller or any Affiliate has any Liability; and

(o)    all Liabilities arising out of violations, or other non-compliance with any Law(s), regulation(s), standard(s), guideline(s), enforcement order(s), or any other authority or requirement enforced by, or under the supervision of the Occupational Safety and Health Administration, where such violations or non-compliance occurred prior to the Closing Date.

Section 2.5    Purchase Option. At the sole discretion of the Purchaser, the Seller is authorized to grant, sell, assign, transfer and deliver to the Purchaser all right, title and interest of the Seller in, to and under any one or more items of Purchase Money Equipment, free and clear of any and all Liens, other than Permitted Liens, for no additional consideration upon written notice from the Purchaser to the Seller not later than twenty-five (25) days after the Closing Date (the "Purchase Money Equipment Option Period"). If the Purchaser timely exercises this option for any specific item of Purchase Money Equipment, the Seller shall deliver the applicable titles or other appropriate assignment documents to the Purchaser, subject to the Permitted Liens, within five (5) Business Days after receipt of the written notice from the Purchaser. The Parties agree that, throughout the Purchase Money Equipment Option Period, the Seller shall: (i) insure the Purchase Money Equipment in at least the amount(s) of insurance maintained by the Seller on the Purchase Money Equipment on the Closing Date and provide proof of such insurance to the Seller, (ii) store the Purchase Money Equipment on the Owned Real Property or the Leased Real Property at no cost to the Seller, and (iii) to the extent required by any order of the Bankruptcy Court, make any required payments during the Purchase Money Equipment Option Period to the holders of any Liens on the Purchase Money Equipment. To the extent the Bankruptcy Court has entered an order requiring the Seller to return any Purchase Money Equipment prior to the expiration of the Purchase Money Equipment Option Period, the Seller

16

shall return such Purchase Money Equipment as required by any such order unless otherwise agreed by the holder of any Lien on such Purchase Money Equipment.

Section 2.6    Assumption/Assignment of Contracts and Rights.

(a)    To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts shall be assigned to and assumed by Purchaser at and as of the Closing. Purchaser shall pay any Cure Costs within ten (10) Business Days after Closing or, if any Cure Costs are disputed, when the dispute is resolved either by agreement of the parties or by the Bankruptcy Court. Purchaser shall have sole responsibility to directly pay any Cure Costs and to provide adequate assurance of future performance under the Assumed Contracts in accordance with Section 365 of the Bankruptcy Code; however, it being understood that any such payment of Cure Costs shall not be deemed to reduce or otherwise offset the Purchase Price in any manner. Schedule 2.6(a) sets forth Seller's good-faith estimate of all Cure Costs for the Assumed Contracts.

(b)    From the date hereof through the Bid Deadline, Purchaser shall have the right, by written notice to Seller, to either: (i) designate any Contract not already so designated to be an Assumed Contract, or (ii) remove any Contract from Schedule 2.1(b) as an Assumed Contract. Any Contract not listed on, or initially listed on but subsequently removed by Purchaser from Schedule 2.1(b) prior to the Bid Deadline, shall not be designated as an Assumed Contract (each, an "Excluded Contract") for all purposes of this Agreement and all Liabilities and obligations under any Excluded Contract shall be Excluded Liabilities for all purposes of this Agreement.

(c)    Seller shall use their commercially reasonable efforts to obtain any consent, approval or amendment, if any, required to novate and/or assign any Assumed Contract to be assigned to Purchaser hereunder which the Bankruptcy Court determines is not able to be assumed and assigned under section 365(c) of the Bankruptcy Code (a "Nonassignable Contract"). Seller shall keep Purchaser reasonably informed from time to time of the status of the foregoing and Purchaser shall cooperate with Seller in this regard. To the extent that the rights of Seller under any Nonassignable Contract, or under any other Purchased Asset, may not be assigned without the consent of a third party which has not been obtained prior to the Closing, this Agreement shall not constitute an agreement to assign the same; such Nonassignable Contract shall be an Excluded Contract and shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price.

Section 2.7    Purchase Price; Adjustments; Allocation of Purchase Price.

(a)    Purchase Price.    In addition to the assumption of the Assumed Liabilities, in consideration for the sale, transfer and delivery of the Purchased Assets: (i) at the Closing, Purchaser shall deliver to Seller an amount equal to Eight Million Two Hundred Fifty Thousand and No/100 Dollars ($8,250,000.00), minus the Downward Adjustment Amount, if any, as determined in accordance with Section 2.7(b) (such amount, the "Cash Purchase Price", and together with the assumption of Assumed Liabilities, the "Purchase Price"). Purchaser shall be entitled to reduce the Cash Purchase Price by (i) the Deposit (to be paid to Seller in accordance with Section 2.10) and (ii) an amount equal to 100% of any DIP Financing provided by

Purchaser or Parent and 100% of the Pre-Petition Loans (collectively, the "Credit Bid") (as an offset against, and reduction in the amount of Seller's debt in respect of such obligations pursuant to Section 363(k) of the Bankruptcy Code). The Purchase Price shall be subject to such adjustments as set forth in Sections 2.7(b), 2.8, 2.9, 2.14 and 8.2. Purchaser shall be entitled to deduct and withhold from the Cash Purchase Price all Taxes that Purchaser may be required to deduct and withhold under any provision of applicable Law. If Purchaser reasonably determines that any withholding in respect of Taxes is required from the Cash Purchase Price, it shall notify Seller as soon as reasonably practicable and shall reasonably cooperate with Seller to lawfully mitigate such Taxes required to be withheld. To the extent that any amounts are withheld and paid to the appropriate Governmental Authority, such withheld amounts shall be treated as delivered to Seller hereunder.

    (b)   Purchase Price Adjustment.

    (i)   No later than five (5) Business Days prior to the anticipated Closing Date, Seller shall deliver to Purchaser a written statement setting forth an estimate of the Specified Matters Amount along with Seller's calculation of any adjustments to the Purchase Price under Section 2.7 and Seller's calculation of the Purchase Price (the "Closing Statement"); provided, that if the Closing Date does not occur on the anticipated Closing Date, the Closing Statement shall be updated to reflect the actual Closing Date. The Closing Statement shall be prepared in good faith, in consultation with Purchaser, and in accordance with the Agreed Principles and be limited to the categories used to prepare the Statement of Specified Matters attached hereto as Exhibit A and the adjustments referenced in Section 2.7(a) above.

    (ii)   Upon delivery of the Closing Statement to Purchaser, Purchaser shall have two (2) Business Days to notify Seller of any dispute related to the Closing Statement. Seller and Purchaser shall use their best efforts to reach an agreement on any disputed items in the Closing Statement within two (2) Business Days after delivery of the dispute notice. If during such period, Purchaser and Seller are unable to reach an agreement, they shall immediately bring all disputed items to the Bankruptcy Court for final resolution; provided, that Purchaser and Seller shall be responsible for bearing any and all of their respective costs incurred in connection with the resolution of the disputed items.

    (iii)   In the event the Target Specified Matters Amount exceeds the Specified Matters Amount set forth on the Closing Statement by more than $50,000.00 (the "Threshold", and such amount in excess of the Threshold, the "Downward Adjustment Amount"), then the Cash Purchase Price shall be decreased by the Downward Adjustment Amount.

    (iv)   In connection with the preparation of the Closing Statement and the determination of the Downward Adjustment Amount, Seller shall provide Purchaser and its advisors with reasonable access, during normal business hours, to the Business and the work papers, ledgers, accounting records, trial balances and such other information reasonably requested to evaluate the Closing Statement.

    (c)   Allocation of Purchase Price. Purchaser and Seller agree that the Cash Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with an allocation schedule (the "Allocation Schedule") prepared jointly by Purchaser and Seller

18

prior to Closing, and prepared in accordance with Section 1060 of the Code and the regulations thereunder. Each of Purchaser and Seller agrees to provide the other promptly with any other information required to complete the Allocation Schedule. Such Allocation Schedule shall be binding on Purchaser and Seller for all purposes, including the reporting of gain or loss and determination of basis for income tax purposes, and each of the parties hereto agrees that it will file a statement (on IRS Form 8594 or other applicable form) setting forth such allocation with its federal and applicable state income tax returns and will also file such further information or take such further actions as may be necessary to comply with the Treasury Regulations that have been promulgated pursuant to Section 1060 of the Code and similar applicable state Laws and regulations.

Section 2.8    Closing Costs and Payments.

(a)    Real Estate and Other Costs. The Purchaser shall be solely responsible for and shall pay, on the Closing Date, the cost of: (i) recording fees with respect to clearing public records of items that are not Permitted Liens; (ii) recording fees of any deed necessary for the Transactions; (iii) recording fees for any of the Purchaser's financing documents; and (iv) all other costs and fees associated with the transfer of the Owned Real Property (subject to sharing of closing charges of Escrow Agent).

(b)    Transfer Taxes. To the extent any Liability exists for any Transfer Taxes, including documentary stamp taxes, imposed in connection with the purchase and sale of the Owned Real Property, the Purchased Assets and the Assumed Liabilities, the Seller shall pay and be solely responsible for all such Transfer Taxes.

Section 2.9    Prorations. The following items shall be prorated and paid as set forth below:

(a)    Real Estate Taxes and Personal Property Taxes. Property Taxes with respect to the Purchased Assets, inclusive of any general or special assessments levied, which are due for the year of Closing, shall be prorated as of the Closing Date based on the actual current tax bill, in accordance with local custom. Seller shall be responsible for the payment of all Property Taxes, including any general or special assessments levied, with respect to the Purchased Assets for the year 2018 and any prior years (to the extent the same are unpaid as of the Closing Date) (the "Seller's Prior Year Taxes"). Any such prorated amount for the year 2019 that is allocated to the Seller hereunder and the Seller's Prior Year Taxes shall reduce the Purchase Price on the Closing Statement, and the Seller shall pay all of the Seller's Prior Year Taxes out of the Purchase Price and the Purchaser shall be responsible for, and shall pay, all such Taxes that are due for the year in which the Closing Date occurs. Any proration pursuant to this Section 2.9(a) shall be considered a final settlement as of the Closing for the 2019 real estate Taxes and the 2019 personal property Taxes, and there shall be no re-proration for Property Taxes post-Closing.

(b)    Utilities. The Seller will cause all meters for electricity, gas, water, sewer or other utility usage at the Owned Real Property and the Leased Real Property to be read on the day before the Closing Date. The Seller will be responsible for all charges for such utilities which have accrued prior to the Closing Date. If the utility companies are unable or refuse to read the

19

meters on the day before the Closing Date, all charges for such utilities to the extent unpaid will be prorated and adjusted as of the day before the Closing Date based on the most recent bills, or as the Seller and the Purchaser may otherwise mutually agree. Any such prorated amount that is allocated to the Seller shall reduce the Purchase Price on the Closing Statement, and the Purchaser shall be responsible for, and shall pay, all such charges for all periods prior to the Closing. If any prepaid utility deposits of Seller are transferred to the Purchaser as part of the transfer of any utility accounts, then the Purchase Price shall be increased on the Closing Statement by the amount of such transferred prepaid utility deposits.

(c)   Operating Expenses. Any other operating expenses of the Seller shall be prorated between the Seller and the Purchaser only to the extent that the Purchaser specifically agrees at or prior to Closing. If the actual amounts of such operating expenses to be prorated are not known as of the Closing Date, the prorations shall be based on the most recent bills related to such operating expenses, or as the Seller and the Purchaser may otherwise mutually agree. Any such prorated amount that is allocated to the Seller shall reduce the Purchase Price on the Closing Statement, and the Purchaser shall be responsible for, and shall pay, all such charges for all periods prior to the Closing.

Section 2.10   Deposit.

(a)   On or prior to the date hereof, Purchaser and Seller have entered into an escrow agreement (as amended, supplemented or otherwise modified from time to time, the "Deposit Escrow Agreement") with a mutually agreed upon Escrow Agent. Concurrently with the execution and delivery of the Deposit Escrow Agreement by Seller, Purchaser and the Escrow Agent, Purchaser deposited $825,000.00 (the "Deposit") with the Escrow Agent by wire transfer of immediately available funds. The Escrow Agent shall hold the Deposit in a segregated, non-interest-bearing account (the "Deposit Escrow Account") pursuant to the Deposit Escrow Agreement. All interest or other earnings on amounts held in the Deposit Escrow Account pursuant to the Deposit Escrow Agreement shall automatically become a part of the Deposit as such interest or earnings accrue.

(b)   If the Closing takes place, the Escrow Agent shall deliver the Deposit to the Seller at the Closing as partial payment of the Purchase Price. If this Agreement is validly terminated prior to the Closing, the Deposit in the Deposit Escrow Account shall be released and distributed to Purchaser or Seller, as applicable, in accordance with Sections 12.2(b), 12.2(c) and 12.2(d).

Section 2.11   Closing.   The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities no later than the later of: (i) three (3) Business Days after satisfaction of the conditions set forth in Article 10 (other than those requiring a delivery, or the taking of other action, at the Closing) and (ii) the final determination of the Closing Statement in accordance with Section 2.7(b), or at such other time or place as Purchaser and Seller may agree.

Section 2.12   Deliveries by Seller.   At the Closing, Seller will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

GR-4812-0752-3017 v13

(a)  a certificate executed by the President of the Seller as to the satisfaction of the Seller of the conditions in Section 10.1 and Section 10.2 of this Agreement;

(b)  a duly executed quit claim deed for each parcel of the Owned Real Property conveying all of Seller's right, title and interest in and to the Owned Real Property to the Purchaser, subject only to the Permitted Liens (collectively, the "Deeds");

(c)  a copy of the most recent final environmental site assessment reports for the Owned Real Property and Leased Real Property, to the extent in existence;

(d)  a duly executed quitclaim bill of sale from Seller to Purchaser with respect to all of the Purchased Assets substantially in the form attached to this Agreement as Exhibit B ("Bill of Sale");

(e)  an assignment and assumption agreement from the Seller with respect to all of the Assumed Contracts substantially in the form attached to this Agreement as Exhibit C ("Assignment and Assumption Agreement");

(f)  an assignment agreement from the Seller with respect to all of the Seller's Intellectual Property Rights substantially in the form attached to this Agreement as Exhibit D ("Intellectual Property Assignment");

(g)  an affidavit from an officer of Seller, sworn under penalty of perjury, setting forth such Seller's name, address and United States federal tax identification number, stating that such Seller is not a "foreign person" within the meaning of Section 1445 of the Code, and otherwise executed in accordance with Treasury Regulation Section 1.1445-2(b);

(h)  a duly executed written letter instructing the Escrow Agent to release the Deposit to Seller;

(i)  the Closing Statement;

(j)  a certificate of good standing (dated not more than ten (10) days prior to the Closing Date) of Seller from its jurisdiction of incorporation or organization;

(k)  a certificate, dated as of the Closing Date, and signed by the President or Secretary of Seller, certifying as to (i) the authenticity of the signatures of each officer or other representative of Seller executing this Agreement and all Ancillary Agreements to which it is a party on behalf of Seller, (ii) the resolutions of the board of directors of Seller authorizing the execution, delivery, and performance of this Agreement and all other Ancillary Agreements to which it is a party (a copy of which resolutions shall be attached to such certificate), including that such resolutions are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented, (iii) the articles of incorporation and bylaws of Seller; and (iv) all approvals of the Transactions required by the ESOP (including any participant vote) and/or the ESOP Trustee;

(l)  certificates of title for all trucks, vehicles and all other titled Purchased Assets;

21

(m)  possession of any and all keys and security codes to the Owned Real Property and Leased Real Property;

(n)  Lien release and termination documentation of all Liens on any of the Purchased Assets, other than the Permitted Liens;

(o)  Intentionally deleted;

(p)  a certified copy of the Approval Order; and

(q)  such other documents and instruments as shall be reasonably necessary to effect the intent of this Agreement and consummate the Transactions contemplated hereby.

Section 2.13  Deliveries by Purchaser. At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following:

(a)  the Cash Purchase Price, as adjusted, less the Deposit;

(b)  the Closing Statement;

(c)  duly executed Bill of Sale, Assignment and Assumption Agreement and Intellectual Property Assignment;

(d)  a duly executed written letter instructing the Escrow Agent to release the Deposit to a bank account designated by Seller at least one (1) day prior to the Closing Date;

(e)  a certificate of good standing (dated not more than ten (10) days prior to the Closing Date) of Purchaser from its jurisdiction of incorporation or organization;

(f)  a certificate, dated as of the Closing Date, and signed by the President or Secretary of Seller, certifying as to (i) the authenticity of the signatures of each officer or other representative of Purchaser executing this Agreement and all Ancillary Agreements to which it is a party on behalf of Purchaser, (ii) the resolutions of the board of directors of Purchaser authorizing the execution, delivery, and performance of this Agreement and all other Ancillary Agreements to which it is a party (a copy of which resolutions shall be attached to such certificate), including that such resolutions are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented, and (iii) the articles of incorporation and bylaws of Purchaser; and

(g)  all other documents, instruments and writings reasonably requested by Seller to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

Section 2.14  Title Insurance.  Within five (5) business days after execution of this Agreement, Seller shall deliver the Title Commitment from the Escrow Agent, which shall be a commitment for an owner's policy of title insurance, in the amount of $5,550,000.00, committing the Escrow Agent to insure fee simple marketable title in the Owned Real Property in the name of Purchaser. Purchaser shall have ten (10) Business Days after receiving the Title Commitment to object to any conditions of title, encumbrances or other conditions disclosed in

22

the Title Commitment. In the case of any mortgage, deed of trust, security interest, Lien or other similar monetary encumbrance, such item shall be deemed automatically objected to by Purchaser and Purchaser shall have the right to apply the Purchase Price to remove, release and satisfy such objections and items from the Owned Real Property. Seller shall have twenty-one (21) days after receiving any such objections to remove those objections or arrange to have the Escrow Agent insure over those objections. Seller shall make good faith efforts to remove any such objections. If Seller is not able to satisfy any objections delivered to Seller by Purchaser within that time frame, Purchaser may terminate this Agreement effective upon written notice to Seller and the Deposit shall be returned to Purchaser. If the parties proceed to Closing, Seller shall cause the Escrow Agent to issue to Purchaser an ALTA form 2006 owner's policy of title insurance, insuring fee simple marketable title to the Owned Real Property in said purchaser's name with all standard exceptions deleted that can be deleted by a seller's/owner's affidavit. Seller shall bear the cost of the owner's title insurance policy. Seller shall execute and deliver all affidavits, documents and such other items requested by the Escrow Agent to deliver the owner's title policy. Purchaser shall bear the cost of any mortgage title insurance policy required by a mortgage lender to Purchaser. The parties shall bear the closing charges of the Escrow Agent in equal shares.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to the terms, conditions and limitations set forth in this Agreement, Seller hereby represents and warrants to Purchaser as of the date of this Agreement as follows:

Section 3.1    Organization.   Seller is a corporation validly existing and in good standing under the Laws of its jurisdiction of formation, and, subject to all necessary approvals of the Bankruptcy Court, has all requisite power and authority to own, lease or use, as the case may be, the Purchased Assets, to carry on in all respects the Business as currently conducted and to consummate the Transactions.

Section 3.2    Corporate Authorization.   Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Case and approval of the Transactions by the ESOP and/or ESOP Trustee, Seller has all requisite power and authority to execute, deliver and perform this Agreement and to consummate the Transactions. Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Case, this Agreement constitutes a valid and binding obligation of the Seller that is enforceable in accordance with its terms. The execution and delivery by Seller of this Agreement and the Ancillary Agreements to which it is a party and the consummation by Seller of the transactions contemplated herein and therein have been duly authorized and approved by all requisite corporate action on the part of Seller, none of which actions have been modified or rescinded and all of which remain in full force and effect. Except for approval by the Bankruptcy Court, no other proceedings on the part of Seller are necessary to authorize the execution and delivery by Seller of this Agreement and the Ancillary Agreements to which it is a party and the consummation by Seller of the transactions contemplated herein and therein.

23

Section 3.3    Governmental Authorization.    Except as disclosed on Schedule 3.3, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions by Seller require no action by or in respect of, or filing with, any Governmental Authority other than: (i) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (ii) any such action or filing as to which the failure to make or obtain would not have a Material Adverse Effect.

Section 3.4    Noncontravention.    Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Case, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions do not and will not: (i) violate Seller's Governance Documents; (ii) assuming compliance with the matters referred to in Section 3.3, violate any applicable Law; (iii) constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to any Purchased Asset to which Seller is entitled under any provision of any agreement or other instrument binding upon such Seller except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code; or (iv) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens and Assumed Liabilities or Liens that will be released at or prior to Closing.

Section 3.5    Required Consents.    Except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and except as otherwise set forth on Schedule 3.5 and subject to entry of the Approval Order, there is no agreement or other instrument binding upon Seller requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement.

Section 3.6    Litigation.    Except as disclosed on Schedule 3.6, there is no action, suit, investigation or proceeding pending against, or to the Knowledge of Seller, threatened against or affecting, the Business or the Purchased Assets before any Governmental Authority.

Section 3.7    Permits.    Schedule 3.7 sets forth a correct and complete list of all of the Permits that are required for the ownership or use of the Purchased Assets and such Permits are held by Seller in full force and effect. Except as set forth on Schedule 3.7, to the Knowledge of Seller: (i) Seller is in material compliance with the terms and requirements of each Permit (other than defaults arising from the Bankruptcy Case), and (ii) no written notice of violation of any Permit has been received from any Governmental Authority and no proceeding is pending seeking to revoke or limit any such Permit.

Section 3.8    Intellectual Property Rights.    Schedule 3.8(a) sets forth a correct and complete list of all Intellectual Property Rights related to the Business. Except as set forth on Schedule 3.8(b), to the Knowledge of Seller, as of the date hereof there exist no outstanding challenges to the ownership and use by Seller of the Intellectual Property Rights used in the conduct of the Business as presently conducted, nor any alleged infringements of such Intellectual Property Rights by third parties. Except as set forth on Schedule 3.8(b), none of the Intellectual Property Rights included in the Purchased Assets have been licensed by Seller to any other Person.

24

Section 3.9    Compliance with Laws and Court Orders.    Except as set forth on Schedule 3.9, to the Knowledge of Seller, Seller is not in violation of any Law in any material respect applicable to the Purchased Assets or the conduct of the Business.

Section 3.10    Real Property.

(a)    The Owned Real Property constitutes all of the real property owned by Seller and used in connection with the operation of the Business. Except as set forth on: (i) the Seller's Bankruptcy Schedules, or (ii) the Title Commitment, Seller has good and marketable, fee simple absolute title to the Owned Real Property, free and clear of all Liens, except for the Permitted Liens and the Assumed Liabilities. At the Closing, Seller will sell, assign and convey to the Purchaser good, marketable, insurable and indefeasible fee simple title to the Owned Real Property, conveyed by Deeds duly executed and delivered by Seller to Purchaser, subject to the Permitted Liens and the Assumed Liabilities. Seller is not obligated under, or a party to, any option, right of first refusal or other contractual right to purchase or otherwise acquire any of the Owned Real Property or any portion thereof or interest therein and to the Knowledge of Seller, there are no unrecorded agreements, easements or encumbrances that materially interfere with the continued operation of the Business as currently conducted thereon. Seller has not leased or otherwise granted to any Person the right to use or occupy the Owned Real Property or any portion thereof which remains in effect.

(b)    Schedule 3.10(b) attached to this Agreement sets forth a true and complete list of all Leases, subleases and other occupancy agreements (written and oral), including all amendments, extensions and other modifications thereto, for each leasehold or sub-leasehold estate and other rights to use or occupy any Leased Real Property. Except as set forth on Schedule 3.10(b) attached to this Agreement, Seller has a good and valid leasehold interest in and to all of its Leased Real Property, subject to no Liens except for the Permitted Liens. Except as set forth on Schedule 3.10(b) attached to this Agreement, to the Knowledge of the Seller, neither party to any Lease is in default thereof which default has not been cured. The Seller has previously delivered to the Purchaser true, complete and correct copies of the Leases and, in the case of an oral Lease, a written summary of the material terms thereof.

(c)    The Owned Real Property and the Leased Real Property constitute all of the real property owned, leased, occupied or otherwise utilized in connection with the Seller's Business as of the Closing Date. There is no pending or, to the Knowledge of the Seller, threatened condemnation action or eminent domain action affecting any portion of the Owned Real Property or the Leased Real Property.

Section 3.11    Business Employees; Employee Benefit Plans.

(a)    Schedule 3.11(a) sets forth a list of Seller's Employee Benefit Plans. Correct and complete copies of each of the material Employee Benefit Plans have been made available to Purchaser.

(b)    Except as set forth on Schedule 3.11(b), neither the execution and delivery of this Agreement nor the consummation of the Transactions contemplated hereby will (i) result in any

25

OP:4812-0733-3017 v13

payment becoming due to any employee of Seller or (ii) increase any benefits otherwise payable under any Employee Benefit Plan.

(c)     Seller has provided Purchaser with a true, complete and correct list of the Business Employees as of the Closing Date, specifying their position, annual salary, and date of hire. Seller is in compliance in all material respects with all Laws relating to the employment of, classification of, and termination of employment of the Business Employees.

(d)     Except as set forth on Schedule 3.11(d), there are no Claims or Litigation pending or, to Seller's Knowledge, threatened, against Seller by any Business Employee, former Business Employee or current or former service provider of Seller.

(e)     Except as set forth on Schedule 3.11(e), Seller, nor any ERISA Affiliate has adopted, maintains, sponsors, contributes to, is required to contribute to, or has any Liability with respect to any (i) Multiemployer Plan (ii) plan or arrangement subject to Title IV or Section 302 of ERISA, or (iii) plan that has two or more contributing sponsors, at least two of whom are not under common control, within the meaning of Section 4063 of ERISA.

(f)     There are no pending audits or investigations by any Governmental Authority involving any Employee Benefit Plan, and no pending or, to the Knowledge of Seller, threatened Claims, Litigation involving any Employee Benefit Plan, any fiduciary thereof or service provider thereto, nor to the Knowledge of Seller is there any reasonable basis for any such Claim or Litigation.

(g)     Except as set forth on Schedule 3.11(g), no Employee Benefit Plan provides benefits, including, without limitation, death or medical benefits, beyond termination of service or retirement other than: (i) coverage mandated by law or (ii) death or retirement benefits under an Employee Benefit Plan.

(h)     Each Employee Benefit Plan that constitutes a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code, complies in both form and operation with the requirements of Section 409A of the Code so that no amounts paid pursuant to any such Employee Benefit Plan is subject to Tax under Section 409A of the Code.

(i)     The employment of each Business Employee of Seller is at-will except as set forth on Schedule 3.11(i). Schedule 3.11(i) sets forth a true, complete and correct list of all written (and includes a summary of all legally binding oral) employment and consulting agreements to which Seller is a party or by which it is bound. True, complete and correct copies of the agreements or arrangements listed and summarized on Schedule 3.11(i) have been provided or made available to Purchaser, together with all amendments thereto.

Section 3.12   Title to the Purchased Assets. Except as set forth on Schedule 3.12, Seller has good, valid, and marketable title in and to, or a valid leasehold interest in (or license or other right to use) each of the Purchased Assets free and clear of all Liens (other than Assumed Liabilities and Permitted Liens), and upon consummation of the Transactions at the Closing, Purchaser will have acquired title in and to, or a valid leasehold interest in (or license or other right to use), each of the Purchased Assets, free and clear of all Liens (other than Assumed

Liabilities and Permitted Liens) to the maximum extent permitted by Section 363 of the Bankruptcy Code.

Section 3.13  Certain Fees. Except as set forth on Schedule 3.13, Seller has not incurred any liability for any investment banking fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

Section 3.14  Taxes.

(a)  Seller has filed all Tax Returns that it was required to file. All such Tax Returns were correct and complete in all respects. Except as set forth in Schedule 3.14(a) all Taxes owed by Seller (whether or not shown on any Tax Return) have been paid.

(b)  No Purchased Assets are subject to any Lien that arose in connection with any failure (or alleged failure) to pay any Tax. The Seller has not waived any statute of limitations or agreed to any extension of time with respect to a Tax assessment or deficiency

(c)  There is no dispute or claim concerning any Tax liability of Seller claimed or raised by any Taxing Authority in writing. Seller has not waived any statute of limitations in respect of any material Taxes or agreed to any extension of time with respect to a material Tax assessment or deficiency.

Section 3.15  Labor Matters.

(a)  Seller is not a party to any collective bargaining agreement. There is no labor strike, slowdown, work stoppage or other material labor dispute relating to Seller or, to Seller's Knowledge, threatened against Seller. To Seller's Knowledge, no union organizing or decertification efforts are underway or threatened.

(b)  Seller has not received written notice of any employment-related charge or complaint against Seller before the Equal Employment Opportunity Commission, the Department of Labor, the National Labor Relations Board or any other Governmental Authority and Seller has not received written notice of any threatened employment-related charge or complaint against Seller by any such Governmental Authority.

(c)  Except as set forth on Schedule 3.15(c), no "mass layoff" of employees of the Business has occurred that would result in any liabilities under the WARN Act or similar state or local Laws.

Section 3.16  Environmental Matters. To the Knowledge of Seller, except as set forth on Schedule 3.16, (a) the Purchased Assets are in compliance with all Environmental Laws in all material respects; (b) Seller has not received written notice of any proceeding relating to or arising under Environmental Laws with respect to the Purchased Assets or the Business, nor, to Seller's Knowledge, are any of the same being threatened in writing against Seller or any real property leased by Seller; (c) Seller has not received any written notice of, or entered into, any obligation, order settlement, judgment, injunction, or decree involving outstanding requirements relating to or arising under Environmental Laws; and (d) To the Knowledge of Seller, there has been no release of any Hazardous Materials into the environment at, onto, or from any property

27

leased by Seller which would reasonably be expected to result in material Liability, costs or Claims relating to any Environmental Law.

Section 3.17.  Contracts.

(a)  Schedule 3.17(a) sets forth a true, correct and complete list of all of the following Contracts to which Seller is a party or otherwise bound and that are used in or related to the Business or the Purchased Assets:

(i)  Contracts (or series of related Contracts) that Seller reasonably anticipates will involve payment or expenditure of more than $20,000 in any one (1) year period from or including the Closing Date;

(ii)  Contracts relating to the mortgaging or pledging of, or otherwise placing an Lien on, any of the assets or properties related to the Business (other than Permitted Liens);

(iii)  Contracts relating to any interest rate, currency or commodity derivatives or hedging transaction;

(iv)  Contracts under which Seller is lessee of or uses, holds or operates any property, real or personal, owned by any other party (including any Leases), or under which Seller is lessor or licensor of or permits any third-party to use, hold or operate any property, real or personal;

(v)  Contracts (or series of related Contracts) entered into during the last three (3) years (or under which there are continuing material obligations) relating to the Business (other than sale of inventory or obsolete or worn-out assets replaced in the Ordinary Course of Business);

(vi)  Contracts that: (A) contain covenants that limit the freedom of Seller or the Business to compete in any line of business with any Person or in any geographic area, or (B) contain exclusivity obligations or restrictions binding on Seller or the Business;

(vii)  Contracts related to any Intellectual Property Rights, and

(viii)  Contracts that: (A) that require payments upon a "change of control" of Seller or the Business, (B) appointing any agent to act on behalf of the Business or granting any power of attorney by Seller, (C) with any Governmental Authority, (D) that are partnership, joint venture or other similar Contracts involving a share of profits, losses, costs, or liabilities with any other Person, (E) that contain any exclusivity, right refusal or right of first offer obligations or restrictions, or any most favored nations provision, (F) under which the Company has advanced or loaned any other Person (together with any Affiliate thereof) any amounts or (G) that is a Collective Bargaining Agreement or other Contract with any labor union.

(b)  The Assumed Contracts include all of the Contracts material to the ownership and/or operation of the Business, except for any Contracts excluded from the Purchased Assets as set forth in Section 2.2 and Section 2.6.

28

(c)    Each Assumed Contract and each Contract identified on Schedule 3.17(a) which is not an Assumed Contract is a valid and binding obligation of Seller thereto and, to Seller's Knowledge, the other parties thereto, enforceable against each of them in accordance with its terms, except, in each case, as such enforceability may be limited by applicable bankruptcy, insolvency or other similar Laws affecting or relating to enforcement of creditor rights generally or general principles of equity. Seller has not, and, to Seller's Knowledge, no other party to any Contract has, commenced any action against any of the parties to any Contract or given or received any written notice of any default or violation under any Contract that has not been withdrawn or dismissed, except to the extent any such default or violation will be cured or dismissed as a result of the entry of the Approval Order and the payment of the applicable Cure Costs.

Section 3.18    Inventory.    All of Seller's Inventory reflected on the Statement of Specified Matters attached hereto as Exhibit A includes all Inventory of Seller, was determined in accordance with GAAP and consists of a quality and quantity usable in the Ordinary Course of Business consistent with past practice, except as would not reasonably be expected to be material to the Business. None of the Inventory has been consigned.

Section 3.19    Accounts Receivable.    All of Seller's Accounts Receivable shown on the Statement of Specified Matters attached hereto as Exhibit A includes all Accounts Receivable and were the result of sales in the Ordinary Course of Business materially consistent with past practice. To the Knowledge of Seller, the Accounts Receivable represent monies due for goods sold or services rendered in the Ordinary Course of Business materially consistent with past practices. To the Knowledge of Seller, there are no disputes regarding the collectability of any Accounts Receivable, except for immaterial disputes in the Ordinary Course of Business. Except for the Accounts Receivable factoring agreement between Seller and Crestmark Bank, the Seller has not factored or sold any of the Accounts Receivable.

Section 3.20    Insurance.    Set forth on Schedule 3.20 attached to this Agreement is a complete and accurate list of all insurance policies held or maintained by, on behalf of, or for the benefit of the Seller, and, for each such policy, the name of the insurer, the policy number, the term of such policy, all insured parties, the type and amount of coverage, the deductible and aggregate limit of the insurer's liability under such policy, and whether such policy provides coverage on an occurrence or claims-made basis. All such insurance coverage shall remain in effect through the Closing.

Section 3.21    Patriot Act; OFAC Certification.    Neither the Seller nor any of its Affiliates, nor to the Knowledge of Seller, any of their respective brokers or other agents acting in any capacity in connection with the Transactions contemplated by this Agreement, is or will be (a) conducting any business or engaging in any transaction or dealing with any Person appearing on the U.S. Department's OFAC list of prohibited countries, territories, "specifically designated nationals" or "blocked persons" (each, a "Prohibited Person") (which lists can be accessed at the following web address: http://ustreas.gov/offices/enforcement/ofac/); including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (b) engaging in certain dealings with countries and organizations designated under Section 311 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the

GP:4832-0732-3017 v13

"Patriot Act") as warranting special measures due to money laundering concerns; (c) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 on Terrorist Financing dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (d) a foreign shell bank or any Person that a financial institution would be prohibited from transacting with under the Patriot Act; or (e) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (i) any United States anti-money laundering law, (ii) the Foreign Corrupt Practices Act, (iii) the United States mail and wire fraud statues, (iv) the Travel Act, (v) any similar or successor statutes, or (vi) any regulations promulgated under the foregoing statutes.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

Section 4.1    Organization. Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

Section 4.2    Corporate Authorization. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions are within the corporate powers of Purchaser and have been duly authorized by all necessary actions on the part of Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

Section 4.3    Governmental Authorization. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court and (b) any such action or filing as to which the failure to make or obtain would not have a Material Adverse Effect on the Purchaser or its ability to close the Transactions.

Section 4.4    Noncontravention. Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of organizational documents of Purchaser; (b) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (c) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b) and (c) such requirements, violations, conflicts, defaults or rights which would not adversely affect the ability of Purchaser to consummate the Transactions.

GP.4812-0732-3017 v13

19-44343-tjt    Doc 15-2    Filed 03/25/19    Entered 03/25/19 14:41:31    Page 35 of 76

Section 4.5    Financial Wherewithal.  Purchaser has, or at the time of Closing will have, on an unconditional basis sufficient cash on hand or other sources of immediately available funds to enable it to make (or cause to be made) all payments required to be made by it at Closing pursuant to this Agreement and to satisfy all other costs and expenses of Purchaser arising in connection with this Agreement and the Transactions.

Section 4.6    Litigation.  There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against or otherwise affecting Purchaser before any Governmental Authority that could reasonably be expected to affect the ability of Purchaser to consummate the Transactions.

Section 4.7    Certain Fees.  Purchaser has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

Section 4.8    "AS IS" TRANSACTION. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, NOTWITHSTANDING THE REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN ARTICLE 3, THE CONSENT OF PURCHASER TO THE CLOSING SHALL CONSTITUTE A WAIVER BY PURCHASER OF ANY CONDITIONS TO CLOSING NOT SATISFIED AS OF THE CLOSING DATE, AND EFFECTIVE UPON AND FOLLOWING CLOSING SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS OR ASSUMED LIABILITIES OR ANY PORTIONS THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, AS OF THE CLOSING DATE AND EFFECTIVE UPON AND FOLLOWING CLOSING, PURCHASER HEREBY ACKNOWLEDGES THAT SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF, AND PURCHASER HEREBY ACCEPTS THE RISKS OF, (1) THE CONDITION, MERCHANTABILITY, HABITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ALL OR ANY PORTION OF THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES (INCLUDING, WITH RESPECT TO ANY REAL PROPERTY, THE ENVIRONMENTAL CONDITION THEREOF), (2) THE PURCHASED ASSETS' COMPLIANCE OR NON-COMPLIANCE WITH LAWS, (3) THE VALUE, PROFITABILITY, FINANCEABILITY OR MARKETABILITY OF ALL OR ANY PORTION OF THE PURCHASED ASSETS AND ASSUMED LIABILITIES, (4) ANY PROJECTIONS, ESTIMATES OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO PURCHASER OF FUTURE REVENUES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF THE BUSINESS OR THE FUTURE PROSPECTS OR OPERATIONS OF THE BUSINESS; AND (5) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO PURCHASER OR ITS COUNSEL, ACCOUNTANTS OR ADVISORS WITH RESPECT TO THE BUSINESS. THE REPRESENTATIONS AND WARRANTIES OF SELLER SHALL TERMINATE UPON AND WILL NOT SURVIVE THE CLOSING, AND ACCORDINGLY, UPON THE CLOSING DATE, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

31

QP\4612-0732-2017.v13

Section 4.9 Inspections. Purchaser is an informed and sophisticated purchaser, and has engaged advisors, experienced in the evaluation and purchase of assets such as the Purchased Assets and assumption of liabilities such as the Assumed Liabilities as contemplated hereunder. Purchaser acknowledges that Seller has given Purchaser reasonable access to the key employees, documents and facilities of the Business, and Purchaser has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of the Purchased Assets and all such other matters relating to or affecting the Purchased Assets as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the Purchased Assets, Purchaser is doing so based solely upon such independent inspections and investigations, except for any representations and warranties expressly set forth in Article 3 (and not any other representations or warranties by Seller or any of their respective Affiliates, agents, employees or brokers, express or implied).

# ARTICLE 5

# COVENANTS OF SELLER

Seller agrees that:

Section 5.1 Conduct of the Business. From the date hereof until the earlier of the termination of this Agreement pursuant to Section 12.1 or the Closing Date, except: (i) as disclosed on Schedule 5.1, (ii) with Purchaser's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed), (iii) as may be required by the Bankruptcy Court, (iv) for the consequences resulting from the continuation of the Bankruptcy Case, or (v) as may be required or contemplated by this Agreement, Seller:

(a) with respect to the Business, shall not acquire a material amount of assets from any other Person, except for the acquisition of supplies and other materials in the Ordinary Course of Business consistent with past practices;

(b) shall not sell, lease, license, transfer or otherwise dispose of any Purchased Assets, except for the sale of Inventory in the Ordinary Course of Business consistent with past practices;

(c) other than as may be required to obtain debtor-in-possession financing ("DIP Financing") in the Bankruptcy Case, Purchaser shall not permit any Purchased Assets to become subject, directly or indirectly, to any Lien (other than Permitted Liens) and any such Liens incurred with respect to DIP Financing in the Bankruptcy Case shall be released from the Purchased Assets prior to or in connection with Closing;

(d) other than as may be required to obtain DIP Financing in the Bankruptcy Case, shall not assume or guarantee the obligations of any other Person;

(e) shall not make any loans, advances or capital contributions to, or investment in, any other Person (other than advances to employees in the Ordinary Course of Business);

32

(f) except as may otherwise be required by applicable Law or the terms of any Employee Benefit Plan existing as of the date of this Agreement, shall not: (i) increase the compensation or fringe benefits of any present or former employee, director or manager of Seller, (ii) grant any severance or termination pay to any present or former employee, director or manager of Seller or (iii) establish, adopt, enter into, amend or terminate any Employee Benefit Plan;

(g) shall not make any capital expenditures;

(h) shall not enter into or assume any Contract material to the Business or materially amend, materially modify or terminate any Contract material to the Business, in each case other than in the Ordinary Course of Business consistent with past practices;

(i) shall not agree or commit to do any of the foregoing covenants in Section 5.1(a)-5.1(h);

(j) shall notify Purchaser promptly in writing upon Seller obtaining Knowledge of a Material Adverse Effect;

(k) shall comply in all material respects with all Laws applicable to Seller or having jurisdiction over the Business or any Purchased Assets;

(l) shall use commercially reasonable efforts to (i) conduct the Business in substantially the same manner as conducted as of the date of this Agreement, to the extent reasonably feasible (ii) preserve the existing business organization and management of the Business, to the extent reasonably feasible, (iii) keep available the services of the employees of the Business, to the extent reasonably feasible and subject to voluntary employee attrition and illness, (iv) maintain the existing relations with customers, distributors, suppliers, creditors, business partners and others having business dealings with the Business, to the extent reasonably feasible, and (v) refrain from changing in any material respect any of their product prices or pricing policies (e.g. discount policies) for any of their products except as shall be necessary to meet competition or customer requirements; and

(m) shall, (i) to the extent consistent with past practices, maintain, preserve and protect all of their Intellectual Property Rights, and (ii) preserve the remainder of their material assets (including all Improvements and all tangible personal property), in use or useful in the conduct of the Business, and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, necessary repairs, replacements and improvements thereto consistent with past practices.

Section 5.2    Access to Information.    Seller shall provide Purchaser and its representatives reasonable access, upon reasonable advance notice and during normal business hours, to the facilities, offices and personnel of Seller and to the books and records of Seller related to the Business or the Purchased Assets as Purchaser shall reasonably request; provided, that (i) any such access shall be conducted in a manner not to unreasonably interfere with the businesses or operations of the Seller, (ii) such access shall not, based on advice of counsel to the Seller, result in the waiver of any attorney-client privilege (provided, that in such event the parties shall use their commercially reasonable efforts to cooperate to permit disclosure in a

33

manner consistent with the preservation of such attorney-client privilege) and (iii) neither Purchaser nor any of its representatives shall conduct or cause any invasive sampling or testing with respect to the Leased Real Property without the prior written consents of the Seller.

Section 5.3    Notices of Certain Events.    To the extent permitted by applicable Law, Seller shall give prompt notice to Purchaser of any event or circumstance that would reasonably be expected to result in any representation or warranty of Seller to be untrue in any material respect or any covenant or agreement of Seller to not be performed or complied with in any material respect such that any condition set forth in Section 10.2(a) or Section 10.2(c) would not be satisfied if such event or circumstance existed on the Closing Date.

Section 5.4    WARN Act.

(a)    Seller shall be responsible for all obligations and liabilities for the provision of notice or payment in lieu of notice and any applicable penalties under the Worker Adjustment and Retraining Notification Act (the "WARN Act") or any similar state or local Law arising as a result of the Transactions (including the employee terminations required by the last sentence of Section 9.1(a)).

(b)    Prior to the Closing Date, Seller shall not effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act without complying fully with the WARN Act.

# ARTICLE 6

## COVENANTS OF PURCHASER

Purchaser agrees that:

Section 6.1    Confidentiality.    Prior to the Closing Date and after any termination of this Agreement, the Confidentiality Agreement shall remain in full force and effect.

Section 6.2    Post-Closing Access.    On and after the Closing Date, upon reasonable advance notice, Purchaser will afford promptly to Seller (and its successors and assigns) and its counsel, advisors and other agents reasonable access during normal business hours to Purchaser's properties, books, records, employees, auditors and counsel to the extent related to the Purchased Assets and to the extent necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, Claim or assessment, the reconciliation of Claims in the Bankruptcy Case, to permit Seller to determine any matter relating to its rights and obligations hereunder, any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities, or in connection with addressing any other issues arising in connection with or relating to the Bankruptcy Case; provided, however, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Purchaser. Seller (and its successors and assigns) will hold, and will use commercially reasonable efforts to cause its officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all

confidential documents and information concerning Purchaser or the Business provided to them pursuant to this Section 6.2.

Section 6.3    Notices of Certain Events.  To the extent permitted by applicable Law, Purchaser shall give prompt notice to Seller of any event or circumstance that would reasonably be expected to result in any representation or warranty of Purchaser to be untrue in any material respect or any covenant or agreement of Purchaser to not be performed or complied with in any material respect such that any condition set forth in Section 10.3(a) or Section 10.3(c) would not be satisfied if such event or circumstance existed on the Closing Date.

Section 6.4    Casualty.  If between the date of this Agreement and the Closing Date any of the Purchased Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause ("Casualty"), and such Casualty results in a Material Adverse Effect, then Purchaser shall have the option to either (a) acquire such Purchased Assets on an "as-is" basis and take an assignment from Seller of all insurance proceeds payable to Seller in respect of the Casualty; or (b) terminate this Agreement and the Transactions contemplated hereby and have the Deposit immediately returned to Purchaser.

## ARTICLE 7

## COVENANTS OF PURCHASER AND SELLER

Purchaser and Seller agree that:

Section 7.1    Efforts; Further Assurances.  Subject to the terms and conditions of this Agreement, Purchaser and Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws to consummate the Transactions contemplated by this Agreement; provided, however, Seller shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Case (including soliciting higher or better offers for the Purchased Assets). Seller and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to vest in Purchaser title to the Purchased Assets and to evidence the assumption by Purchaser of the Assumed Liabilities.

Section 7.2    Certain Filings.  Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 7.3    Public Announcements.  Prior to the Closing Date, Purchaser shall not make any public announcements or statements concerning the Transactions without the prior written consent of Seller. Purchaser acknowledges and agrees that Seller may provide copies of this Agreement to parties in interest in the Bankruptcy Case and to those parties to whom Seller

OP4812-0732-2017.v13

determines it is necessary to provide copies in connection with soliciting higher or better bids for the Purchased Assets or as otherwise necessary or desirable in connection with the Bankruptcy Case. Seller also shall be entitled to file copies with the Bankruptcy Court or as otherwise required by Law.

Section 7.4    Bankruptcy Court Matters.

(a)    Filing of Sale and Bidding Procedures Motion. As promptly as practicable following the execution and delivery of this Agreement, Seller shall file with the Bankruptcy Court a motion (the "Sale and Bidding Procedures Motion") seeking, among other things, the entry of (i) the Approval Order, and (ii) an Order (the "Bidding Procedures Order") approving the bidding procedures set forth in Section 7.4(b) (the "Bidding Procedures"). Seller shall provide Purchaser with a draft of the Sale and Bidding Procedures Motion at least one (1) day prior to filing with the Bankruptcy Court.

(b)    Bidding Procedures. In the Sale and Bidding Procedures Motion, Seller shall seek, among other things, approval of the following Bidding Procedures, which shall be incorporated into the Bidding Procedures Order:

(i)    Bid Deadline and Initial Overbids. Any third party (other than Purchaser) that is interested in acquiring all or substantially all of the Purchased Assets must submit an "Initial Overbid" in conformance with this Section 7.4(b) at or prior to April 25, 2019 (the "Bid Deadline"). Any such Initial Overbid must:

(1)    Contain a signed definitive purchase agreement (together with a copy of the signed agreement that is marked to show changes from this Agreement) with, at a minimum, the following requirements: (w) having substantially identical terms and conditions as this Agreement (including being subject to confidentiality provisions no less favorable to Seller in any meaningful respect than those contained in the Confidentiality Agreement), except with higher and better consideration; (x) containing terms and conditions no less favorable to Seller's estate in the aggregate than the terms and conditions in this Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (y) provide for a purchase price in an amount equal to or greater than the sum of (1) the Purchase Price, (2) the Breakup Fee, and (3) $250,000 (the "Initial Overbid Amount"); (z) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Purchased Assets other than those included in this Agreement;

(2)    Include a cashiers' or certified check in the amount of $825,000.00 to be held as a deposit; and

(3)    To the extent not previously provided to Seller, be accompanied by evidence satisfactory to Seller in its commercially reasonable discretion that the overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally

36

performing all obligations contained in the definitive asset purchase agreement delivered pursuant to Section 7.4(b)(i)(1).

(ii) Auction. In the event that Seller timely receives a conforming Initial Overbid from a prospective purchaser as described above (a "Qualified Bidder"), then Seller will conduct an auction (the "Auction") with respect to the sale of the Purchased Assets. If an Auction is required, it is anticipated that the Auction would occur on or about April 29, 2019. In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bidding Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bidding Procedures. At the Auction, Qualified Bidders and/or Purchaser may submit successive bids in increments of at least $250,000 greater than the prior bid, or such lesser amounts as shall be determined by Seller in its sole discretion (the "Incremental Bid Amount"), for the purchase of the Purchased Assets until there is only one offer that Seller determines, subject to Bankruptcy Court approval, is the highest or best offer (the "Prevailing Bid"). When bidding at the Auction, Purchaser shall receive a "credit" in the amount of the Breakup Fee and the Credit Bid. All bidding for the Purchased Assets will be concluded at the Auction and there will be no further bidding at the Bankruptcy Court hearing held in the Bankruptcy Case to approve the highest or best bid for the Purchased Assets (the "Approval Hearing"). If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Bid Deadline, the Auction will not be held and the Approval Hearing will proceed with respect to this Agreement.

(iii) Breakup Fee. Upon the consummation of a sale of all or substantially all of the Purchased Assets to any third party (other than Purchaser) who submits a Prevailing Bid for the Purchased Assets, Seller shall pay to Purchaser cash or other immediately available funds in an amount equal to $330,000.00 (the "Breakup Fee"); provided, however, the Breakup Fee shall not be due and payable if Purchaser has committed a material breach of this Agreement prior to the consummation of such sale to the third party. The Parties agree that the Breakup Fee shall be the full and liquidated damages of Purchaser arising out of any termination of this Agreement pursuant to Section 12.1(g); provided, however, that payment of the Breakup Fee would not relieve Seller of the obligation to repay the Pre-Petition Loans or any DIP Financing provided by Purchaser or Parent. The provisions of this Section 7.4(b)(iii) shall survive any termination of this Agreement pursuant to Section 12.1(g). The Breakup Fee shall be treated as an administrative expense claim in the Bankruptcy Case, shall be paid to Purchaser within three (3) Business Days following the closing of such sale to the third party, and shall be paid to Purchaser prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee).

(iv) Backup Bid. At the conclusion of the Auction, Seller shall identify and certify the bid that constitutes the second highest or best offer for the Purchased Assets (the "Backup Bid" and the Qualified Bidder submitting such bid, the "Backup Bidder"). The Backup Bidder may be required by Seller to close on the Backup Bid within twenty (20) days of the conclusion of the Auction. In the event that the Backup Bidder fails to close on the transaction contemplated in the Backup Bid, Seller shall be permitted to retain the Backup Bidder's good faith deposit as liquidated damages.

37

(v)   The dates set forth in Sections 7.4(b)(i) and (ii) above may be adjusted by mutual agreement of the Parties and approval of the Bankruptcy Court.

(c)   Bankruptcy Court Approval of Sale. Seller and Purchaser shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an Order (the "Approval Order") of the Bankruptcy Court in the Bankruptcy Case (i) approving this Agreement (as the same may be amended to incorporate the results of the Auction), (ii) authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code, (iii) authorizing the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, (iv) authorizing the sale of the Assumed Contracts pursuant to Section 363 of the Bankruptcy Code, and (v) authorizing the Transactions; provided, however, Seller shall be entitled to take such actions as may be required in connection with the discharge of its fiduciary duties in the Bankruptcy Case (including soliciting higher or better offers for the Purchased Assets in accordance with the Bidding Procedures). In connection with the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, Purchaser shall take all actions required to provide "adequate assurance of future performance" by Purchaser under the Assumed Contracts after the Closing. Seller and Purchaser shall consult with one another in good faith regarding pleadings that either of them intends to file, or positions either of them intends to take, with the Bankruptcy Court in connection with or that might reasonably affect the Bankruptcy Court's entry of the Approval Order.

Section 7.5   Notices. If at any time (a) Purchaser becomes aware of any material breach or violation by Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Seller, or (b) Seller becomes aware of any material breach or violation by Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach or violation shall promptly notify the other Party, in accordance with Section 13.1, in writing of such breach or violation. Upon such notice of breach or violation, the breaching Party shall have until the earlier of (y) ten (10) days after receiving such notice, and (z) the Outside Date, to cure such breach or violation prior to the exercise of any remedies in connection therewith.

Section 7.6   Receivables and Post-Closing Receipts. If, following the Closing, Seller shall receive payment in respect of any Accounts Receivable that is included in the Purchased Assets, then Seller shall hold such amounts in trust for Purchaser and shall promptly forward such payments to Purchaser. If, following the Closing, Purchaser shall receive payment in respect of any Excluded Asset, then Purchaser shall hold such amounts in trust for Seller and shall promptly forward such payments to Seller.

Section 7.7   Name Change. Within ten (10) days after the Closing Date, Seller shall use commercially reasonable efforts to take such corporate and other actions necessary to change their company names to ones that are not similar to, or confusing with, their current names, including any necessary filings required by the law of the state of their respective organization, and shall promptly thereafter provide Purchaser with written evidence of such name changes. Seller shall also file a motion with the Bankruptcy Court to change the caption of the Bankruptcy Case to reflect such name changes.

38

Section 7.8    No Successor Liability.    The Parties intend that, to the fullest extent permitted by Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Purchaser shall not be deemed to: (i) be the successor of Seller, (ii) have, de facto, or otherwise, merged with or into Seller, (iii) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller or (iv) be liable for any acts or omissions of Seller in the conduct of the Business or arising under or related to the Purchased Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Purchaser shall not be liable for any Lien (other than Assumed Liabilities and Permitted Liens) against Seller or any of Seller's predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any Liabilities of Seller arising prior to the Closing Date.

# ARTICLE 8

# TAX MATTERS

Section 8.1    Tax Cooperation.    Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax. Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

Section 8.2    Transfer Taxes.    Any and all sales, use, transfer, recording or other similar taxes or charges (the "Transfer Taxes") assessed at Closing or at any time thereafter on the transfer of any Purchased Assets or Assumed Liabilities shall be paid by Seller with a corresponding reduction on the Closing Statement if not paid by Seller as of the Closing Date. Purchaser and Seller shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.

# ARTICLE 9

# EMPLOYEE MATTERS

Section 9.1    Business Employees and Offers of Employment.

(a)    As of the Closing Date, Purchaser shall have the right, but not the obligation, to employ or engage as contractors any or all of the employees of Seller whose job function primarily relates to the Business ("Business Employees") as Purchaser determines. Any Business Employees actually employed by Purchaser are referred to herein as "Transferred Employees." The terms of employment offered to any Business Employees shall be determined by Purchaser in its sole discretion and shall be contingent upon the issuance of the Approval Order by the Bankruptcy Court. Purchaser shall deliver a list of the Business Employees it

intends to hire no later than ten (10) days prior to the Closing Date. As of the Closing, the employment of all of the Transferred Employees shall be terminated by the Seller; provided, however, Seller shall be permitted to retain such employees as it deems reasonably necessary to administer or otherwise wind-down the respective Bankruptcy Case.

(b) Seller will pay, in the Ordinary Course of Business payroll practices, all obligations owed to Business Employees through the day prior to the Closing Date, including all salary, wage, bonus, paid time off, benefits, overtime, taxes, and other compensation or other amounts payable to or with respect to the Business Employees. Seller will be solely liable for all workers' compensation claims made by any of the Transferred Employees based on events or circumstances first occurring before the Closing.

(c) As of 11:59 p.m. on the day before the Closing Date, all Transferred Employees shall cease participation in all Employee Benefit Plans of Seller. Beginning at 12:01 a.m. on the Closing Date, the Purchaser will provide employee benefit coverage for all Transferred Employees under new or existing plans sponsored by Purchaser. Seller will remain solely liable and the Purchaser will not assume or otherwise have any Liabilities for any contributions or benefits due with respect to any period prior to the Closing under any of Seller's Employee Benefit Plans, including without limitation, the ESOP.

(d) Nothing in this Section 9.1, whether express or implied confers upon any Employee or any other Person any rights or remedies, including any right to employment or recall, or any right to claim any particular compensation, benefit or aggregation of benefits, of any kind or nature whatsoever.

(e) Purchaser shall maintain employee records transferred to Purchaser hereunder for a period of not less than four (4) years and during that period will afford Seller reasonable access to such records during Purchaser's normal business hours.

(f) Unless such Transferred Employee is a party to an employment contract included in the Assumed Contracts, nothing contained in this Agreement shall confer upon any Transferred Employee any right with respect to continuance of employment by Purchaser, nor shall anything herein interfere with the right of Purchaser to terminate the employment of any Transferred Employees at any time, with or without notice, or restrict Purchaser, in the exercise of its business judgment in modifying any of the terms or conditions of employment of the Transferred Employees after the Closing.

Section 9.2    Employee Plans. Following the Closing Date, (i) Purchaser shall ensure that no waiting periods, exclusions or limitations with respect to any pre-existing conditions, evidence of insurability or good health or actively-at-work exclusions are applicable to any Transferred Employee or their dependents or beneficiaries under any welfare benefit plans in which such employees may be eligible to participate; and (ii) Purchaser shall provide or cause to be provided that any costs or expenses incurred by employees of Seller (and their dependents or beneficiaries) up to and including the Closing Date shall be taken into account for purposes of satisfying applicable deductible, co-payment, coinsurance, maximum out-of-pocket provisions and like adjustments or limitations on coverage under any such welfare benefit plans. Transferred Employees shall be subject to Seller's normal waiting period before being eligible to

40

participate in Seller's 401(k) plan.

## ARTICLE 10

## CLOSING CONDITIONS

Section 10.1   Conditions to Obligations of Purchaser and Seller.   The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)      the Bankruptcy Court shall have entered the Approval Order in the Bankruptcy Case, authorizing the Transactions and approving this Agreement (as the same may be amended to incorporate the results of the Auction) under Sections 105(a), 363 and 365 of the Bankruptcy Code, in form and substance reasonably acceptable to Purchaser and Seller, and as of the Closing Date the Approval Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed;

(b)      all terminations or expirations of waiting periods (and any extension thereof) imposed by any Governmental Authority necessary for consummation of the Transactions contemplated under this Agreement, if any, shall have occurred; and

(c)      no injunction, stay or similar Order issued by any Governmental Authority of competent jurisdiction shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

Section 10.2   Conditions to Obligations of Purchaser.   The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)      Seller shall have performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date;

(b)      Seller shall have delivered all documents and approvals required under Section 2.12;

(c)      the representations and warranties of Seller contained in this Agreement shall be true and correct in all respects (without giving effect to any materiality qualifications contained therein, other than with respect to Section 3.17) on and as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties expressly stated to relate to an earlier date, in which case, as of such earlier date), except where the failure of such representations and warranties to be so true and correct has not had and would not reasonably be expected to have a Material Adverse Effect;

(d)      there shall not have occurred any Material Adverse Effect; and

(e)      Purchaser is satisfied that Seller has obtained all necessary approvals to the Transactions from the ESOP and the ESOP Trustee ("ESOP Approval").

GP\4812-0732-3017 v13

Section 10.3    Conditions to Obligations of Seller.    The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a)    Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date;

(b)    Purchaser shall have delivered all documents required under Section 2.13;

(c)    the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date, as if made on and as of such Closing Date (except for such representations and warranties expressly stated to relate to an earlier date, in which case, as of such earlier date);

(d)    there shall not have occurred any Material Adverse Effect; and

(e)    the portion of the Purchase Price available for distribution to Seller's pre-petition first and second lien lenders (collectively, the "Senior Lender"), after netting out all costs and expenses related to the Closing (together with any other amounts required by the Bankruptcy Court or otherwise necessary to be reserved or set aside for the payment of administrative or other expenses of Seller's bankruptcy estate), shall be sufficient to fully satisfy at Closing all outstanding obligations owed by Seller to the Senior Lender as of the Closing Date (it being understood that the closing condition set forth in this Section 10.3(e) may not be waived by Seller without the consent of the Senior Lender).

## ARTICLE 11

## SURVIVAL

Section 11.1    Survival. The representations, warranties, covenants and agreements of Seller and Purchaser contained in this Agreement (and in the Ancillary Agreements) will not survive the Closing; provided, that such covenants and agreements contained herein (and in the Ancillary Agreements) that by their terms are to be performed after the Closing shall survive the Closing in accordance with their terms. From and after the Closing, the Seller, Purchaser and their respective Affiliates, successors and assigns, and any present or former director, manager, officer, employee, partner or shareholder of Seller or Purchaser will not have any liability for any breach of any representation, warranty, covenant or agreement contained in this Agreement, except that each of Seller and Purchaser will have liability for their respective covenants that are required to be performed after the Closing. The Purchased Assets will be sold, transferred and conveyed by Seller to Purchaser on an AS IS-WHERE IS basis.

## ARTICLE 12

## TERMINATION

Section 12.1    Grounds for Termination. This Agreement may be terminated at any time prior to the Closing:

42

(a)    by mutual written agreement of Seller and Purchaser;

(b)    by Seller or Purchaser, if the Closing shall not have been consummated on or before May 10, 2019 (the "Outside Date"); provided, however, that the right to terminate this Agreement under this Section 12.1(b) shall not be available to Purchaser or Seller, as applicable, if such terminating Party is then in material breach or violation of any of their respective representations, warranties, covenants or agreements under this Agreement. The date set forth in this Section 12.(b) may be adjusted by mutual agreement of the Parties and Bankruptcy Court approval;

(c)    by Purchaser, if the (i) Bidding Procedures Order is not entered on or before March 29, 2019, or (ii) the Approval Order is not entered on or before May 3, 2019, provided, however, that the right to terminate this Agreement under this Section 12.1(c) shall not be available to Purchaser if Purchaser is then in material breach or violation of any of its representations, warranties, covenants or agreements under this Agreement. The date set forth in this Section 12.1(c) may be adjusted by mutual agreement of the Parties and Bankruptcy Court approval;

(d)    by Purchaser or Seller, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable Order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(e)    by Purchaser, if (i) there has been a violation or breach by Seller of any representation, warranty, covenant or agreement contained in this Agreement, (ii) any representation or warranty of Seller has become untrue, or (iii) any event has occurred which, in the case of each of subsections (i)-(iii), (A) has rendered the satisfaction of any condition set forth in Section 10.1 or Section 10.2 impossible or is not curable or able to be performed or, if curable or able to be performed, has not been cured or performed prior to the earlier of (y) ten (10) days following receipt by Seller of written notice of such breach from Purchaser and (z) the Outside Date, and (B) has not been waived by Purchaser; provided, however, that Purchaser shall not have the right to terminate this Agreement under this Section 12.1(e) if Purchaser is then in material breach or violation of any of its representations, warranties, covenants or agreements under this Agreement;

(f)    by Seller, if (i) there has been a violation or breach by Purchaser of any representation, warranty, covenant or agreement contained in this Agreement, (ii) any representation or warranty of Purchaser has become untrue, or (iii) any event has occurred which, in the case of each of subsections (i)-(iii), (A) has rendered the satisfaction of any condition set forth in Section 10.1 or Section 10.3 impossible or is not curable or able to performed or, if curable or able to performed, has not been cured or performed prior to the earlier of (y) ten (10) days following receipt by Purchaser of written notice of such breach from Seller and (z) the Outside Date; and (B) has not been waived by Seller; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 12.1(f) if Seller is then in material breach or violation of any of their representations, warranties, covenants or agreements under this Agreement;

43

OP-4812-0132-3017 v13

(g)  by Seller, if (i) Seller executes a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all of the Purchased Assets, and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Case approving such definitive agreement;

(h)  by written notice from Purchaser to Seller, if (i) Seller seeks to have the Bankruptcy Court enter an Order dismissing or converting the Bankruptcy Case into a case under chapter 7 of the Bankruptcy Code, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged power relating to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or (ii) an order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within fourteen (14) days after entry thereof;

(i)  by written notice from Purchaser, if Seller is in material default (after giving effect to all applicable cure periods) under the DIP Financing, if such notice is delivered while the default remains uncured or unwaived;

(j)  by written notice of either Seller or Purchaser, if, under Section 363(k) of the Bankruptcy Code, Purchaser is disallowed from credit bidding as set forth in Section 2.7(a) (or on such other terms as may be agreed by the Parties) in payment of the Purchase Price;

(k)  by Purchaser according to the terms of Section 2.14 or by Purchaser if the ESOP Approval is not received by April 25, 2019.

(l)  In the event of a termination of this Agreement by Purchaser or Seller, or both, pursuant to this Section 12.1, (a) the Party desiring to terminate this Agreement (other than pursuant to Section 12.1(a)) shall give written notice of such termination to the other Parties in accordance with Section 13.1, specifying the provision hereof pursuant to which such termination is made, and (b) except as set forth in Section 12.2, this Agreement shall thereupon terminate and become void and of no further force or effect, and the consummation of the Transactions shall be abandoned without further action of the parties hereto. Any termination of this Agreement by Purchaser or Seller, or both, pursuant to this Section 12.1 shall be effective on the date that written notice of such termination is given by the terminating Party to the other Parties hereto.

Section 12.2  Effect of Termination.

(a)  If this Agreement is validly terminated as provided herein, such termination shall be without liability of any Party (or any stockholder, director, officer, employee, agent, consultant or representative of such Party) to the other Party to this Agreement except as expressly set forth below in this Section 12.2. The provisions of Section 7.4(b), Article 11, Section 12.1, this Section 12.2, and Article 13 shall survive any termination of this Agreement and shall remain in full force and effect.

(b)  If this Agreement is terminated pursuant to Section 12.1 (other than pursuant to Section 12.1(f)) then Purchaser shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Deposit Escrow Account.

-44-

(c)     Subject to the terms and conditions set forth in Section 7.4(b)(iii), if this Agreement is terminated pursuant to Section 12.1(g), in addition to Purchaser's right to receive the Deposit pursuant to Section 12.2(b), Purchaser shall also be entitled to payment from Seller of the Breakup Fee, within three (3) Business Days following the closing of such sale to the third party. The Parties acknowledge and agree that if this Agreement is terminated as contemplated by Section 12.1(g), the actual damages incurred by Purchaser will be difficult, if not impossible, to ascertain and accordingly, the Parties have provided for the liquidated damages provided above. This provision shall not be construed as a penalty, but as a bonafide attempt to establish an agreed upon measure of damages which Purchaser will suffer as a result of such termination of this Agreement.

(d)     If this Agreement is terminated pursuant to Section 12.1(f), then Seller shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Deposit Escrow Account.

(e)     Notwithstanding the foregoing in this Section 12.2, the Escrow Agent shall not disburse the Deposit until the earlier to occur of (i) receipt by the Escrow Agent of joint written instructions, signed by Seller and Purchaser, or (ii) entry of a final and unappealable adjudication of the Bankruptcy Court determining which Party is entitled to receive the Deposit. In the event of a dispute between Seller and Purchaser with respect to the Deposit, the Escrow Agent may deposit the Deposit with the Bankruptcy Court and commence an action to determine the proper disposition of such Deposit.

## ARTICLE 13

## MISCELLANEOUS

Section 13.1    Notices.    All notices, requests and other communications to any Party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Purchaser, to:

Sheridan Dexter, Inc.
3323 Oak Street
Brainerd, MN 56401
Facsimile: 218-829-7145
Attention: Brianna Blazek, General Counsel

with a copy to (which shall not constitute notice):

Gray Plant Mooty
1010 W. St. Germain, Suite 500
Saint Cloud, MN 56301
Facsimile: 320-654-4101
Attention: Aaron J. Crandall

45

if to Seller, to:

Thomson-Shore, Inc.
7300 Joy Rd.
Dexter, MI 48130
Attention: Peter Shima

with a copy (which shall not constitute notice) to:

Mark J. Eby
Eby, Conner, Smillie & Bourque, PLLC
301 N Main St. Second Floor
Ann Arbor, MI 48104
Facsimile: 734-994-0206

All such notices, requests and other communications shall be deemed received (i) when delivered personally to the recipient, (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) one (1) Business Day after being sent to the recipient by facsimile transmission or electronic mail, or (iv) four (4) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth above. Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

Section 13.2   Waivers.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative.

Section 13.3   Binding Effect; Assignment.   This Agreement shall be binding upon Purchaser and, subject to entry of the Bidding Procedures Order (with respect to the matters covered thereby) and the Approval Order, Seller, and inure to the benefit of the parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Chapter 11 case or any successor Chapter 7 case. No assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or Purchaser (by operation of Law or otherwise) without the prior written consent of the other Party hereto and any attempted assignment without the required consents shall be void; provided, however, that Purchaser may assign all or any portion of its rights and obligations under this Agreement (as the same may be amended at any time) to one or more Affiliates of Purchaser.

Section 13.4   Governing Law.   This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Michigan and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

QB\812-0732-3017.v13

19-44343-tjt   Doc 15-2   Filed 03/25/19   Entered 03/25/19 14:41:31   Page 51 of 76

Section 13.5  Jurisdiction.

(a)  Prior to the closing of the Bankruptcy Case, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Each Party agrees that service of process on such Party as provided in Section 13.1 shall be deemed effective service of process on such Party.

(b)  After the closing of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any state or federal court located in the Eastern District of Michigan, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Each Party agrees that service of process on such Party as provided in Section 13.1 shall be deemed effective service of process on such Party.

Section 13.6  Waiver of Jury Trial.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

Section 13.7  No Third Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and, except as set forth in Section 10.3(c), nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable rights hereunder.

Section 13.8  Entire Agreement; Amendments; Counterparts.  This Agreement (including the Schedules and Exhibits hereto), the Deposit Escrow Agreement and the Confidentiality Agreement set forth the entire agreement among the Parties with respect to the subject matter hereof. This Agreement (including the Schedules and Exhibits hereto) may be amended only by a writing executed by Purchaser and Seller. This Agreement may be executed in counterparts, each of which when taken together shall constitute an original. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.

Section 13.9  Headings.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

47

Section 13.10 <u>Joint Drafting</u>. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

Section 13.11 <u>Expenses</u>. Except as otherwise set forth expressly herein, all costs and expenses incurred in connection with this Agreement or the Transactions shall be paid by the Party incurring such cost or expense.

Section 13.12 <u>Injunctive Relief</u>. The Parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by the Parties, and, accordingly, each Party shall be entitled to injunctive relief with respect to any such breach by the other Parties, including specific performance of such covenants, promises or agreements or an order enjoining the other Parties from any threatened, or from continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement by such Parties, all without the necessity of providing the inadequacy of money damages as a remedy and without the necessity of posting bond. The rights set forth in this <u>Section 13.12</u> shall be in addition to any other rights which Seller or Purchaser may have at Law or in equity pursuant to this Agreement.

Section 13.13 <u>Disclosure Schedules</u>. The Parties acknowledge and agree that (i) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Purchaser and (ii) the disclosure by Seller of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Seller that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Sheridan Dexter, Inc., a Minnesota corporation

By: _____
    Name: Christopher J. Kurtzman
    Title: Chief Executive Officer


THOMSON-SHORE, INC., a Michigan corporation

By: _____
    Name: Peter Shima
    Title: Chief Executive Officer

*[Signature Page to Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Sheridan Dexter, Inc., a Minnesota corporation

By: _____

Name: Christopher J. Kurtzman
Title: Chief Executive Officer

THOMSON-SHORE, INC., a Michigan corporation

By: _____

Name: Peter Shima
Title: Chief Executive Officer

*[Signature Page to Asset Purchase Agreement]*

## Exhibit A

### *Statement of Specified Matters*

See attached.

**Specified Matters Target**      1/31/19

Accounts Receivable
| | |
|---|---|
| Accounts Receivable | 3,094,212 |
| Allowance for Doubtful Accts | (130,000) |
| SBC Revenue Accrual | 9,368 |

Inventory
| | |
|---|---|
| Inventory | 1,667,532 |

Prepaids
| | |
|---|---|
| Deposits | 30,614 |
| Prepaid Expenses | 110,681 |
| Prepaid Insurance | 40,450 |
| Prepaid Technology | 7,105 |

Minus Employee Payments
| | |
|---|---|
| Vacation Payable | (23,139) |
| Reduction in Pay | - |
| Sales Bonus | . |

Minus Customer Obligations
| | |
|---|---|
| A/R Customer Deposits | (900,189) |
| Sales Discounts | (2,925) |

**Target Specified Matters**      3,903,709

## Exhibit B

### *Bill of Sale*

See attached.

## BILL OF SALE

THIS BILL OF SALE (this "Bill of Sale") is made on this ____ day of _____ 2019, by and between Sheridan-Dexter, Inc. ("Assignee") and Thomson-Shore, Inc. ("Assignor").

WHEREAS, this Bill of Sale is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of March 25, 2019 (the "Asset Purchase Agreement"), by and among Sheridan Dexter, Inc. ("Purchaser") and Thomson-Shore, Inc. ("Seller"), pursuant to which, among other things, Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignor, the Purchased Assets; and

WHEREAS, the United States Bankruptcy Court for the Eastern District of Michigan presiding over Seller's bankruptcy case entered into the Approval Order approving and authorizing the sale of the Purchased Assets to Assignee on the terms and conditions set forth in the Asset Purchase Agreement.

NOW, THEREFORE, pursuant to the Asset Purchase Agreement and in consideration of the mutual promises it contains, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## TRANSFER

1.      Defined Terms. Capitalized terms used herein but not otherwise defined in this Bill of Sale shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

2.      Transfer of Purchased Assets. Subject to the terms and conditions of the Asset Purchase Agreement, Assignor does hereby sell, transfer, assign, convey and deliver to Assignee, and Assignee does hereby purchase, acquire and accept from Assignor, all of Assignor's right, title and interest in, to and under all of the Purchased Assets identified on Exhibit A attached hereto, free and clear of all Liens, other than Permitted Liens.

3.      Excluded Assets and Excluded Liabilities. Notwithstanding anything in this Bill of Sale to the contrary, Assignor is retaining ownership and possession of, and is not selling, transferring, assigning, conveying or delivering to Assignee hereunder or otherwise, any right, title or interest, legal or equitable, of Assignor in, to or under any of the Excluded Assets or the Excluded Liabilities, and Assignee shall not assume (and shall not be deemed to have assumed) or otherwise be liable in respect of, or responsible for, any of the Excluded Assets or the Excluded Liabilities.

4.      Asset Purchase Agreement Controls. This Bill of Sale is in all respects subject to the provisions of the Asset Purchase Agreement and nothing in this Bill of Sale shall be deemed to supersede, enlarge or modify any provision of the Asset Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale as provided in and subject to the limitations set forth in the Asset Purchase Agreement. In the event of any conflict between the terms and

conditions of this Bill of Sale and the terms and conditions of the Asset Purchase Agreement, the terms and conditions of the Asset Purchase Agreement shall supersede, govern and control.

5.     Governing Law.  This Bill of Sale is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the state of Michigan shall govern, without giving effect to the choice of law principles thereof (except for any laws of that state which would render such choice of law in effect), including all matters of construction validity and performance.

6.     Further Assurances.  Assignor hereby covenants that, at any time or from time to time after the date hereof, and without further consideration, Assignor will take all further actions and execute and deliver all further documents as Assignee may reasonably request to sell, transfer, convey, assign, and deliver to Assignee and to confirm their right, title and interest in, to and under the Purchased Assets, and to put Assignee in actual possession of such rights, title and interest in, to and under the Purchased Assets and to assist Assignee in exercising all rights with respect thereto.

7.     Successors and Assigns.  This Bill of Sale and the covenants and agreements contained herein shall inure to the benefit of and be binding upon the respective parties hereto and their respective successors and permitted assigns.

8.     Closing Date.  This Bill of Sale is to be effective as of the Closing Date.

9.     Counterparts.  This Bill of Sale may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

10.     Amendment and Waiver.  This Bill of Sale may not be amended or modified in any manner other than by an agreement in writing signed by the parties hereto or their respective successors or permitted assigns. No waiver under this Bill of Sale shall be valid or binding unless set forth in a writing duly executed and delivered by the party against whom enforcement of such waiver is sought. Neither the waiver by any of the parties of a breach or default under any of the provisions of this Bill of Sale, nor the failure by any of the parties, on one or more occasions, to enforce any of the provisions of this Bill of Sale or to exercise any right or privilege hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.

11.     Notices.  Any notice given pursuant to this Bill of Sale shall be given in the same manner as stated in Section 13.1 of the Asset Purchase Agreement.

*[Signature Page Follows]*

2

GP:4817-1335-1317 v1

IN WITNESS WHEREOF, the undersigned parties have caused this Bill of Sale to be executed and delivered as of the date first above written.

ASSIGNEE:

SHERIDAN DEXTER, INC.

By: _____
    Name: Christopher J. Kurtzman
    Title:  Chief Executive Officer

ASSIGNOR:

THOMSON-SHORE, INC.

By: _____
    Name: Peter Shima
    Title:  Chief Executive Officer

# EXHIBIT A

## PURCHASED ASSETS

See attached.

## Exhibit C

*Assignment and Assumption Agreement*

See attached.

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is made on this ___ day of _____ 2019, by and between Sheridan-Dexter, Inc. ("Assignee"), and Thomson-Shore, Inc. ("Assignor").

WHEREAS, this Assignment is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of March 25, 2019 (the "Asset Purchase Agreement"), by and among Sheridan Dexter, Inc. ("Purchaser") and Thomson-Shore, Inc. ("Seller"), pursuant to which, among other things, Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignor, the Assumed Contracts;

WHEREAS, this Assignment, as duly executed by Assignee and Assignor, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing; and

WHEREAS, all capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assignment and Assumption.  Subject to the terms and conditions of the Asset Purchase Agreement, Assignor does hereby sell, assign, transfer, convey and deliver to Assignee, its successors and assigns, and Assignee, its successors and assigns, do hereby purchase, acquire and accept from Assignor, all of the right, title and interest of Assignor in, to and under the Assumed Contracts free and clear of all Liens, other than Permitted Liens. Notwithstanding the foregoing, nothing in this Assignment shall constitute or be construed as selling, assigning, transferring, conveying or delivering to Assignee, and Assignee shall not purchase, acquire or accept hereby, any right, title or interest to or in any of the Excluded Assets or any Excluded Contract, and Assignee shall not assume (and shall not be deemed to have assumed) or otherwise be liable in respect of, or responsible for, any of the Excluded Liabilities.

2.    Terms of the Asset Purchase Agreement.  This Assignment is in all respects subject to the provisions of the Asset Purchase Agreement and is not intended in any way to supersede, limit, or qualify any provision of the Asset Purchase Agreement. In the event of any conflict between the terms and conditions of this Assignment and the terms and conditions of the Asset Purchase Agreement, the terms and conditions of the Asset Purchase Agreement shall supersede, govern and control.

QP:4828-6842-2413.v1

3.     <u>Governing Law</u>. This Assignment shall be construed and governed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of Michigan (without giving reference to the principles of conflicts of law).

4.     <u>Further Assurances</u>. The parties hereto agree to execute and deliver such further documentation, instruments and the like and to take such further action as is reasonably required to carry out the intentions or to facilitate the performance of the terms of this Assignment.

5.     <u>Successors and Assigns</u>. This Assignment and the covenants and agreements contained herein shall inure to the benefit of and be binding upon the respective parties hereto and their respective successors and permitted assigns.

6.     <u>Counterparts</u>. This Assignment may be executed in any number of counterparts, all of which, taken together, shall constitute one document. Counterparts of this Assignment (or applicable signature pages hereof) that are manually signed and delivered by facsimile or other electronic transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

7.     <u>Modification</u>. This Assignment may only be modified by a written agreement duly signed by the parties hereto.

8.     <u>Severability</u>. The parties hereto agree that the assignment of each of the Assumed Contracts shall be construed as being separable and divisible from the assignment of every other Assumed Contract. The unenforceability or invalidity of this Assignment with respect to any one Assumed Contract shall not limit the enforceability or validity, in whole or in part, with respect to any other Assumed Contract.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned parties have caused this Assignment to be executed and delivered as of the date first above written.

ASSIGNEE:

SHERIDAN DEXTER, INC.

By: _____
Name: Christopher J. Kurtzman
Title: Chief Executive Officer

ASSIGNOR:

THOMSON-SHORE, INC.

By: _____
Name: Peter Shima
Title: Chief Executive Officer

*[Signature Page to Assignment and Assumption Agreement]*

## Exhibit D

### *Intellectual Property Assignment*

See attached.

## IP ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS IP ASSIGNMENT AND ASSUMPTION AGREEMENT (this "IP Assignment") is made on this _____ day of _____ 2019, by and between Sheridan-Dexter, Inc. ("Assignee"), and Thomson-Shore, Inc. ("Assignor").

WHEREAS, this IP Assignment is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of March 25, 2019 (the "Asset Purchase Agreement"), by and among Sheridan Dexter, Inc. ("Purchaser") and Thomson-Shore, Inc. ("Seller"), pursuant to which, among other things, Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignor, including, without limitation, the Intellectual Property Rights (collectively, the "Assigned IP"), along with the goodwill of the business associated therewith; and

WHEREAS, Assignee desires to acquire Assignor's entire right, title and interest in, to and under the Assigned IP.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below and in the Asset Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Assignment. Subject to the terms and conditions of the Asset Purchase Agreement, Assignor does hereby irrevocably and unconditionally sell, assign, transfer, deliver, and convey to Assignee, and Assignee does hereby purchase, acquire and accept from Assignor, all of Assignor's right, title and interest in, to and under the Assigned IP, including, without limitation, the Assigned IP set forth on Exhibit A hereto and the goodwill and all rights associated therewith, and all other corresponding rights that are or may be secured under the laws of the United States, any jurisdiction thereof, any foreign country or any multinational jurisdiction now or hereafter in effort, the same to be held by Assignee for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors and assigns and other legal representatives, together with all rights to income, royalties and license fees deriving from the Intellectual Property, all claims for damages by reason of past, present and future infringements or unauthorized uses of the Intellectual Property and the right to sue for and collect such damages, as permitted under the applicable laws of any jurisdiction or country in which such claims may be asserted for the use and benefit of Assignee and each of Assignee's successors, assigns and other legal representatives. The foregoing assignment includes the right of priority to file and prosecute corresponding applications for any Intellectual Property in the Assigned IP in any and all jurisdictions through the world, the rights to all patents which may be granted from any patent applications in the Assigned IP, and the rights to any divisionals, renewals, continuations, continuations-in-part, reissues, reexaminations, and extensions with respect to any patents or patent applications in the Assigned IP. To the extent any intent-to-use applications for trademarks are included in the Assigned IP, such intent-to-use applications are being assigned as part of the entire business or

CP:4844-7231-6813 v1

portion thereof to which the mark pertains, as required by Section 10 of the Trademark Act, 15 U.S.C. 1060.

2.    Waiver of Moral Rights.  To the full extent permissible under applicable law, Assignor hereby irrevocably and unconditionally assigns to Assignee and waives and agrees never to assert or enforce any Moral Rights (as defined below) in or with respect to any and all of the Assigned IP that may exist anywhere in the world, together with all claims for damages and other remedies asserted on the basis of Moral Rights. "Moral Rights" means any right to claim authorship to or to object to any distortion, mutilation, or other modification or other derogatory action in relation to a work, whether or not such action would be prejudicial to the author's reputation, and any similar right, existing under common or statutory law of any country in the world or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right."

3.    Delivery of Assigned IP Documents.  Assignor shall, not later than five (5) days after the Effective Date, deliver to Assignee all Assigned IP Documents. For purposes of this IP Assignment, "Assigned IP Documents" means all documents, records, and files in the possession or control of Assignor or their counsel or agents relating to the Assigned IP, including, without limitation: (i) original patent or trademark applications for the Assigned IP; (ii) complete prosecution files and docketing reports, including materials filed or prepared for the purpose of being filed with the United States Patent and Trademark Office or similar authority in any other jurisdiction; (iii) originals of all assignment agreements in its possession relating to the Assigned IP; (iv) copies of laboratory notebooks, documents, records, and files relating to the conception or reduction to practice of the claims made in the Assigned IP; (v) copies of documents, records, and files relating to any marking activities or the assertion, licensing, enforcement or defense of the Assigned IP; and (vi) copies of any other materials or information in the possession or control of, or known to, Assignor, their counsel, or their agents that is reasonably likely to be required to be produced in any litigation to enforce the Assigned IP; but with respect to all of the foregoing, specifically excluding any attorney-client or work-product privileged information.

4.    Delivery of Domain Name Credentials.  Assignor shall, not later than five (5) days after the Closing Date, deliver to Assignee all account information, contact information, passwords, or other access and control credentials for the domain names included in the Assigned IP.

5.    Assistance.  Assignor further agrees that should additional or further documentation of the foregoing assignment or further acts be required to protect, secure, vest, and record good title to the Assigned IP in Assignee, Assignor will execute such other documents or take such further acts as may be reasonably necessary upon Assignee's reasonable request.

6.    Recordation.  On the Closing Date, Assignor shall deliver to Assignee duly executed short-form assignments in the form set forth on Exhibit B attached hereto with respect to the trademarks included in the Assigned IP and Assignor hereby authorizes and requests the

2

Commissioner for Trademarks of the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign countries, to record Assignee as the owner and assignee of the Assigned IP registered in the corresponding jurisdiction.

    7.    Relation to Asset Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern and control.

    8.    General

    a.    Severability; Amendment. Any provision in this IP Assignment which is illegal, invalid or unenforceable shall be ineffective to the extent of such illegality, invalidity or unenforceability, without affecting in any way the remaining provisions hereof. This IP Assignment may not be amended except by execution and delivery of an instrument in writing signed by officers of the parties hereto.

    b.    Entire Agreement; No Third Party Beneficiaries. The Asset Purchase Agreement and this IP Assignment, including the Exhibits and other documents attached or referred to therein or herein, which form a part hereof, embodies the entire agreement and understanding of the parties hereto, and supersedes all prior or contemporaneous agreements or understandings (whether written or oral) among the parties hereto, in respect to the subject matter contained herein. This IP Assignment and the obligations hereunder are not intended to confer any rights or remedies to any third party and are not intended to operate, in anyway, as an agreement for the benefit of any third party.

    c.    Successors and Assigns. This IP Assignment shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns. This IP Assignment and the rights and obligations hereunder shall not be assignable by Assignor without the prior written consent of Assignee, and any such purported assignment without such consent shall be void. This IP Assignment and the rights and obligations hereunder shall be assignable by Assignee without the written consent of Assignor.

    d.    Governing Law. This IP Assignment shall be governed and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of Michigan (without giving effect to the principles of conflicts of law).

    e.    Defined Terms. All capitalized terms not defined herein shall have the meaning assigned to them in the Asset Purchase Agreement.

    f.    Counterparts. This IP Assignment may be executed in any number of counterparts, all of which, taken together, shall constitute one document. Counterparts of this IP Assignment (or applicable signature pages hereof) that are manually singed and delivered by

facsimile or other electronic transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

g.    Notices. Any notices to be delivered in connection with this IP Assignment shall be made in accordance with Section 13.1 of the Asset Purchase Agreement.

*[Signature Page Follows]*

4

**IN WITNESS WHEREOF**, the undersigned parties have caused this Assignment to be executed and delivered as of the date first above written.

ASSIGNEE:

SHERIDAN DEXTER, INC.

By: _____
Name: Christopher J. Kurtzman
Title: Chief Executive Officer

ASSIGNOR:

THOMSON-SHORE, INC.

By: _____
Name: Peter Shima
Title: Chief Executive Officer

*[Signature Page to IP Assignment and Assumption Agreement]*

# EXHIBIT A

## ASSIGNED IP

See attached.

# EXHIBIT B

## SHORT FORM TRADEMARK ASSIGNMENT

See attached.

## TRADEMARK ASSIGNMENT

This Trademark Assignment (the "Assignment") is made effective _____, 2019, by Thomson-Shore, Inc., a Michigan corporation having an address of 7300 W. Joy Road, Dexter, Michigan 48130 ("Assignor"), in favor of Sheridan Dexter, Inc., a Minnesota corporation having an address of 3323 Oak Street, Brainerd, Minnesota 56401 ("Assignee").

## RECITALS

WHEREAS, Assignor is the owner of the marks set forth in Exhibit A attached hereto (the "Marks");

WHEREAS, Assignor has assigned to Assignee all rights in the Marks, together with the good will of the business associated with the Marks, pursuant to a separate IP Assignment and Assumption Agreement dated _____, 2019 (the "Agreement"); and

WHEREAS, the purpose of this Assignment is for recordation with the United States Patent and Trademark Office to effect assignment of all U.S. registrations and applications of Assignor with respect to the Marks.

NOW, THEREFORE, in exchange for good and valuable consideration described in the Agreement, Assignor hereby assigns and transfers to Assignee, Assignor's entire right, title and interest in and to the Marks, together with the goodwill of the business associated with the Marks, for the United States and for all foreign countries, including any registration, renewals or extensions thereof that are or may be secured under the laws of the United States or foreign countries now or hereafter in effect and including the subject matter of all claims which may be obtained therefrom for its own use and enjoyment, and for the use and enjoyment of its successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment and sale had not been made; together with all income, royalties or payments due or payable as of the effective date of this Assignment or thereafter, including all claims for damages by reason of past, present or future infringement or other unauthorized use, with the right to sue for, and collect the same for its own use and enjoyment, and for the use and enjoyment of its successors, assigns, or other legal representatives.


THOMSON-SHORE, INC.

By: _____

Name: Peter Shima

Title: Chief Executive Officer

Exhibit A

Registered Trademarks

| Mark | U.S. Reg. No. | Post-Separation Ownership | Description of Product or No. Service Associated with Mark |
|------|---------------|---------------------------|------------------------------------------------------------|
| **THOMSON-SHORE HELPING YOU PUT YOUR BEST BOOK FORWARD** | 3515626 | Sheridan-Dexter, Inc. | Bindery services for others, namely, collating, folding, stapling, perforating, cutting and binding of printed, photocopied and typewritten materials; Design printing for others; Lithographic printing; Paper finishing; Pattern printing; Photocomposing services; Photographic printing; Printing; Printing of books; Typesetting. |
| HELPING YOU PUT YOUR BEST BOOK FORWARD | 3837684 | Sheridan-Dexter, Inc. | Bindery services for others, namely, collating, folding, stapling, perforating, cutting and binding of printed, photocopied and typewritten materials; Design printing for others; Lithographic printing; Paper finishing; Pattern printing; Photocomposing services; Photographic printing; Printing; Printing of books; Typesetting. |